# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:16-CR-212** |
| | : | |
| **v.** | : | **(Chief Judge Conner)** |
| | : | |
| **KEVIN COLES,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Defendant Kevin Coles moves the court to suppress evidence resulting from his detention and arrest on July 7, 2016, and statements made during an August 11, 2016 interrogation. (Docs. 67, 69). Coles also seeks to suppress all evidence gathered during execution of a search warrant at a residence located in Chambersburg, Pennsylvania. (Doc. 100). The court will grant in part and deny in part Coles' motions.

## I. Factual Background[1]

Authorities in Franklin County, Pennsylvania, began investigating a drug-related triple homicide in late June of 2016. (See Docs. 105, 117). In furtherance of that investigation, on June 29, 2016, authorities applied for an order authorizing disclosure of mobile communication information for a cell phone believed to belong to defendant Kevin Coles ("Coles"). (See Doc. 117). Pennsylvania State Police

---

[1] The above factual narrative derives from testimonial and documentary evidence adduced during two suppression hearings in this matter, together with several exhibits attached to the parties' extensive briefing. The court reporter has provided the court with transcripts of both suppression hearings. Citations thereto are abbreviated as "7/18/17 Hr'g Tr." and "8/17/17 Hr'g Tr.," respectively. Exhibits admitted during the first suppression hearing are cited as "7/18/17 Hr'g Gov't Ex." and "7/18/17 Hr'g Def. Ex.," respectively.

Trooper Jeffrey Baney described the ongoing investigation in detail and indicated his belief that Coles' cell phone may obtain information relevant to same. (See id.) On June 30, 2016, Franklin County Court of Common Pleas Judge Angela R. Krom granted the application, expressly finding "that there is probable cause to believe that information relevant to an ongoing criminal investigation . . . will be obtained" from Coles' cell phone. (Doc. 99-1 at 1). The order stated that its authorization "shall be without geographic limitations as long as the results of the disclosure . . . are monitored within the jurisdiction of the court." (Id. at 5).

Pennsylvania State Police Trooper Neal Navitsky ("Trooper Navitsky") monitored Coles' cell phone in accordance with Judge Krom's order. (8/17/17 Hr'g Tr. 42:14-16, 43:11-15). Cell site location information revealed that, on July 7, 2016, Coles was near a Days Inn in Hagerstown, Maryland. (Id. at 44:18-45:5). Trooper Navitsky relayed Coles' location to the Maryland State Police fugitive apprehension team. (7/18/17 Hr'g Tr. 7:1-12; 8/17/17 Hr'g Tr. 44:18-45:5). At the time, Maryland authorities were aware that a bench warrant for Coles' arrest had been issued in New York state on July 30, 2015. (7/18/17 Hr'g Tr. 10:20-12:19; see 7/18/17 Hr'g Gov't Ex. 1). A National Crime Information Center ("NCIC") printout listed the warrant under the phrase "FULL EXTRADITION," but directed authorities to contact the originating agency to confirm both the warrant and the authorization for extradition. (Doc. 79-1; see 7/18/17 Hr'g Tr. 26:2-24). The printout stated that Coles was wanted for second degree arson. (Doc. 79-1; see also 7/18/17 Hr'g Tr. 26:13-17). Detective Jesse Duffy ("Detective Duffy"), a member of the Hagerstown Police Department, testified that dispatch confirmed the warrant with New York state

authorities and advised field officers "that full extradition was authorized." (7/18/17 Hr'g Tr. 5:23-6:1, 11:17-13:5, 20:20-21:12, 26:18-27:2).

The Maryland State Police fugitive apprehension team coordinated with Hagerstown police to arrest Coles. (See 7/18/17 Hr'g Tr. 7:1-12). The team gathered outside of the Days Inn in Hagerstown and prepared to make contact with Coles in his hotel room. (Id. at 7:1-12, 18:22-19:4). Before officers could execute their plan, they observed Coles exiting the hotel with a large white trash bag which "appeared to be pretty full of items." (Id. at 7:16-17, 8:1-9). Coles waited underneath the hotel portico for "several minutes" until a silver Chevrolet Equinox pulled up, at which point Coles walked immediately to the vehicle and entered the rear passenger side. (Id. at 8:5-22). When the vehicle began to exit the portico, the apprehension team surrounded it with guns drawn, directed its occupants to keep their hands in the air, and ordered Coles to exit the vehicle. (Id. at 8:14-9:2).

Officers removed Coles from the vehicle and brought him to the ground, whereupon he was handcuffed and secured. (Id. at 9:22-10:1). A white Motorola cell phone fell to the ground when Coles exited the vehicle. (Id. at 9:3-16). During a search of Coles' person following the arrest, authorities recovered a black Kyocera cell phone. (Id. at 10:2-11). Authorities also observed a ZTE cell phone on the rear passenger seat of the vehicle. (Id. at 10:12-17). Coles was placed into custody, and he has remained in custody since that time. (See 7/18/17 Hr'g Tr. 49:2-8; 8/17/17 Hr'g Tr. 6:6-10).

Detective Duffy applied to the Circuit Court of Washington County,

Maryland, for a search warrant for the Chevrolet Equinox. (7/18/17 Hr'g Tr. 13:6-

21). In his affidavit in support of the warrant application, Detective Duffy described

the underlying homicide investigation and Coles' association with the victims. (See

7/18/17 Hr'g Gov't Ex. 2 at 6-7). Detective Duffy stated, in pertinent part:

> It was learned that Coles had an active bench warrant out
> of New York State for a probation violation concerning an
> attempted homicide. On July 7, 2016, Coles was located at
> the Days Inn Motel in Hagerstown, Maryland. Coles was
> observed exiting the Days Inn Motel carrying a white bag.
> Coles was under constant surveillance from the time he
> exited the motel to the time he entered the aforementioned
> vehicle. Coles got into a silver in color, 2014 Chevrolet
> Equinox bearing MD registration 1BT1827 which was
> subsequently stopped due to the outstanding warrant.
> Coles was taken into custody at this time for the warrant.
> There were four other occupants in the car. The vehicle
> was secured and towed to Hagerstown Police Department
> (HPD) impound lot.
>
> One of the occupants in the vehicle related she had just
> met Coles about one week prior and observed Coles in
> possession of a gun on his person 2-3 times. She further
> advised that at approximately 0030 hours (07/07/16), they
> were in the aforementioned vehicle when they were
> encountered by HPD responding to a call for a suspicious
> vehicle. Coles provided a false name of Curtis Smith to
> HPD. As the HPD officer was running the name, Coles
> fled from the vehicle on foot. A foot pursuit ensued for
> two blocks; however Coles got away.
>
> Upon taking Coles into custody, a search incident to arrest
> of his person was conducted with negative results for a
> weapon. Coles also did not have the white bag on his
> person. The Days Inn Motel room that Coles had been
> in was searched with negative results for a weapon.

(Id. at 7). A magisterial district judge approved Detective Duffy's application, and

authorities executed the warrant on July 7, 2016. (7/18/17 Hr'g Tr. 13:12-14:5; see

also 7/18/17 Hr'g Gov't Ex. 2 at 1-2). Authorities recovered, *inter alia*, several cell phones, a tablet, a plastic bag containing suspected heroin, and a white trash bag containing clothing. (7/18/17 Hr'g Tr. 14:1-15; see also 7/18/17 Hr'g Gov't Ex. 2 at 10).

Later that same day, Pennsylvania State Police Trooper Antwjuan Cox ("Trooper Cox") traveled to the Hagerstown Police Department to interview Coles. (See 7/18/17 Hr'g Tr. 49:2-17). Trooper Cox advised Coles of his Miranda rights. (7/18/17 Hr'g Def. Ex. 102 at 1; see 7/18/17 Hr'g Tr. 56:16-57:8). Coles replied that he would listen to what Trooper Cox had to say before determining if he wanted to have an attorney present. (7/18/17 Hr'g Def. Ex. 102 at 1; see 7/18/17 Hr'g Tr. 56:16-57:8). Trooper Cox indicated that he wished to speak with Coles about the homicide in Franklin County. (7/18/17 Hr'g Tr. 67:22-24). After some preliminary inquiries, Coles stated that he was uncomfortable with Trooper Cox's questions and expressly requested an attorney. (7/18/17 Hr'g Def. Ex. 102 at 1; see 7/18/17 Hr'g Tr. 56:16-57:8). Trooper Cox reported that questioning ceased as soon as Coles requested counsel. (7/18/17 Hr'g Def. Ex. 102 at 1-2; 7/18/17 Hr'g Tr. 57:6-8).

Trooper Cox and Drug Enforcement Agency Special Agent Keith T. Kierzkowski ("Agent Kierzkowski") traveled to Franklin County Jail to interview Courtney Smith ("Smith"), a target of a narcotics investigation and associate of Coles, on July 21, 2016. (Doc. 105 at 3). Smith admitted distributing heroin and crack cocaine from her apartment at 142 Lincoln Way West in Chambersburg, Pennsylvania with Coles and others. (Id.) Smith reported to Trooper Cox and Agent Kierzkowski that she believed Coles continued to use the apartment to

distribute heroin while she was incarcerated.[2]  (Id.)  At the end of the interview,

Smith executed a Pennsylvania State Police Consent to Search form for her

apartment at 142 Lincoln Way West.  (See Doc. 112-1; see also Doc. 105 at 3).

Pennsylvania State Police Troopers Paul M. Decker ("Trooper Decker")

and Richard Kline performed the consent search at 142 Lincoln Way West on July

21, 2016.  (Doc. 105 at 4).  The officers observed the apartment door to be "hanging

open" upon arrival.  (Id.)  The officers also observed that the hallway carpet had

been removed, the hallway walls were freshly painted, and painting supplies were

lying in the hallway.  (Id.)  In the bedroom, officers discovered materials consistent

with evidence recovered from the homicide scene.  (Id.)  Based on this information,

Trooper Decker applied for and received a warrant to search the apartment.  (See

id. at 1).  During execution of the warrant, authorities seized the painting and

cleaning supplies as well as suspected drugs.  (Id. at 6).

Coles was brought to the Hagerstown Police Department for additional

questioning by Trooper Cox and Agent Kierzkowski on August 11, 2016.  (7/18/17

Hr'g Tr. 29:21-30:2).  Trooper Cox advised Agent Kierzkowski before the interview

that Coles had requested counsel on July 7, 2016.  (See 7/18/17 Hr'g Tr. 53:3-12).

Trooper Cox met with Coles first to explain Agent Kierzkowski's role; during that

meeting, Trooper Cox observed to Coles that "you kinda shut me down" during our

last meeting.  (See 7/18/17 Hr'g Def. Ex. 106 at 9:34:58-9:35:17).  Agent Kierzkowski

---

[2] Coles confirmed during the second suppression hearing that he spent
the night at Smith's apartment on an unknown number of occasions following her
arrest.  (See 8/17/17 Hr'g Tr. 11:24-13:23, 32:15-33:15).  Coles claimed to have
completed some "projects," including painting and removing carpet, while at the
apartment.  (Id. at 15:9-21, 32:15-33:15).

then joined Trooper Cox and showed Coles a copy of the indictment returned against him in this case. (See 7/18/17 Hr'g Tr. 30:7-8).

As Trooper Cox began reading Coles his <u>Miranda</u> rights, Coles interrupted and attempted to recite the rights himself. (<u>Id.</u> at 30:12-31:14). Agent Kierzkowski explained to Coles that officers must themselves advise him of his rights, and Coles listened as Trooper Cox again read Coles his rights under <u>Miranda</u>. (<u>Id.</u> at 31:5-14). Coles did not explicitly waive his rights but proceeded to answer more than three hours' worth of questions concerning his involvement in drug trafficking and any knowledge he had with respect to the triple homicide. (<u>See</u> <u>generally</u> 7/18/17 Hr'g Def. Ex. 106). Only at the conclusion of the interview did Coles expressly renew his request for counsel. (<u>See</u> 7/18/17 Hr'g Tr. 32:9-33:1). Agent Kierzkowski then terminated the interview. (<u>Id.</u> at 32:25-33:1).

## II.    <u>Procedural History</u>

A federal grand jury returned a five-count indictment against Coles and codefendant Devin Dickerson on August 3, 2016. (Doc. 1). The indictment charges Coles in four counts, as follows: one count of conspiracy to distribute and possess with intent to distribute at least 100 grams of heroin and 28 grams of cocaine base in violation of 21 U.S.C. § 846 (Count 1); two counts of possession with intent to distribute heroin and cocaine base in violation of 21 U.S.C. § 841(a)(1) (Count 2 and Count 4); and one count of possession of a firearm during and in relation to a drug-trafficking offense in violation of 18 U.S.C. § 924(c)[3] (Count 5). Counts 2, 4, and 5

---

[3] The indictment cites to 21 U.S.C. § 924(c) as the statutory provision undergirding Count 5. The correct statutory provision is 18 U.S.C. § 924(c).

charge both substantive offenses and aiding and abetting offenses under 18 U.S.C.

§ 2. (Doc. 1). Count 5 further invokes co-conspirator liability pursuant to <u>Pinkerton</u>

<u>v. United States</u>, 328 U.S. 640 (1946). (Doc. 1). Coles pleaded not guilty to all counts.

(Doc. 21).

On June 23, 2017, Coles filed a motion (Doc. 67) to suppress statements

made during the July 7, 2016 and August 11, 2016 interviews and a motion (Doc.

69) to suppress all evidence from his allegedly unlawful detention and arrest on

July 7, 2016. In reply, the government indicated that it did not intend to introduce

statements from the July 7, 2016 interview, (<u>see</u> Doc. 79 at 3), and the court denied

that aspect of Coles' motion as moot. (<u>See</u> Doc. 92). Coles later moved to suppress

all evidence obtained from the warrant search of Smith's apartment on July 22,

2016. (Doc. 100). The court convened suppression hearings on July 18, 2017 and

August 17, 2017. (<u>See</u> Docs. 72, 111). The motions are fully briefed and ripe for

disposition.

## III. <u>Discussion</u>

Coles' motions raise manifold arguments seeking to suppress evidence from

his arrest, two subsequent searches, and a custodial interrogation. We begin with

Coles' claims concerning the cell phone tracking order from which all subsequent

law enforcement action flowed.

### A. **Cell Phone Tracking**

Coles contends that the warrantless use of cell site location information

("CSLI") is an "obvious" violation of the Fourth Amendment. (Doc. 94 at 8; <u>see</u>

<u>also</u> 8/17/17 Hr'g Tr. 49:21-50:17, 51:17-52:7). The court disagrees. In fact, the

Third Circuit Court of Appeals has previously considered and rejected a Fourth Amendment challenge to the warrantless use of cell site data. In <u>United States v. Stimler</u>, 864 F.3d 253 (3d Cir. 2017), the court reaffirmed that CSLI collection under the federal Stored Communications Act, 18 U.S.C. § 2703(d)—which requires only "reasonable grounds" to believe that relevant and material records will be obtained—does not implicate an individual's reasonable expectation of privacy. <u>Id.</u> at 266-67 (citing <u>*In re* Application of the United States for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to the Gov't</u>, 620 F.3d 304, 312-13 (3d Cir. 2010)). Accordingly, in the Third Circuit, CSLI collection does not trigger the Fourth Amendment's warrant requirement. <u>Id.</u>

Coles acknowledges this binding precedent but invites this court to reconsider it. (Doc. 94 at 8). He emphasizes that the Supreme Court recently granted *certiorari* review of a Sixth Circuit decision which employs a rationale similar to <u>Stimler</u>, thereby signaling that the Supreme Court is poised to overrule <u>Stimler</u> and its analogues. (<u>See</u> 8/17/17 Hr'g Tr. 50:10-17; <u>see also</u> <u>United States v. Carpenter</u>, 819 F.3d 880, 885-90 (6th Cir. 2016), <u>cert. granted</u>, 137 S. Ct. 2211 (2017). We decline Coles' invitation. We are bound to follow the current law of our circuit, which holds that CSLI tracking does not actuate the Fourth Amendment's warrant requirement. <u>See</u> <u>Stimler</u>, 864 F.3d at 266-67 (citing <u>*In re* Application</u>, 620 F.3d at 312-13).

Even if the Supreme Court were to adopt a more stringent probable cause requirement for CSLI tracking, the requirement would be satisfied *sub judice*. The tracking order in question issued under Pennsylvania's Wiretapping and Electronic

9

Surveillance Control Act, 18 Pa. Cons. Stat. § 5701 *et seq.*, not the Stored Communications Act, 18 U.S.C. § 2703(d). (Doc. 99-1 at 1). Before a tracking order may issue under Pennsylvania law, the applicant must demonstrate "probable cause to believe that information relevant to an ongoing criminal investigation will be obtained." 18 Pa. Cons. Stat. § 5773(a). The state trial court judge who issued the order expressly found that the application satisfied the state's probable cause requirement. (Doc. 99-1 at 1). Hence, even if the Supreme Court adopts a heightened probable cause standard in <u>Carpenter</u>, it will have no impact on our decision, and we will deny Coles' motion to the extent it oppugns the lawfulness of the cell phone tracking order.[4]

## B.    July 7, 2016 Arrest

Coles challenges several aspects of his July 7, 2016 arrest and the subsequent search. He asserts that officers did not have probable cause to arrest him; that they did not have reason to seek a warrant to search the vehicle Coles was traveling in; and that the affidavit of probable cause for the vehicle search warrant contained a materially false statement. We address these issues in turn.

### 1.    *Arrest Warrant for Coles*

Coles contends that the government did not have probable cause to arrest him on July 7, 2016. (Doc. 70 at 2-3; Doc. 94 at 1-3). He asseverates that the NCIC

---

[4] We note that Coles has also implied in various court filings and proceedings that authorities exceeded the scope of the tracking order. (Doc. 110; 8/17/17 Hr'g Tr. 43:19-46:5). During the second suppression hearing, defense counsel articulated that Coles disputes not whether officers complied with the four corners of the order, but only the constitutionality of the order in the first instance. (8/17/17 Hr'g Tr. 51:17-52:7).

printout submitted by the government does not establish that the New York state bench warrant was extraditable, and that no officer present at the scene on July 7, 2016 had a copy of the New York warrant in their possession. (Doc. 70 at 2-4; Doc. 94 at 1-3). He further asserts that, absent a valid arrest, the subsequent search of his person and the vehicle are unconstitutional. (<u>See</u> Doc. 70 at 2-4; Doc. 94 at 1-3).

The record developed during the suppression hearings flatly contradicts Coles' contentions. There is no dispute that a valid warrant for Coles' arrest was issued in New York state on July 30, 2015. (<u>See</u> 7/18/17 Hr'g Gov't Ex. 1). Coles conceded as much during the second suppression hearing. (<u>See</u> 8/17/17 Hr'g Tr. 24:4-12). That exchange proceeded as follows:

> Q: And your reason for using a false name when talking to the person who is renting the apartment to her?
>
> A: Because at that point in time I was a fugitive from New York. So I covered my name.
>
> Q: So you're confirming for us by your answer that when you were arrested on July 7, 2016, you were a fugitive from the state of New York because there was an active warrant for you, correct?
>
> A: I believe that's correct.

(<u>Id.</u>)

Coles remonstrates that the officers failed to confirm that the warrant was extraditable. (Doc. 94 at 1-2). The NCIC printout concerning the New York state warrant includes the phrase "FULL EXTRADITION" at the top of the page. (Doc. 79-1). Detective Duffy testified that dispatch confirmed the warrant with New York authorities and "that full extradition was authorized." (7/18/17 Hr'g Tr. 11:7-13:5,

20:20-21:12, 26:18-27:2).  Coles has not contradicted or discredited this evidence.  He cites no case law to support his intimation that an officer cannot rely on dispatch to confirm that a warrant is extraditable but must instead "personally" speak to the issuing agency.  (Doc. 94 at 1-2).  The court's research reveals no support for this proposition.

Coles also contends that his seizure was not supported by "particularized" probable cause because authorities had no reason to believe that the individual who entered the vehicle was in fact Coles.  (See Doc. 94 at 2-3).  He suggests that officers "pounced" on the vehicle based solely "on suspicion or a hunch, rather than factual evidence that he was in the car."  (Id.)  *Per contra*, Detective Duffy testified that the apprehension team knew Coles was at the hotel on the day in question based on location monitoring of his cell phone, and that they knew Coles was the person exiting the hotel based on a photograph provided to the officers.  (7/18/17 Hr'g Tr. 7:18-20, 16:20-23).  The record refutes Coles' claim that the arresting officers did not have particularized probable cause.

We find that the New York state bench warrant provided a valid basis for Coles' arrest on July 7, 2016.  We also find that, because authorities arrested Coles pursuant to a valid bench warrant, the search of his person incident to arrest was likewise lawful.  See Arizona v. Gant, 556 U.S. 332, 335 (2009) (quoting Chimel v. California, 395 U.S. 752, 763 (1969)); see also Michigan v. DeFillippo, 443 U.S. 31, 35 (1979) (citing United States v. Robinson, 414 U.S. 218, 235 (1973)).  The court will deny the motion to suppress evidence gathered during Coles' July 7, 2016 arrest.

## 2.    *Search Warrant for Vehicle*

Coles challenges the subsequent search of the Chevrolet Equinox on two grounds: he asserts first that police did not have "cause" to search the vehicle, and second that the application for the search warrant included a false statement knowingly made under Franks v. Delaware, 438 U.S. 154 (1978).  (See Doc. 94 at 3).  Because the Franks analysis encompasses a probable cause inquiry, we address these issues together.

A criminal defendant may challenge the truthfulness of factual statements appearing in an affidavit of probable cause through what is commonly referred to as a Franks proceeding.  Franks, 438 U.S. at 155; United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006).  The defendant must first make a "substantial preliminary showing that the affidavit contain[s] a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause."  Yusuf, 461 F.3d at 383 (internal quotation marks omitted) (citing Franks, 438 U.S. at 171).  If the defendant makes this preliminary showing, the court will conduct a hearing, at which the defendant must prove by a preponderance of the evidence that the affiant made the false statement knowingly and deliberately, or with reckless disregard to the truth, and that the statement was material to the probable cause determination.  Id. (citing Franks, 438 U.S. at 171-72).

There is no question *sub judice* that the affidavit of probable cause supporting the search warrant application contains an incorrect statement of fact. Detective Duffy stated therein that the active bench warrant out of New York was issued for a probation violation "concerning an attempted homicide."  (7/18/17 Hr'g

13

Gov't Ex. 2 at 7). The bench warrant actually issued for alleged arson. (See Doc. 79-1 at 2). During the first suppression hearing, Detective Duffy acknowledged that the warrant out of New York was "for second degree arson," but explained that he "believe[d] part of the case was that he had attempted to burn down a house with people inside it." (7/18/17 Hr'g Tr. 24:7-23). A transcript of radio transmissions between dispatch and field officers reflects that someone on the radio identified Coles as a "homicide suspect." (See id. at 20:2-17).

Coles has not shown that Detective Duffy made the incorrect statement "knowingly or with reckless disregard for the truth." Yusuf, 461 F.3d at 383. The mere fact of an inaccurate statement will not suffice under Franks. The defendant must show that "the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Wilson v. Russo, 212 F.3d 781, 788 (3d Cir. 2000) (citation and internal quotation marks omitted). Detective Duffy's error simply does not satisfy the *mens rea* contemplated by Franks.

Even if Detective Duffy had acted with knowing or reckless disregard for the truth, the erroneous statement concerning the bench warrant was not material to the finding of probable cause. We measure materiality by excising the incorrect or inaccurate statement to determine whether the corrected affidavit would support a probable cause finding. Id. at 789 (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997)). Engaging in this exercise herein does nothing to alter the probable cause determination. The amended affidavit would accurately state that Coles had an outstanding bench warrant for second degree arson. Regardless of the

underlying offense, there is no dispute that Coles was a fugitive with an active bench warrant at the time of Detective Duffy's application.

Moreover, the balance of the affidavit provides support for a probable cause finding independent of the bench warrant issue. The affidavit describes the circumstances of Coles arrest, including that he was observed placing a large white bag into the vehicle prior to apprehension and that the bag was not found on his person during a search incident to arrest. (7/18/17 Hr'g Gov't Ex. 2 at 7). The affidavit also relays a report from one of the vehicle's occupants that she had been a passenger in the same vehicle earlier that morning; that the vehicle was stopped by police as a "suspicious vehicle"; that she knew Coles to carry a firearm; and that Coles fled from the vehicle. (Id.) The issuing magistrate judge would have had a "substantial basis" to find probable cause based on the amended affidavit irrespective of the underlying bench warrant. See United States v. Stearn, 597 F.3d 540, 554 (3d Cir. 2010). We will deny Coles' motion to suppress evidence obtained from the July 7, 2016 vehicle search.

### C.    July 22, 2016 Search

Coles moves the court to suppress all evidence gathered as a result of the search warrant executed at 142 Lincoln Way West in Chambersburg, Pennsylvania, on July 22, 2016. (Doc. 100). In addition to answering the merits of Coles' motion, the government rejoins that Coles lacks standing to challenge a search of the 142 Lincoln Way West residence. (Doc. 112 at 3-9).

### 1.    *Legitimate Expectation of Privacy*

Fourth Amendment analysis traditionally begins with examining whether the defendant possessed a reasonable expectation of privacy in the object or place being searched.  See Kyllo v. United States, 533 U.S. 27, 27-28 (2001); Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  An individual who lacks a reasonable expectation of privacy in a place cannot invoke Fourth Amendment protection.  See United States v. Perez, 280 F.3d 318, 337 (3d Cir. 2007).  In other words, a defendant aggrieved by the introduction of damaging evidence obtained from an illegal search of a third party's property or premises suffers no Fourth Amendment infringement.  Rakas v. Illinois, 439 U.S. 128, 133-34 (1978); United States v. Baker, 221 F.3d 438, 442 (3d Cir. 2000).  A defendant must show both that he had a subjective expectation of privacy in the place searched, and that society would accept that expectation as reasonable.  See Rakas, 439 U.S. at 143 & n.12; United States v. Donohue, 764 F.3d 293, 298-99 (3d Cir. 2014).

Overnight guests "legitimately" in a third-party's apartment may have a reasonable expectation of privacy therein.  Perez, 280 F.3d at 337 (citing Minnesota v. Olson, 495 U.S. 91, 98-99 (1990)).  The law distinguishes between overnight guests (who reasonably expect a degree of privacy) and transient visitors (who do not).  See Minnesota v. Carter, 525 U.S. 83, 90 (1998).  In most cases, a person's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home."  Olson, 495 U.S. at 96-97.  Several factors guide this assessment, including, *inter alia*, whether and how often the person spent the night, whether the person had a key, whether the premises were habitable, and whether the person stored

personal belongings or overnight accoutrements in the place. See, e.g., United States v. Edwards, No. 11-735, 2013 WL 2256125, at *10 (E.D. Pa. May 23, 2013); United States v. Henry, No. 11-30, 2012 WL 2886204, at *5-6 (D.V.I. July 15, 2012); United States v. Mitchell, No. 10-CR-114, 2010 WL 3938235, at *4 (M.D. Pa. Oct. 4, 2010).

Coles testified that, prior to Smith's incarceration in June of 2016, he visited her apartment at 142 Lincoln Way West but never stayed the night. (8/17/17 Hr'g Tr. 22:10-23:6). He further testified that, after Smith was arrested, he stayed at the apartment several times while he was removing carpet and repainting the walls. (Id. at 15:9-21, 32:15-33:15). Coles could not recall the number of nights he spent in the apartment, nor could he estimate when his stays occurred. (See id. at 11:24-13:23, 32:15-33:15). Coles also could not recall whether the electricity was working on the nights that he did stay there. (See id. at 25:15-27:1). According to Coles, he received the key to Smith's apartment from her boyfriend. (See id. at 29:20-23). An account provided by Smith and memorialized in the search warrant application suggests that Smith was not aware initially that Coles was staying in her apartment but did not object when she found out. (See Doc. 105 at 3).

We conclude that Coles did not have a reasonable expectation of privacy in Smith's apartment. The record contains no evidence suggesting that Coles used the apartment as a temporary residence. He visited the apartment for the sole purpose of completing his remodeling "project." (8/17/17 Hr'g Tr. 15:9-21, 32:25-33:5). Coles never stayed in the apartment intentionally, but only when he would "fall asleep" because he did not want to travel back to Maryland. (Id. at 32:25-33:5). He brought

an overnight bag on some occasions, but kept no clothing in the apartment, nor any toiletries or other overnight necessities. (See id. at 4:22-25, 16:22-17:21).

Moreover, it is entirely unclear whether Coles actually had Smith's permission to stay in the apartment. Specifically, the court does not find Coles' description of his permissive use of the apartment to be credible. Indeed, Coles' credibility is deeply compromised by his selective recollection of certain events and a convenient failure to recall others, and his inconsistent and, at times, prevaricative, testimony is all that supports a finding that he was "legitimately" on the premises. See Perez, 280 F.3d at 337 (citing Olson, 495 U.S. at 98-99).[5] Coles testified that Smith gave him permission to stay in the apartment and that he received a key from Smith's boyfriend after requesting it, (see 8/17/17 Hr'g 4:17-21, 18:20-19:14), but when asked to confirm that permission, he could not say whether it was Smith or "some third party" who directed him to Smith's boyfriend for the key. (Id. at 30:24-31:3). The only record indicia of Smith's intent suggests that she was unaware that Coles had been staying at her apartment until he told her after the fact. (See Doc. 105 at 3). Coupled with Coles' rather incredible inability to recall whether the residence had any electricity during his overnight visits, we find substantial grounds to doubt Coles' permission to use Smith's apartment.

---

[5] For example, Coles failed to recall how or when he met Smith despite claiming that she was a close friend "dear to my heart," (8/17/17 Hr'g Tr. 5:18-25, 7:21-8:10); provided conflicting descriptions of the apartment layout, (id. at 9:3-10:24); struggled to recall the number of entrances to the apartment, (id. at 9:6-13, 11:19-23); asserted that he did not have clothing in the apartment but subsequently that he could not recall whether he had clothing in the apartment, (id. at 16:22-24, 17:9-18); failed to recall what he might have told Smith about why he visited the apartment, (id. at 23:7-15); and failed to recall the circumstances under which he allegedly obtained Smith's permission to use the apartment, (id. at 30:24-31:3).

## 2.     *Probable Cause*

Assuming *arguendo* that Coles did have a reasonable expectation of privacy in the Lincoln Way West apartment, we find no deficiency in the magistrate judge's finding of probable cause.  Coles contends that the affidavit failed to establish a "causal nexus" between the place searched and the evidence sought and concealed from the magistrate judge that Smith was incarcerated and motivated to lie at the time of her interview with law enforcement.  (See Doc. 101 at 3-5).  Coles further contends that the information provided by Smith was so dated as to be unreliable. (Id.)  Neither argument has merit.

Under the Fourth Amendment, a search warrant must be issued on the basis of probable cause.  U.S. CONST. amend. IV.  To establish probable cause, a warrant application must show that there is a "fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  As noted *supra*, in reviewing a magistrate judge's decision to authorize a warrant based on an affidavit of probable cause, we must decide whether the magistrate judge had a "substantial basis" for determining that probable cause existed.  See Stearn, 597 F.3d at 554.  The court gives "great deference" to the issuing judge's assessment and must consider the most reasonable reading of the affidavit.  Gates, 462 U.S. at 236; see United States v. Williams, 3 F.3d 69, 72 (3d Cir. 1993).

The probable cause assessment does not require direct evidence linking a place to be searched to a crime.  Stearn, 597 F.3d at 554; United States v. Hodge, 246

F.3d 301, 305 (3d Cir. 2001) (citation omitted).  Probable cause is typically inferred from "the type of crime, the nature of the items sought, the suspect's opportunity for concealment[,] and normal inferences about where a criminal might hide [evidence]."  Stearn, 597 F.3d at 554 (quoting United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993)).

Aged information inherently offers less value to this assessment.  United States v. Williams, 124 F.3d 411, 420 (3d Cir. 1997); United States v. Christie, 570 F. Supp. 2d 657, 680 (D.N.J. 2008).  Importantly, age alone will not determine the value of or weight attributable to stale information.  See Christie, 570 F. Supp. 2d at 680 (quoting United States v. Harvey, 2 F.3d 1318, 1322 (3d Cir. 1993)).  The court should instead undertake a holistic review of the information in the affidavit of probable cause, examining both "the nature of the crime and the type of evidence."  Harvey, 2 F.3d at 1322 (citations omitted).

Staleness is less significant when the criminal activity is protracted and ongoing, such as in a drug trafficking conspiracy.  See United States v. Urban, 404 F.3d 754, 774-75 (3d Cir. 2005); see also United States v. Thompson, No. 1:11-CR-77, 2013 WL 594019, at *6 (M.D. Pa. Feb. 15, 2013) (Conner, J.).  When information supporting probable cause reveals "a course or pattern of ongoing and continuous criminality," the passage of time "loses significance."  Urban, 404 F.3d at 774-75. In this context, the Third Circuit has observed that "intervals of weeks or months" between the acts described and the warrant application may not necessarily render

evidence stale when other variables support a finding of probable cause.  United States v. Gallo, 110 F. App'x 265, 268-69 (3d Cir. 2004) (nonprecedential).

The warrant affidavit, dated July 22, 2016, begins by describing a triple homicide investigation initiated on June 25, 2016.  (See Doc. 105 at 2).  The affiant, Trooper Decker, reports that Coles was associated with two of the victims.  (See id.)  Trooper Decker then details his interview with Smith.  (See id.)  He begins by identifying the fact that Smith is under investigation for trafficking narcotics and was incarcerated in June of 2016.  (Id. at 3).  Smith informed Trooper Decker that she, Coles, and others distributed heroin and crack cocaine from her 142 Lincoln Way West apartment.  (Id.)  She also reported that, since the time of her arrest, she believed that Coles continued to use the premises to distribute heroin.  (See id.)  With Smith's consent, law enforcement conducted a search of her apartment.  (Id.)  Trooper Decker states that, during the consent search, officers discovered certain items consistent with those found at the homicide scene.  (Id.)

The warrant affidavit amply supports the magistrate judge's determination, viz.: that probable cause existed to believe that drugs and drug paraphernalia—at minimum—would be discovered at 142 Lincoln Way West.  As a preliminary matter, Coles' assertion that law enforcement concealed the fact of Smith's incarceration is belied by the affidavit itself.  (See id.)  The affidavit explicitly notes that Smith was incarcerated in June of 2016 and is the target of a narcotics investigation.  (See id.)

Smith's status as a suspect and detainee was known to the magistrate judge. It was within the informed discretion of the magistrate judge to credit Smith's report.[6]

Nor do we find that Smith's information was "stale" or lacking a sufficient link between the place searched and the evidence sought. Coles claims that the 14-day lapse of time between Smith's interview and Coles' arrest "alone supports [his] argument that the information was stale." (Doc. 101 at 4). He further suggests that the age of Smith's information removes any "causal nexus" between her apartment and the items sought. (See id. at 5). We disagree. As noted *supra*, in the context of continuing crimes like drug trafficking, passage of time "loses significance." Urban, 404 F.3d at 774-75. Periods of weeks or even months are generally insufficient to divest information of probative value. Gallo, 110 F. App'x at 268-69. Smith stated that she and Coles began routinely dealing drugs from her apartment as early as April of 2016. (Doc. 105 at 3). She also stated that Coles had been in her apartment as recently as the first week of July—mere days before his arrest and less than three weeks before the apartment search. (See id.) Smith's information, in combination with the balance of the affidavit, provided a "substantial basis" for the magistrate judge to conclude that evidence of criminal activity would be found in Smith's

---

[6] We reject Coles' broader suggestion that the mere fact of incarceration *ipso facto* discredits a witness. Taken to its logical conclusion, Coles' argument would have the court reject the testimony of all incarcerated persons—Coles included—as *per se* incredible.

apartment. See Stearn, 597 F.3d at 554. We will deny Coles' motion to suppress evidence obtained during execution of the warrant at 142 Lincoln Way West.[7]

### D.    August 11, 2016 Interview

Coles lastly contends that authorities failed to scrupulously honor his preexisting request for counsel during the August 11, 2016 interview. (See Doc. 68 at 5-6; Doc. 94 at 5). We first identify the facts that are not in dispute. The government does not dispute that Coles was in Miranda custody and was subject to interrogation on July 7, 2016 and again on August 11, 2016. (See Doc. 85 at 2; Doc. 99 at 11-12). It is also undisputed that Coles invoked his right to counsel during the July 7, 2016 interview and that officers conducting the August 11, 2016 interview were aware of that fact. (See Doc. 99 at 2, 11; see also 7/18/17 Hr'g Tr. at 36:21-37:14, 50:3-5, 52:25-53:12, 59:12-20). The government concedes that, after the July 7, 2016 interview, Coles remained in pretrial confinement "on the drug charge with the NY warrant lodged as a detainer" until the second interview on August 11, 2016. (Doc. 99 at 2-3). On August 11, 2016, Coles was transported to the Hagerstown Police Department, was read his Miranda rights, and then proceeded to answer police questions for more than three hours. (See 7/18/17 Hr'g Tr. 29:21-30:2, 30:12-31:14;

---

[7] Coles emphasizes that the apartment door was ajar when authorities arrived for the initial consent search on July 21, 2016. (See 8/17/17 Hr'g Tr. 54:19-24). This information was not withheld from the magistrate judge: the affidavit of probable cause explains that officers, upon arrival for the consent search, "observed the door to the apartment to be hanging open." (Doc. 105 at 4). The magistrate judge properly weighed this fact with the balance of the affidavit and determined that it did not defeat a probable cause finding. To the extent Coles believes this fact impacts the reliability of the evidence obtained, his argument goes to the weight but not to the admissibility of the evidence.

see also 7/18/17 Hr'g Def. Ex. 106).  Coles asserts that Trooper Cox and Agent Kierzkowski violated the Fifth Amendment by resuming interrogation on August 11, 2016 after Coles invoked his Miranda rights during the earlier interview.

Statements made by a suspect during custodial interrogation are admissible only if police apprised the suspect of his or her rights under Miranda v. Arizona, 384 U.S. 436 (1966), and the suspect chose to waive them knowingly and voluntarily.  Id. at 444, 475.  When a suspect invokes the right to counsel, police must immediately cease interrogation until counsel is present.  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).  The Supreme Court in Edwards established a presumption that once a suspect invokes his right to counsel, any subsequent Miranda waiver is involuntary until counsel is present or the suspect himself initiates communication, exchanges, or conversation.  Arizona v. Roberson, 486 U.S. 675, 680-81 (1988).  The Edwards presumption "is not offense specific."  McNeil v. Wisconsin, 501 U.S. 171, 177 (1991) (citing Roberson, 486 U.S. at 682-83).  Accordingly, "[o]nce a suspect invokes the Miranda right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present."  Id.

The Court delimited the scope of the Edwards presumption in Maryland v. Shatzer, 559 U.S. 98 (2010), explaining that its prophylaxis cannot extend into perpetuity.  The Shatzer case tasked the Court to consider whether and under what circumstances a break in custody terminates Edwards' protections.  The Court held that, when a suspect invokes the right to counsel during custodial interrogation but is subsequently released from Miranda custody for a period of 14 days, the Edwards

presumption dissolves.  Id. at 109-10.  The government channels Shatzer *sub judice*, emphasizing that 35 days separate Coles' July 7, 2016 request for counsel and his August 11, 2016 interview.  (Doc. 99 at 11-12).  Careful review of Shatzer's *ratio decidendi* establishes that its rule is inapplicable in Coles' case.

We begin with the facts of Shatzer.  In August of 2003, a detective attempted to interview Shatzer concerning allegations of sexual abuse.  Shatzer, 559 U.S. at 100-01.  At the time, Shatzer was serving a state prison sentence for an unrelated conviction.  See id.  He invoked his right to counsel, and the detective terminated the interview.  Id. at 101.  Two years and six months later, while Shatzer was still incarcerated, authorities reopened the abuse cause and a new detective sought to interrogate him.  Id.  This time, Shatzer waived his Miranda rights and provided several incriminating statements over the course of two subsequent interviews.  Id. at 101-02.  Shatzer later relied on Edwards in attempt to suppress the inculpatory statements.  See id. at 102.  The trial court denied Shatzer's motion, concluding that he had experienced a break in Miranda custody sufficient to override the Edwards presumption.  Id. at 103.  The state appeals court disagreed, finding that even if a "break-in-custody" exception existed, returning to general population was not an adequate break.  Id.

The Supreme Court granted *certiorari*.  The Court promulgated two new Miranda rules in the course of rejecting Shatzer's argument.  The Court resolved *first*, that a 14-day break in Miranda custody will suffice to release the Edwards presumption, id. at 109-10; and, *second*, that a state prisoner's return to general population qualifies as a break in custody for purposes of this new rule, id. at 112-

14.  The Court held that a 14-day period accords a suspect "plenty of time . . . to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody."  Id. at 110.  In reaching its second conclusion, the Court observed that, for a suspect incarcerated pursuant to a prior conviction, a return to general population is a return to "normal life" as that person knows it.  Id. at 113-14.

The Shatzer Court did not expressly conclude that return to general population breaks Miranda custody *only* for sentenced prisoners.  But the Court explicitly based its holding on the distinction between post-conviction incarceration and pretrial detention.  In finding that sentenced prisoners are not exposed to the same coercive pressures attending Miranda custody, the Court emphasized that interrogated prisoners who return to general population resume a daily routine in the place where they live and "regain the degree of control they had over their lives prior to" questioning.  Id. at 113.  The opposite is true for pretrial detainees.  Most illuminative is the Court's comparative discussion of coercive pressure:

> Their detention, moreover, is relatively disconnected
> from their prior unwillingness to cooperate in an
> investigation.  The former interrogator has no power
> to increase the duration of incarceration, which was
> determined at sentencing.  And even where the possibility
> of parole exists, the former interrogator has no apparent
> power to decrease the time served.  This is in stark
> contrast to the circumstances faced by the defendants
> in Edwards, Roberson, and Minnick, whose continued
> detention as suspects rested with those controlling their
> interrogation, and who confronted the uncertainties of
> what final charges they would face, whether they would
> be convicted, and what sentence they would receive.

Id. at 113-14.

This language evinces the Court's view that sentenced prisoners are distinct from pretrial detainees for purposes of Edwards' presumption of involuntariness. Indeed, the Court seemed to signal as much by defining the paradigmatic Edwards case as one in a pretrial posture:

> That is a case in which the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated. After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, "thrust into" and isolated in an "unfamiliar," "police-dominated atmosphere," where his captors "appear to control his fate."

Id. at 106 (internal citations and alterations omitted) (quoting Illinois v. Perkins, 496 U.S. 292, 297 (1990); Miranda, 384 U.S. at 456-57). Nearly every court to address this question in Shatzer's wake has concluded that a pretrial detainee is subject to the rule of Edwards and not the exception of Shatzer.[8]

We conclude that Coles did not experience a break in Miranda custody when he was returned to pretrial detention for 35 days between interrogations. Detainees like Coles remain vulnerable—and increasingly so—to the coercive

---

[8] See, e.g., United States v. McIntosh, No. 1:13-CR-18, 2014 WL 7642345, at *6 (N.D. Ga. Dec. 17, 2014), adopted in relevant part by 2015 WL 224745, at *1 (N.D. Ga. Jan. 15, 2015); United States v. Doe, No. 12-52, 2012 WL 5364269, at *8 n.11 (W.D. La. Oct. 1, 2012), adopted by 2012 WL 5364266 (W.D. La. Oct. 31, 2012); United States v. Hollister, No. 12-CR-13, 2012 WL 4076170, at *3-7 (D. Minn. Sept. 14, 2012); Trotter v. United States, 121 A.3d 40, 47-49 (D.C. Ct. App. 2015); but see United States v. May, No. 14-136, 2014 WL 6775283, at *7-8 (D. Minn. Dec. 4, 2014) (applying Shatzer to pretrial detainee without acknowledging distinction between pretrial and post-conviction status); Commonwealth v. Champney, 161 A.3d 265, 282-84 (Pa. Super. Ct. 2017) (concluding that pretrial detention does not preclude Shatzer break in custody).

pressures of continued confinement. Coles' fate rested, at least to a degree, in the hands of his interrogators. Indeed, both Trooper Cox and Agent Kierzkowski repeatedly insisted throughout the August 11, 2016 interview that they had *some* ability to help Coles alleviate his exposure. (See generally 7/18/17 Hr'g Def. Ex. 106). The charges Coles would face, whether he would be convicted, and what sentence he could receive were uncertain.[9]

The August 11, 2016 interrogation concerned the same subject matter, and involved the same trooper, as the July 7, 2016 interview during which Coles invoked his right to counsel. The only difference is that, at the time of the second interview, Coles had been subject for 35 days to the "mounting coercive pressure of prolonged police custody." Shatzer, 559 U.S. at 105 (quoting Roberson, 486 U.S. at 686). All of these factors coalesce to render Coles' uncounseled Miranda waiver involuntary.[10] Consequently, we conclude that Coles' statements on August 11, 2016 were obtained in violation of the Fifth Amendment. We will grant Coles' motion to suppress these statements.

---

[9] We acknowledge that, at the time of the second interview, a federal grand jury had already returned the instant indictment charging Coles with conspiracy, drug offenses, and firearms offenses. (See Doc. 1). The court's review of the entire August 11, 2016 interrogation video reveals that the officers' questions principally concerned the ongoing homicide investigation. Whether charges will be filed in that case remains an open question.

[10] Coles asserts, assuming *arguendo* that Edwards does not apply, that the purported waiver of his Miranda rights on August 11, 2016 was not clear and unequivocal. (Doc. 94 at 5). In view of the above conclusion, we need not address this argument.

## IV.    Conclusion

The court will grant in part and deny in part Coles' motions (Docs. 67, 69, 100) to suppress as more specifically stated hereinabove.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      September 8, 2017