**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:16-CR-212** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **KEVIN COLES (1),** | : | |
| **DEVIN DICKERSON (2),** | : | |
| **TOREY WHITE (3),** | : | |
| **JERELL ADGEBESAN (5),** | : | |
| **KENYATTA CORBETT (6),** | : | |
| **MICHAEL BUCK (7),** | : | |
| **NICHOLAS PREDDY (8), and** | : | |
| **JOHNNIE JENKINS-** | : | |
|    **ARMSTRONG (9),** | : | |
| | : | |
|      **Defendants** | : | |

## MEMORANDUM

The above-captioned criminal action was a capital case until just over

one month ago, and each defendant charged with a capital crime was assigned a

second attorney "learned in the law applicable to capital cases" as required by

statute.  See 18 U.S.C. § 3005.  Learned counsel for each of the formerly death-

eligible defendants now ask the court to continue their respective appointments

notwithstanding the government's declination to seek the death penalty as to any

defendant.  (See Docs. 599-603, 605, 608).  For the reasons that follow, the court will

grant learned counsel's requests and continue their appointments in this case, but

at a reduced hourly rate of compensation.

## I.   Factual Background & Procedural History

In August 2016, a grand jury sitting in Harrisburg, Pennsylvania, returned a

five-count indictment charging defendants Kevin Coles and Devin Dickerson with

various drug-trafficking and firearms offenses.  (Doc. 1).  This case was complicated

even in its early stages, with counsel disputes prompting numerous substitutions

of appointed counsel, motions to suppress requiring multiple evidentiary hearings

and extensive briefing, an interlocutory appeal by the government that was later

withdrawn, and three unsuccessful defense motions for reconsideration.  While

all of this was occurring, the grand jury returned a superseding indictment adding

a count against both Coles and Dickerson for drug trafficking resulting in serious

bodily injury.  (See Doc. 189 at 7).

On December 20, 2018, the grand jury returned a second superseding

indictment which added nine defendants and 16 counts, including several capital

charges.  (See Doc. 238).  Specifically, the second superseding indictment charged

Coles and Dickerson, as well as newly named defendants Torey White, Christopher

Johnson, Jerell Adgebesan, Kenyatta Corbett, Michael Buck, and Johnnie Jenkins-

Armstrong, with the following capital crimes: three counts of use of a firearm

during and in relation to a crime of violence (viz., Hobbs Act robbery and killing

a witness) resulting in death; one count of conspiracy to commit murder for hire;

and three counts of murder of a witness.  (Doc. 238 at 12-21).  The court promptly

assigned a second attorney "learned in the law applicable to capital cases" to each

death penalty-eligible defendant in accordance with 18 U.S.C. § 3005.  (Docs. 383-

390).

We convened a telephonic scheduling conference on March 15, 2019, to

discuss pretrial scheduling matters.  (See Doc. 426).  At the parties' request, we

appointed a coordinating discovery attorney, (Doc. 432), established a discovery

deadline, (Doc. 435 ¶ 7(a)), and set February 3, 2020, as the government's deadline to provide notice of intent to seek the death penalty pursuant to 18 U.S.C. § 3593(a), (Doc. 435 ¶ 1(e)). We subsequently imposed a status-report requirement, tasking the government to file reports at 45-day intervals concerning, *inter alia*, the status of discovery and whether the government had made an initial decision to not seek the death penalty as to any death penalty-eligible defendant. (See Doc. 449; see Docs. 450, 456, 466, 473, 491, 492, 507, 550).

On November 21, 2019, Johnson pled guilty to 10 counts of the second superseding indictment. (See Doc. 480). The plea agreement recommends that the court impose consecutive life sentences on eight of those counts. (See Doc. 468 at 13). Sentencing is scheduled for August 18, 2020. (Doc. 571).

The grand jury returned a third superseding indictment on January 29, 2020. (Doc. 499). The third superseding indictment added a new capital charge of conspiracy to murder three witnesses against Coles, Dickerson, White, Adgebesan, Corbett, and Jenkins-Armstrong, (id. at 24); added a new non-death-eligible count against those defendants and Preddy, (id. at 18-19); added Preddy to all new and existing capital counts, making him death penalty-eligible for the first time, (id. at 12-17, 20-23); and removed all counts and allegations against Johnson, (Doc. 508 at 2). We promptly appointed learned counsel for Preddy. (Doc. 506). At the request of the government, we extended the deadline for its Section 3593(a) notice of intent from February 3 to June 2. (Doc. 495). We thereafter granted the government's request, with defense counsel's concurrence, for a three-day extension of that deadline. (See Docs. 573-575).

On June 4, the government filed a notice pursuant to Section 3593(a) advising the court and the defendants that it will not seek the death penalty as to any death penalty-eligible defendant.  (Doc. 577).  We convened a telephonic conference on June 22, 2020, to discuss pretrial and trial scheduling and the propriety of retaining learned counsel given the government's election.  (Doc. 585).  During the conference call, all learned counsel expressed a desire to remain on the case.  We thus invited learned counsel to submit *ex parte* letter briefs to the court by July 6 setting forth a justification for their continued appointment.  (Doc. 596).  All counsel filed timely submissions, (Docs. 599-603, 605, 608), and the matter of retention of learned counsel is ripe for disposition.

II.     **Discussion**

Section 3005 of Title 18 of the United States Code provides that a person

> indicted for . . . [a] capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases.

18 U.S.C. § 3005.  We have adhered to the letter of this mandate.  After return of the indictments charging capital crimes against Coles, Dickerson, White, Johnson, Adgebesan, Corbett, Buck, Preddy, and Jenkins-Armstrong, we expeditiously appointed a second attorney "learned in the law applicable to capital cases" to represent each of them.  (See Docs. 383-390, 506).

The question now before us is whether the appointment of learned counsel must—or if not must, should—continue in light of the fact that the government has

opted not to pursue the death penalty against any death penalty-eligible defendant. The Third Circuit Court of Appeals has not squarely decided if capital defendants retain the right to a second attorney after the government elects not to seek the death penalty.  It has said, however, that defendants "[a]re no longer capital defendants" within the meaning of Section 3005 once the death penalty is formally disavowed.  See United States v. Casseus, 282 F.3d 253, 256 (3d Cir.) (concluding that district court's failure to address defendants' requests for appointment of learned counsel for several weeks, until requests "were rendered moot by the government's decision not to seek the death penalty," was harmless), cert. denied, 537 U.S. 852 (2002).

Nearly all circuit courts to address the question *sub judice* have held that a defendant's entitlement to learned counsel ends when the government elects not to pursue the death penalty.  See United States v. Cordova, 806 F.3d 1085, 1099-1102 (D.C. Cir. 2015); United States v. Douglas, 525 F.3d 225, 235-37 (2d Cir.), cert. denied, 555 U.S. 1033 (2008); United States v. Waggoner, 339 F.3d 915, 917-19 (9th Cir. 2003), cert. denied, 543 U.S. 1005 (2004); United States v. Grimes, 142 F.3d 1342, 1347 (11th Cir. 1998), cert. denied, 525 U.S. 1088 (1999); see also In re Sterling-Suarez, 306 F.3d 1170, 1174 (1st Cir. 2018) (signaling agreement with cases concluding that learned-counsel right dissolves when government disavows death penalty).  Others have similarly held that, when the death penalty has been legally foreclosed, the learned-counsel right is eliminated.  See, e.g., United States v. Dufur, 648 F.2d 512, 514-15 (9th Cir. 1980); United States v. Sheperd, 576 F.2d 719, 727-29 (7th Cir. 1978); United States v. Weddell, 567 F.2d 767, 770-71 (8th Cir. 1977).

These cases look to the purpose of the learned-counsel right—to provide those charged with a capital offense "specialized help" from attorneys with "a separate and unique base of knowledge, training, and experience," Cordova, 806 F.3d at 1100, and to "reduce the chance that an innocent defendant would be put to death because of inadvertence or errors in judgment of his counsel," Douglas, 525 F.3d at 235-36 (quoting Waggoner, 339 F.3d at 918).  The majority of courts reason persuasively that when the government takes the death penalty off the table, the heightened stakes necessitating two counsel are no longer present, and the right to a second attorney is no longer absolute.  See Cordova, 806 F.3d at 1100 (citing Waggoner, 339 F.3d at 918); Douglas, 525 F.3d at 235-36 (citing Waggoner, 339 F.3d at 917-19; In re Sterling-Suarez, 306 F.3d at 1174-75; Grimes, 142 F.3d at 1347).

The only court of appeals to take a contrary position is the Fourth Circuit.  In United States v. Boone, 245 F.3d 352 (4th Cir. 2001), the Fourth Circuit concluded that the right to a second attorney persists even after the government elects not to pursue the death penalty, interpreting Section 3005 to apply "upon indictment" and "regardless of whether the government chooses to seek the death penalty."  Boone, 245 F.3d at 364.  However, it later signaled that the right may be less absolute than suggested by Boone.  In United States v. Robinson, 275 F.3d 371 (4th Cir. 2001), the court declined to exercise its discretion to reverse the conviction of a defendant whose learned counsel was discharged after the government chose not to seek the death penalty.  Robinson, 275 F.3d at 384.  Although the court found the discharge to be plain error under Boone, it held that the error "did not affect the fairness, integrity, or public reputation of judicial proceedings."  Id.  In 2014, a Fourth Circuit

panel observed that it remains bound by <u>Boone</u> while recognizing that the decision "is at odds with the view adopted by all our sister circuits to have considered the issue." <u>United States v. Shepperson</u>, 739 F.3d 176, 178 n.1 (4th Cir.) (collecting cases), <u>*cert.* denied</u>, 572 U.S. 1125 (2014).

We are persuaded by and will adopt the majority view, which aligns with the intent undergirding Section 3005. We conclude that the statutory *right* to learned counsel applies to capital cases only and that this case lost its capital nature when the government chose not to seek the death penalty. <u>See</u> <u>Casseus</u>, 282 F.3d at 256; <u>see also</u> <u>Cordova</u>, 806 F.3d at 1099-1102; <u>Douglas</u>, 525 F.3d at 235-37; <u>Waggoner</u>, 339 F.3d at 917-19; <u>Grimes</u>, 142 F.3d at 1347. Thus, to the extent counsel urge the court to adopt the Fourth Circuit's approach and find that their clients remain statutorily entitled to second counsel, (<u>see</u> Doc. 601 ¶ 3), we decline to do so.

That a formerly death-eligible defendant is not entitled to continued appointment of second counsel does not mean that continuation is not permitted or appropriate. Neither Section 3005 nor any decision of which this court is aware prohibits a trial court from retaining second counsel if the complexity of the case or other relevant considerations make retention of the second lawyer prudent. <u>See</u> <u>Douglas</u>, 525 F.3d at 238; <u>see also</u> <u>Cordova</u>, 806 F.3d at 1102. *Per contra*, whether to continue the dual appointment in a particular case is a matter "best left to the broad discretion of the district court." <u>Douglas</u>, 525 F.3d at 238.

The Guidelines for Administering the Criminal Justice Act provide guidance for a court deciding how to exercise that discretion. The Guidelines state that, when the government declines to pursue the death penalty, the court should

reduce the number of counsel and the compensation rate "absent extenuating circumstances."  GUIDE TO JUDICIARY POLICY, Vol. 7, Ch. 6, §§ 630.30.20(a), -.30(a) (hereinafter "CJA GUIDELINES").  With respect to the number of counsel, the Guidelines recommend considering "(1) the need to avoid disruption of the proceedings; (2) whether the decision not to seek the death penalty occurred late in the litigation; (3) whether the case is unusually complex; and (4) any other factors that would interfere with the need to ensure effective representation of the defendant."  Id. § 630.30.20(b)(1)-(4).  In determining the compensation rate, we should consider "(1) the extent to which this representation precludes counsel from taking other work; (2) the commitment of time and resources counsel has made and will continue to make in the case; and (3) the need to compensate appointed counsel fairly."  Id. § 630.30.30(b)(1)-(3).

    After reviewing counsel's thorough and quite candid submissions, we find it appropriate to continue the appointment of learned counsel for all formerly death-eligible defendants.  The decision not to seek the death penalty in this case was not made until June 4, 2020—almost 18 months after the first capital indictment was returned in late December 2018.  (Doc. 577).  This case was designated unusual and complex shortly after that indictment was docketed, (see Doc. 435 ¶ 6), and we have continued that designation despite the transformation to a noncapital prosecution, (see Doc. 613 ¶ 10).

    As may be gleaned from our most recent scheduling order, this case is tremendously complicated.  Ten defendants remain for trial, with nearly two dozen counts charged among them, several of which carry mandatory minimum terms of

life imprisonment.  (See Doc. 499).  The nature of the charged conduct is serious: all defendants for whom learned counsel have been appointed are charged with conspiring to commit and committing three murders, and two of those defendants (Preddy and Jenkins-Armstrong) are also charged with conspiring and attempting to murder a codefendant.  (See id.)  All told, there are seven robbery, murder, and drug-trafficking conspiracies charged against the various defendants, (see id. at 8-9, 18-19, 20, 24, 25-26, 28-31, 37-38), in addition to the individual murder, attempted-murder, robbery, drug-trafficking, firearms, and accessory-after-the-fact counts, (see id. at 10-11, 12-13, 14-15, 16-17, 21, 22, 23, 27, 32, 33, 34, 35, 36, 39-40, 41).

The unusual complexity of this matter is further illustrated by the scope of the investigation and the sheer volume of discovery.  Ten local, state, and federal law enforcement agencies have participated in the investigation of this case.  See *Press Release*, United States Attorney's Office Middle District of Pennsylvania, Maryland Man Pleads Guilty to Murder, Drug Trafficking and Obstruction of Justice (Nov. 21, 2019), https://www.justice.gov/usao-mdpa/pr/maryland-man-pleads-guilty-murder-drug-trafficking-and-obstruction-justice.  Counsel report that the initial discovery production exceeded 130 gigabytes of data, with still more to come.  (Doc. 601 ¶ 11).  That data includes "massive" cell phone extractions, 20 sets of cell phone records, thousands of pages of written reports, hundreds of recorded

phone calls, and "hours of audio and visual files, including surveillance videos, recorded interrogations, and photographs."[1]  (Id.)

The pretrial schedule in this case contemplates four separate tiers of motions practice, with extensive briefing and evidentiary hearings anticipated within each tier.  (Doc. 613 ¶¶ 2-5).  What is more, counsel report that the Jencks Act materials are expected to exceed 1,000 pages, (see Doc. 608 at 1; Doc. 601 ¶ 12), and it is likely that those materials will prompt a flurry of motions *in limine* in the weeks before trial, (see Doc. 601 ¶ 12; Doc. 613 ¶ 5).  The government has agreed to disclose Jencks material 30 days before trial.  (See Doc. 611-2 at 1).  Consequently, defense counsel will have just one week to file their motions *in limine*.  (See Doc. 613 ¶ 5).  That task, on top of preparing for a multidefendant trial predicted to last at least one month, "arguably exceeds the capacity of a single attorney."  United States v. Ledbetter, 107 F. Supp. 3d 849, 857 (S.D. Ohio June 1, 2015).  And we are of course mindful that all pretrial investigation, client consultations, strategizing, motions practice, and evidentiary hearings will take place against the backdrop of— and with the many limitations wrought by—an unprecedented global pandemic of unknowable duration.

---

[1] The court has already determined that the volume and nature of the discovery in this case required appointment of a coordinating discovery attorney. (See Doc. 432).

Finally, learned counsel have worked for 17 months[2] to establish effective working relationships with their clients and their defense teams.  Those teams have thoughtfully divided responsibilities to avoid duplication of effort, and the resulting efficiencies would be undermined or entirely lost if learned counsel were discharged at this late juncture.  These attorneys have also successfully worked to build trust with defense witnesses, friends, family members, and, most importantly, their clients.  (Doc. 599 at 6; Doc. 600 at 1-2; Doc. 602 at 2-3; Doc. 602-1; Doc. 603 at 2-3; Doc. 605 at 3-4; Doc. 608 at 2-4).  Termination of learned counsel would jeopardize multiple attorney-client relationships, the coordinated efforts of the defense teams, and our ability to adhere to the carefully structured and multi-tiered trial schedule.  Therefore, we conclude that extraordinary circumstances exist in this case to justify—indeed, to necessitate—the continued appointment of learned counsel for each formerly death-eligible defendant.

We will, however, reduce the hourly compensation rate.  Most counsel have expressed no opinion on the question of compensation.  Counsel for several defendants have deferred to the court's judgment, (see Doc. 599 at 7; Doc. 600 at 2; Doc. 602 at 5), and counsel for another defendant have opined that compensation at the rate applicable to noncapital cases is appropriate, (see Doc. 605 at 5).  We agree that compensation at the noncapital rate is now appropriate in this case, see CJA GUIDELINES § 230.16(a), and we will reduce the hourly rate accordingly.

---

[2] The exception to this statement is Preddy, who only became death-eligible and was appointed a second attorney five months ago.  (See Docs. 499, 506).

III.   **Conclusion**

For all of the reasons set forth herein, the court will grant learned

counsel's request to continue their respective appointments in this inordinately

complex criminal case, but at a reduced hourly rate.  An appropriate order shall

issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:   July 22, 2020