## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:16-CR-212** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **KEVIN COLES,** | : | |
| **DEVIN DICKERSON,** | : | |
| **TOREY WHITE,** | : | |
| **JERELL ADGEBESAN,** | : | |
| **KENYATTA CORBETT,** | : | |
| **NICHOLAS PREDDY,** | : | |
| **JOHNNIE JENKINS-** | : | |
| **ARMSTRONG,** | : | |
| **TERRENCE LAWSON, and** | : | |
| **TYRONE ARMSTRONG,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

In accordance with the court's July 16, 2020 pretrial and trial scheduling order, defendants in the above-captioned action have filed their first-tier pretrial motions. Their requests number more than two dozen and seek relief ranging from discovery and disclosures of certain evidence, to dismissal of counts and perceived surplusage from the third superseding indictment, to severance of defendants and counts for trial. This memorandum addresses defendants' discovery-related motions.

## I.  Factual Background & Procedural History

A grand jury sitting in Harrisburg, Pennsylvania, returned a five-count indictment in August 2016 charging defendants Kevin Coles and Devin Dickerson with various drug-trafficking and firearms offenses. The grand jury has since

returned three superseding indictments.  The first, returned April 12, 2018, added a sixth charge against Coles and Dickerson.  The grand jury then returned a second superseding indictment on December 20, 2018, adding 16 counts, including several capital charges, and nine new defendants: Torey White, Christopher Johnson, Jerell Adgebesan, Kenyatta Corbett, Michael Buck, Nicholas Preddy, Johnnie Jenkins-Armstrong, Terrance Lawson, and Tyrone Armstrong.  We promptly assigned learned capital counsel to each death-penalty-eligible defendant (Coles, Dickerson, White, Johnson, Adgebesan, Corbett, Buck, and Jenkins-Armstrong) in accordance with 18 U.S.C. § 3005.

We convened a telephonic conference on March 15, 2019, to discuss pretrial scheduling.  We appointed a coordinating discovery attorney at defendants' request, set a discovery deadline, and established February 3, 2020, as the government's deadline to provide notice of intent to seek the death penalty pursuant to 18 U.S.C. § 3593(a).  We later imposed a status-report requirement, tasking the government to file reports at 45-day intervals concerning, *inter alia*, the status of discovery and whether the government had made an initial decision not to seek the death penalty as to any eligible defendant.

The grand jury returned a third superseding indictment on January 29, 2020.  That indictment, *inter alia*, added a new capital charge against the death-penalty-eligible defendants, (see Doc. 499 at 24); added a new noncapital charge against those defendants and Preddy, (id. at 18-19); and added Preddy to all new and existing capital counts, making him death-penalty-eligible for the first time, (id.

at 12-17, 20-23).  The third superseding indictment charges defendants in 22 counts,

as follows[1]:

- Count One: conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946), against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Count Two: Hobbs Act robbery, and aiding and abetting same, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2, against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Counts Three, Four, and Five: using, brandishing, and discharging a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness) resulting in the deaths of Phillip Jackson, Brandon Cole, and Wendy Chaney,[2] respectively, and aiding and abetting same, in violation of 18 U.S.C. § 924(c) and (j) and 18 U.S.C. § 2, against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Count Six: conspiracy to use, brandish, and discharge a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness) resulting in the death of Chaney, in violation of 18 U.S.C. § 924(c), (j), and (o), against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

---

[1] Johnson and Buck have both entered guilty pleas and are not included in the below list of pending charges.  Johnson pled guilty to Counts One, Three, Four, Five, Six, Seven, Eight, Nine, Ten, and Twenty of the second superseding indictment.  (<u>See</u> Doc. 480).  Buck pled guilty to Count One of the third superseding indictment and to a one-count felony information charging him with using and discharging a firearm during and in relation to a crime of violence under Section 924(c).  (<u>See</u> Doc. 642).  Corbett has signed a plea agreement in which he agrees to plead guilty to Count One of the third superseding indictment and to a Section 924(c) information.  (<u>See</u> Doc. 707).  A change of plea hearing is scheduled for February 9, 2021.  (<u>See</u> Doc. 749).

[2] The third superseding indictment uses two different spellings for this victim's last name, switching between "Chaney" and "Cheney."  We use "Chaney" in this memorandum, which we understand to be the correct spelling.

- Count Seven: conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958 and <u>Pinkerton</u>, against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Counts Eight, Nine, and Ten: murder of witnesses (Chaney, Jackson, and Cole, respectively), and aiding and abetting same, in violation of 18 U.S.C. § 1512(a)(1)(C) and 18 U.S.C. § 2, against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Count Eleven: conspiracy to murder witnesses (Chaney, Jackson, and Cole) in violation of 18 U.S.C. § 1512(k), against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Count Twelve: conspiracy to distribute and possess with intent to distribute 1,000 grams and more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 846, against Corbett and Adgebesan;

- Count Thirteen: possession with intent to distribute heroin, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, against Corbett and Adgebesan;

- Count Fourteen: conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, and at least 28 grams of a mixture and substance containing a detectable amount of cocaine base and cocaine HCL, in violation of 21 U.S.C. § 846, against Coles and Dickerson;

- Counts Fifteen and Sixteen: possession with intent to distribute a mixture and substance containing a detectable amount of heroin, and a mixture and substance containing a detectable amount of both cocaine HCL and cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, against Coles and Dickerson, respectively;

- Count Seventeen: possession with intent to distribute a mixture and substance containing a detectable amount of heroin and a mixture and substance containing a detectable amount of cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, against Coles and Dickerson;

- Count Eighteen: distribution of a mixture and substance containing a detectable amount of heroin resulting in serious bodily injury, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2, against Coles and Dickerson;

- Count Nineteen: possession of firearms in furtherance of a drug-trafficking crime as alleged in Counts Fourteen through Eighteen, and aiding and abetting same, in violation of 18 U.S.C. § 924(c)(1), 18 U.S.C. § 2, and Pinkerton, against Coles and Dickerson;

- Count Twenty: conspiracy to murder a witness (codefendant Adgebesan) in violation of 18 U.S.C. § 1512(k), against Preddy, Jenkins-Armstrong, Lawson, and Armstrong;

- Count Twenty-One: attempted murder of a witness (codefendant Adgebesan) in violation of 18 U.S.C. § 1512(a)(1)(A) and (C), against Preddy, Jenkins-Armstrong, Lawson, and Armstrong; and

- Count Twenty-Two: accessory after the fact with respect to Hobbs Act robbery and murder, in violation of 18 U.S.C. § 3, against Lawson and Armstrong.

(See Doc. 499 at 8-41).  We appointed learned counsel for Preddy shortly after the third superseding indictment was returned.

On June 4, 2020, following two concurred-in extensions of its Section 3593(a) deadline, the government notified defendants and the court that it would not seek the death penalty as to any eligible defendant.  We held a telephonic conference on June 22, 2020, to discuss pretrial and trial scheduling and the propriety of retaining learned counsel given the government's election.  After hearing from counsel, we issued a memorandum and order authorizing the formerly death-penalty-eligible defendants to continue with two attorneys.  We then entered a pretrial and trial scheduling order which established four tiers of pretrial motions: non-fact-based motions (to sever, to dismiss, for bill of particulars, and concerning discovery), due

October 23, 2020; fact-based and suppression motions, due January 11, 2021; expert motions, due August 2, 2021; and motions *in limine*, due November 5, 2021.  That order also established an August 2, 2021 deadline for the parties to provide notice of their experts and adopted the government's proposal for a November 5, 2021 early-disclosure date for its Jencks Act material.

      Defendants have now filed 19 individual and omnibus first-tier motions. (See Docs. 586, 588, 590, 592, 652, 660, 662, 664, 666, 668, 670, 672, 673, 676, 679, 679-3, 680, 683, 685).  After several extensions of briefing deadlines at the government's request, defendants' first-tier motions became ripe for disposition on January 4, 2021.  This memorandum addresses defendants' discovery-related motions.  A separate memorandum will follow, taking up defendants' remaining motions.

## II.   **Discussion**

      We will summarize the pending motions, delineate the standards by which they must be adjudged, and then address the issues presented therein.  Defendants' discovery motions run the gamut from demands for disclosure of exculpatory evidence to requests for the identification of witnesses.  Coles, White, Adgebesan, and Preddy move to compel disclosure of long lists of material believed to be in the government's possession.  They also seek immediate production of any exculpatory and impeachment material the government may have.  Coles, White, and Preddy ask us to order the government to identify its jailhouse-informant witnesses, and Preddy further requests a court order directing the government to identify *all* of its

witnesses in advance of trial.  Dickerson's lone request is for modification of the existing protective order.[3]

### A.      Discovery in a Criminal Case

We begin with an overview of the principles that guide discovery in a criminal case.  The government's disclosure obligations arise from three primary sources: Federal Rule of Criminal Procedure 16, see FED. R. CRIM. P. 16; the Jencks Act, 18 U.S.C. § 3500; and Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. See United States v. Maury, 695 F.3d 227, 247 (3d Cir. 2012) (citing FED. R. CRIM. P. 16; 18 U.S.C. § 3500; Brady, 373 U.S. 83).

Most of the government's pretrial disclosure obligations stem from Rule 16(a).  See FED. R. CRIM. P. 16(a).  The rule establishes six categories of information that the government must produce to an individual defendant "[u]pon . . . request." See id.  Rules 16(a)(1)(A) and (B) task the government to disclose a defendant's oral, written, and recorded statements, and Rule 16(a)(1)(D) requires disclosure of a defendant's prior record.  See FED. R. CRIM. P. 16(a)(1)(A), (B), (D).  Rule 16(a)(1)(E) is the broadest provision, requiring the government to allow a defendant "to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings[,] or places," if the item is in the possession, custody, or control of

---

[3] Dickerson's counsel indicate that they are working with the government to resolve discovery disputes but do not require the court's intervention at this time. (See Doc. 681 at 9).  Counsel reserve their right to return to the court for assistance if their disagreements with the government do not resolve.  (See id.)  Additionally, we note that Jenkins-Armstrong did not file his own discovery motion but has fully joined in Preddy's discovery requests.  (See Doc. 686 at 1).  Consequently, our disposition of Preddy's requests infra applies equally to Jenkins-Armstrong.

the government and is "material to preparing the defense," is intended to be used in the government's case-in-chief at trial, or "was obtained from or belongs to the defendant."  See FED. R. CRIM. P. 16(a)(1)(E).  Rule 16(a)(1)(F) requires the same for the results or reports of any physical or mental examinations or scientific tests or experiments that are in the possession, custody, or control of the government; are known to exist (or reasonably should be known to exist) by the attorney for the government; and either are material to preparing the defense or intended to be used in the government's case-in-chief.  See FED. R. CRIM. P. 16(a)(1)(F).  Under Rule 16(a)(1)(G), the government must provide defendants with a written summary of any expert testimony it intends to use in its case-in-chief.  See FED. R. CRIM. P. 16(a)(1)(G).

Rule 16 includes important caveats.  Except as authorized under Rule 16(a)(1)(A) through (D), (F), and (G), the rule exempts government work product from discovery and inspection.  See FED. R. CRIM. P. 16(a)(2).  Government work product includes "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."  See id.  The rule also exempts from discovery and inspection the statements of prospective government witnesses, except as provided in the Jencks Act.  See id. (citing 18 U.S.C. § 3500).

The Jencks Act protects from disclosure statements or reports made by prospective government witnesses until after they testify on direct examination at trial.  See 18 U.S.C. § 3500(a).  After the witness testifies, the Act entitles the defendant to a copy of "any statement . . . of the witness in the possession of the

United States which relates to the subject matter as to which the witness has testified." Id. § 3500(b); see Maury, 695 F.3d at 247.  The Act is intended to ensure that a defendant has "an opportunity to review the witness's statements for any possible inconsistencies that he might use to impeach the witness." Maury, 695 F.3d at 248 (citing United States v. Rosa, 891 F.2d 1074, 1076-77 (3d Cir. 1989)).

The Jencks Act is the sole means of acquiring the statements that it covers; that is, "statements of a government witness made to an agent of the [g]overnment which cannot be produced under the terms of [the Jencks Act] cannot be produced at all." Palermo v. United States, 360 U.S. 343, 351 (1959).  Our court of appeals has made clear that "the government has no obligation to produce Jencks material until the witness has testified" at trial. Maury, 695 F.3d at 248 (citing 18 U.S.C. § 3500(a)); see United States v. Murphy, 569 F.2d 771, 773 (3d Cir. 1978).  Fortunately, in an effort to minimize trial interruptions, federal prosecutors often agree to turn Jencks material over before the witness testifies. See Murphy, 569 F.2d at 773 n.5; see also Maury, 695 F.3d at 248 n.18.[4]

---

[4] This case is no exception.  Indeed, given the complexity of the case and in the interest of judicial economy, the government has agreed to turn over its Jencks material a full month before trial, (see Doc. 611 ¶ 5), on November 5, 2021, (see Doc. 613 ¶ 5).  Despite this straightforward agreement, we note that the government states throughout the instant briefing: "[C]onsistent with the practice of the U.S. Attorney's Office for the Middle District of Pennsylvania, all Jencks material will be turned over to the defendants in the week prior to the commencement of trial." (See Doc. 720 at 20 n.1; Doc. 724 at 20 n.1; Doc. 727 at 21 n.1; Doc. 748 at 5 n.1).  We presume these references are inadvertent recitations of standard policy and not a deliberate retreat from the government's promise to disclose Jencks material 30 days in advance of trial.  If the government wishes to modify the existing scheduling order, the court will require a motion to that effect immediately.

The Jencks Act includes procedures for *in camera* review and redaction of a statement if the government contests the relevancy of any part of it.  <u>See</u> 18 U.S.C. § 3500(c); <u>see also</u> <u>Maury</u>, 695 F.3d at 247-48.  The term "statement" means

> (1) a written statement made by said witness and signed or otherwise adopted or approved by [the witness];
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>
> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3005(e).  The Jencks Act is implemented by Federal Rule of Criminal Procedure 26.2.  <u>See</u> FED. R. CRIM. P. 26.2; <u>see also</u> <u>Maury</u>, 695 F.3d at 247.

Finally, under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the government is obligated to disclose to a criminal defendant any evidence in the government's possession that is "favorable to an accused" and "material either to guilt or to punishment."  <u>See</u> <u>Brady</u>, 373 U.S. at 87.  The government must also disclose any "evidence that goes to the credibility of crucial prosecution witnesses."  <u>Maury</u>, 695 F.3d at 249 (quoting <u>Buehl v. Vaughn</u>, 166 F.3d 163, 181 (3d Cir. 1999)).  Known as <u>Giglio</u> material, <u>see</u> <u>Giglio v. United States</u>, 405 U.S. 150 (1972), "this evidence is a subset of <u>Brady</u> material insofar as it addresses situations in which certain evidence about a witness's credibility or motivation to testify exists."  <u>Maury</u>, 695 F.3d at 249 (quoting <u>Giglio</u>, 405 U.S. at 154).  Failure to disclose either type of material violates the defendant's due-process rights.  <u>See</u> <u>id.</u>  Admissibility is relevant but not a

prerequisite to disclosure under <u>Brady</u>, since "inadmissible evidence may be material if it could . . . [lead] to the discovery of admissible evidence." <u>Johnson v. Folino</u>, 705 F.3d 117, 129-30 (3d Cir. 2013) (collecting cases).

<u>Brady</u> and its progeny "establish a prosecutorial obligation rather than a general rule of pretrial discovery." <u>United States v. Beech</u>, 307 F.R.D. 437, 441 (W.D. Pa. 2015).  This obligation may not be used "to obtain wholesale discovery of the government's principal case." <u>Id.</u> (citing <u>United States v. Higgs</u>, 713 F.2d 39, 42 (3d Cir. 1983); <u>United States v. Bocra</u>, 623 F.2d 281, 285 (3d Cir. 1980)).  Even so, the United States Supreme Court favors a liberal policy of disclosure of exculpatory material.  Thus, "[t]he prudent prosecutor will resolve doubtful questions in favor of disclosure." <u>Kyles v. Whitley</u>, 514 U.S. 419, 439 (1995) (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 108 (1976)).

> This is as it should be.  Such disclosure will serve to justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'  And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.

<u>Id.</u> at 439-40 (alterations in original) (quoting <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935)) (citing <u>Rose v. Clark</u>, 478 U.S. 570, 577-78 (1986); <u>Estes v. Texas</u>, 381 U.S. 532, 540 (1965); <u>United States v. Leon</u>, 468 U.S. 897, 900-01 (1984)).

**B.   <u>Brady</u> *and* <u>Giglio</u> *Disclosure Timing***

We turn first to the issue of timing of required disclosures, which is raised in most of moving defendants' discovery requests.  The government

underscores throughout its briefing that it understands and acknowledges its disclosure obligations; that it has turned over any Brady material in its possession and will continue to turn over additional Brady material as it is uncovered; and that it will turn over Giglio material at the appropriate time.  (See, e.g., Doc. 727 at 26).  Defendants ask the court to accelerate the government's Brady and Giglio disclosures, requesting that we order production now, or at least well in advance of trial.  (See, e.g., Doc. 591 at 8; Doc. 654 at 20-24; Doc. 679-2 at 13-14).

Decisional law guides the timing of required disclosures.  Exculpatory material—that which "go[es] to the heart of the defendant's guilt or innocence," see Higgs, 713 F.2d at 42—must be disclosed on a rolling basis "without undue delay," see United States v. Johnson, 218 F. Supp. 3d 454, 459 (W.D. Pa. 2016).  Impeachment material—that which goes to "a witness's credibility or motivation to testify," see Maury, 695 F.3d at 149—may be disclosed later, but must still be turned over "in time for its effective use at trial," see Higgs, 713 F.2d at 44.  Exactly when impeachment material must be disclosed "depends on what information has been requested and how that information will be used."  Id. at 43-44.  For material that will primarily be used to challenge witness credibility on cross-examination, the government meets its obligation if "disclosure is made the day that the government witnesses are scheduled to testify in court."  Id. (citation omitted).  The government acknowledges that its Brady obligation is ongoing and continues as the proceedings progress, (see, e.g., Doc. 727 at 19 (citing Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987))), and states that it will "produce the appropriate Giglio materials to defense

counsel in reasonable time for the defense to make effective use of the materials at trial," (see id. at 26; see also Doc. 724 at 26-27).

Importantly, these minimum constitutional requirements establish a floor, not a ceiling.  A district court may, in the exercise of its discretion, set earlier disclosure deadlines "to ensure the effective administration of the criminal justice system."  See United States v. Starusko, 729 F.2d 256, 261 (3d Cir. 1984) (quoting Higgs, 713 F.2d at 44 n.6).  Indeed, to do so is preferred by the Third Circuit Court of Appeals, which has a "longstanding policy of encouraging early production." See id. (collecting cases); see also Johnson, 218 F. Supp. 3d at 459 (citing Starusko, 729 F.2d at 261); United States v. Mariani, 7 F. Supp. 2d 556, 562 (M.D. Pa. 1998) (collecting cases).  The court of appeals has "flatly reject[ed] the notion . . . that it is the government, not the district court, that in the first instance is to decide when to turn over Brady material."  Starusko, 729 F.2d at 261 (internal quotation marks omitted).  District courts accordingly "may dictate by court order when Brady material must be disclosed, and absent an abuse of discretion, the government must abide by that order."  Id.

This court's criminal practice order requires the government to disclose Brady material no later than 10 days after the order is entered.  (See Doc. 24 ¶ 4(F); Doc. 34 ¶ 4(F); Doc. 304 ¶ 4(F); Doc. 318 ¶ 4(F); Doc. 325 ¶ 4(F); Doc. 337 ¶ 4(F); Doc. 356 ¶ 4(F); Doc. 371 ¶ 4(F)).  The order allows the government to first redact impeachment material within the scope of Giglio, provided it makes all Giglio material available for inspection or copying at least one week before trial.  (See Doc. 24 ¶ 4(F); Doc. 34 ¶ 4(F); Doc. 304 ¶ 4(F); Doc. 318 ¶ 4(F); Doc. 325 ¶ 4(F); Doc. 337

¶ 4(F); Doc. 356 ¶ 4(F); Doc. 371 ¶ 4(F)).  It includes an exception to the one-week advance disclosure deadline if "the government demonstrates that unique circumstances in the case require a later disclosure."  (See Doc. 24 ¶ 4(F); Doc. 34 ¶ 4(F); Doc. 304 ¶ 4(F); Doc. 318 ¶ 4(F); Doc. 325 ¶ 4(F); Doc. 337 ¶ 4(F); Doc. 356 ¶ 4(F); Doc. 371 ¶ 4(F)).

Consistent with our prior orders, we will direct the government to immediately produce any Brady material in its actual or constructive possession, or in the actual or constructive possession of its agents, to the defendants.  It shall also continue producing Brady material to the defendants as it becomes available, or as the exculpatory value of existing material becomes apparent, and shall exercise its best efforts to do so within 14 days of uncovering that material.  To the extent any exculpatory material may also contain Giglio or Jencks material, the government may redact that information from its disclosures; the redacted material will then be produced before trial in accordance with the deadlines set forth below.  Cf. Mariani, 7 F. Supp. 2d at 564 (citing United States v. Beckford, 962 F. Supp. 780, 795 (E.D. Va. 1997)).  Should the government have any doubt as to the exculpatory nature of material in its possession, it shall promptly submit the material to this court for in camera review.  See generally Bocra, 623 F.2d at 285-86.

We also find it appropriate to accelerate disclosure of Giglio material in this case "to ensure the effective administration of the criminal justice system."  See Starusko, 729 F.2d at 261 (quoting Higgs, 713 F.2d at 44 n.6).  We understand that the government's case-in-chief will rely in large part on testimony of cooperating witnesses and informants.  (See Doc. 443 at 4; see also Doc. 654 at 21).  Although

impeachment evidence "*normally* does not require counsel to be given substantial time in advance to review," see Mariani, 7 F. Supp. 2d at 563 (emphasis added) (citing Beckford, 962 F. Supp. at 788); see also Higgs, 713 F.2d at 44, the volume of expected impeachment material in this case, given its myriad complexities and the anticipated number of witnesses, necessitates early disclosure.  Because the government has already agreed to disclose its Jencks material 30 days before trial, (see Doc. 611 ¶ 5; Doc. 613 ¶ 5), we conclude that a similar 30-day advance disclosure deadline for Giglio material is appropriate.  Early disclosure will not only further the interests of judicial economy and trial efficiency, it will also allow counsel to "more fully advise [their] client[s] regarding the appropriate development of the case, including consideration of any plea agreement offered by the government." See United States v. Mais, No. 2:00CR54, 2006 WL 3308429, at *7 (W.D. Pa. Oct. 30, 2006).

We recognize that defendants would like to have this material even earlier.  But in a criminal prosecution of this nature—involving allegations that certain defendants murdered federal witnesses, and that others attempted to murder a coconspirator suspected to be cooperating in the underlying murder investigation—we must balance defendants' desire for advance disclosure with the government's legitimate interest in protecting its witnesses.  Cf. Beckford, 962 F. Supp. at 788-89 (because impeachment material "serves . . . to identify the witnesses to whom the material relates," timing of disclosures must "take into account such factors as the risk to witnesses").  We conclude that a 30-day advance disclosure deadline for Giglio material adequately balances these interests.

C.      **Specific Discovery Requests**

In addition to their generalized requests for disclosure of exculpatory and impeachment material, defendants raise targeted requests for specific categories of evidence and information.  We take up each of these requests *seriatim*.

1.      *Coconspirator or Codefendant Statements*

Several defendants ask the court to order the government to turn over all coconspirator or codefendant statements in the government's actual or constructive possession.  (See Doc. 654 at 14-15; Doc. 679-2 at 5-6; see also Doc. 589 at 3; Doc. 591 at 3; Doc. 673 at 3-5).  Defendants contend they are entitled to these statements either under Rule 16 or Brady and ask that they be turned over immediately.  To the extent these statements include exculpatory Brady material, the government has acknowledged its obligation to turn them over and reports that it has already done so.  (See, e.g., Doc. 748 at 9).  Some defendants contest that representation in their reply briefs, indicating that no such statements have been received to date.  (See, e.g., Doc. 762 at 11; Doc. 764 at 8).  We reiterate our above directive: if any material sought by the defense contains exculpatory Brady information—including the requested statements—the government must disclose that material now, subject to Giglio and Jencks redactions as appropriate.  If it is the government's position that it has no Brady material encompassed by this request, it shall notify defendants of that fact forthwith.

To the extent defendants request that the government turn over statements of *all* coconspirators and codefendants, exculpatory or not, their request finds no support in Rule 16.  Although our court of appeals has not addressed this question

as to unindicted coconspirators, it has held that an "individual defendant is not entitled to discovery of the statements of his codefendants." See Maury, 695 F.3d at 251 n.21 (citing United States v. Randolph, 456 F.2d 132, 135-36 (3d Cir. 1972)). Thus, defendants' request for discovery of their codefendants' statements under Rule 16 is foreclosed by binding precedent.[5]  Such statements may only be turned over as required by Brady, Giglio, and the Jencks Act, in a manner consistent with the disclosure timeline set forth above.

With respect to coconspirators, the robust and longstanding consensus of district courts within this circuit is that statements of coconspirators are not

---

[5] Adgebesan cites Government of Virgin Islands v. Ruiz, 495 F.2d 1175 (3d Cir. 1974), for the proposition that criminal defendants are entitled to discovery of their codefendants' statements under Rule 16(a)(1)(E).  (See Doc. 735 at 7 (citing Ruiz, 495 F.2d 1175)).  A leading treatise also reads Ruiz this way.  See 2 FEDERAL PRACTICE & PROCEDURE § 253 (4th ed. 2020) (citing Ruiz as support for statement that "[s]ome courts have held that they had the power to order production under [Rule 16(a)(1)(E)]").  This interpretation misapprehends Ruiz, which did not involve disclosure of a defendant's statement to other defendants.  To the contrary, Ruiz concerned the government's failure to turn the defendant's *own statement* over to the defendant's *own lawyer* under Rule 16(a)(1)(A).  See Ruiz, 495 F.2d at 1178 (explaining that "*the defendant's* attorney was entitled to be informed of it pursuant to his Rule 16(a)(1) motion" (emphasis added)); see also United States v. Eisenberg, 773 F. Supp. 662, 681 n.11 (D.N.J. 1991).

discoverable under Rule 16.[6]  Courts reach this conclusion whether treating the

defendant's request as arising under Rule 16(a)(1)(A), on a theory that the statement

of a coconspirator may be attributable to the defendant under the Federal Rules

of Evidence, see Cheatham, 500 F. Supp. 2d at 538-39, or under Rule 16(a)(1)(E),

on a theory that such a statement may be "material to preparing the defense," see

Hanner, 2007 WL 587462, at *1.  These courts explain that, since Rule 16 does not

permit discovery of coconspirator statements, they are subject to production only

as required by Brady or the Jencks Act.  See Johnson, 218 F. Supp. 3d at 458 & n.2

(collecting cases).  This interpretation of Rule 16(a) accords with the view of every

court of appeals to address the question.  See United States v. Mayberry, 896 F.2d

1117, 1122 (8th Cir. 1990); United States v. Tarantino, 846 F.2d 1384, 1418 (D.C. Cir.

1988); United States v. Orr, 825 F.2d 1537, 1541 (11th Cir. 1987); United States

---

[6] See Johnson, 218 F. Supp. 3d at 458 (collecting numerous court of appeals decisions); United States v. D'Elia, No. 3:CR-06-191, 2007 WL 2458487, at *8 (M.D. Pa. Aug. 24, 2007) (same); United States v. Cheatham, 500 F. Supp. 2d 528, 538-39 (W.D. Pa. 2007) (same); United States v. Hanner, No. 02:05cr385-02, 2007 WL 587462, at *1 (W.D. Pa. Feb. 20, 2007); Mais, 2006 WL 3308429, at *2 (same); United States v. Giampa, 904 F. Supp. 235, 284-85 (D.N.J. 1995) (same), aff'd without opinion, 107 F.3d 9 (3d Cir. 1997); Eisenberg, 773 F. Supp. at 682 (same); United States v. Ahmad, 53 F.R.D. 186, 189 (M.D. Pa. 1971); but see United States v. Bloom, 78 F.R.D. 591, 618 (E.D. Pa. 1977) (ordering production of non-Jencks coconspirator statements).

v. Roberts, 811 F.2d 257, 258-59 (4th Cir. 1987) (*en banc*) (*per curiam*); United States v. Percevault, 490 F.2d 126, 130-32 (2d Cir. 1974).[7]

We agree with the *ratio decidendi* of these courts and conclude that Rule 16 does not entitle defendants to discovery of their codefendants' or unindicted coconspirators' statements. Disclosure of these statements instead falls within the scope of Brady, Giglio, and the Jencks Act, as set forth *supra*.

### 2. *List of Witnesses*

Preddy asks the court to order the government to identify all of its witnesses in advance of trial and suggests that it is the government's burden to establish that doing so would jeopardize witness safety. (See Doc. 654 at 16-18). As the Supreme Court has explained, "[i]t does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably." Weatherford v. Bursey, 429 U.S. 545, 559 (1977). Indeed, it is "firmly established" that the government is under no obligation "to divulge the identity of its witnesses in a noncapital case." See United States v. Addonizio, 451 F.2d 49, 62 (3d Cir. 1971) (citations omitted); see

---

[7] Several defendants cite United States v. Jackson, 757 F.2d 1486 (4th Cir. 1985), for the proposition that statements of a coconspirator are discoverable under Rule 16 if the coconspirator will not be testifying as a government witness at trial. Jackson indeed held that "the defendant is entitled to disclosure of statements of co-conspirators if the co-conspirator is not a prospective government witness and disclosure does not unnecessarily reveal sensitive information." See Jackson, 757 F.2d at 1491. But the Fourth Circuit Court of Appeals reversed that decision *en banc* two years later in United States v. Roberts, 811 F.2d 257 (4th Cir. 1987) (*per curiam*), adopting Judge Wilkinson's separate concurrence from Jackson as the law of that circuit. See Roberts, 811 F.2d at 258-59 (holding that coconspirator statements are not within the purview of Rule 16(a)(1)(A) and are "more properly governed by the Jencks Act").

also Gov't of Virgin Islands v. Martinez, 847 F.2d 125, 128 (3d Cir. 1988); United States v. DePasquale, 740 F.2d 1282, 1294 (3d Cir. 1984).  It follows that the government is not required to justify withholding its witness list or to identify with particularity a known threat to its witnesses.

Preddy identifies no binding precedent to the contrary.  He merely notes—correctly—that district courts have discretion to order early disclosure of witness lists, and he asks us to exercise that discretion here.  (See id. at 16-18); see also Martinez, 847 F.2d at 128 (citing Higgs, 713 F.2d at 44 n.6).  We decline to do so. Preddy fails to articulate a compelling need for immediate identification of witnesses other than a generalized desire to learn more about the government's case.  (See Doc. 654 at 16-18).  And we have already explained our serious concern for witness safety given the nature of the allegations in this case.  See Martinez, 847 F.2d at 128.  We will accordingly deny the request for a list of prospective government witnesses.

### 3.   *List of Informants*

Preddy also asks the court to order the government to identify all confidential informants who have assisted the prosecution in this case.  (See Doc. 654 at 18-19).  The government has a qualified privilege to protect the identity of its confidential informants.  See Roviaro v. United States, 353 U.S. 53, 59 (1957). This privilege "serves important law enforcement objectives, most significantly, the public interest in encouraging persons to supply the government with information concerning crimes."  United States v. Brown, 3 F.3d 673, 693 (3d Cir. 1993) (citing Roviaro, 353 U.S. at 59).  The privilege is not without limitation, and it "must give

way" when "disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." See United States v. Jiles, 658 F.2d 194, 196 (3d Cir. 1981) (quoting Roviaro, 353 U.S. at 60-61). If a defendant "sets forth a specific need for disclosure," the court must "balance 'the public interest in protecting the flow of information against the individual's right to prepare his defense.'" Id. (quoting Roviaro, 353 U.S. at 62).

Preddy has not set forth a "specific need" for the requested information. As with his request for the government's witness list, Preddy expresses nothing more than a generalized desire to know the identity of those who have informed against him. (See Doc. 654 at 18). Our court of appeals has repeatedly held that "[m]ere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity." See United States v. Bazzano, 712 F.2d 826, 839 (3d Cir. 1983) (en banc) (citation omitted); see also Jiles, 658 F.2d at 197 (citations omitted). The government states that its informants will have their identities revealed closer to trial, "when the safety and utility of the informant can be compared to the need for the testimony." (See Doc. 724 at 24 n.3). Moreover, any Brady material provided by an informant has ostensibly already been disclosed, and the statements of any informant who will testify at trial will be disclosed as part of the government's Giglio and Jencks production. Thus, Preddy will have 30 days prior to trial to review that information, to conduct additional investigation, and to prepare for cross-examination. For these reasons, we will deny Preddy's request for a list of all government informants.

###     4.    *Jailhouse-Informant Witnesses*

White has filed a separate motion, joined in by Coles, asking the court to order the government to provide wide-ranging disclosures of all favorable evidence regarding all jailhouse informants[8] who will testify as prosecution witnesses.  (See Docs. 672, 675; see also Doc. 700 ¶ 2).  White asks that we order the government to produce all of the following with respect to any jailhouse-informant witness:

- basic identifying information including names, addresses, birth dates, and government-issued identification numbers;

- any evidence the government has that tends to discredit or impugn the reliability of the witness's actual or anticipated testimony;

- the identity of any person with whom the witness may have spoken about their allegations or other material facts;

- any prior cases, within or beyond this jurisdiction, in which the witness has provided information to the government or testified as a government witness;

- any evidence tending to show that the witness was intoxicated, under the influence of medication or other drugs, suffering mental illness or cognitive disability, or otherwise impaired at the time an alleged statement was made to the witness, when supplying information to the government, or while testifying;

- any prison recordings of the witness containing potential impeachment information;

- the witness's criminal record and any information concerning the witness's criminal activity, including whether the witness has been questioned about but not charged for a crime;

---

[8] White uses the terms "jailhouse informant" and "snitch" interchangeably. He defines both to mean "any individual who will testify that Mr. White or any of his co-defendants confessed or made inculpatory admissions since their incarceration, whether or not those individuals have received explicit promises or benefits in exchange for their testimony."  (Doc. 675 at 1 n.1).

- any information revealing that the witness has a prior reputation for or disposition toward untruthfulness;

- any consideration or promises of consideration made by the government to the witness, and any suggestions made that cooperation could result in favorable treatment;

- any preferential treatment or privileges the witness has already received for their assistance;

- any express or implied nonprosecution or immunity deal;

- any evidence of bias or animosity of the witness toward White, his family or friends, or his codefendants or their family or friends;

- any evidence of personal bias in favor of or against law enforcement;

- any false or broken promises by the witness, including violations of a plea or cooperation agreement, violations of pretrial or other criminal justice supervision, or failure to appear;

- evidence of ongoing criminality or deceptive conduct during the period of cooperation;

- any information concerning the witness's "personal problems that affect credibility," to include mental health conditions, cognitive impairment, alcohol or substance abuse history, or other medical problems that impact credibility, perception, memory, and observation; and

- the immigration status of the witness, as well as information suggesting concern about potential immigration consequences.

(Doc. 672 at 5-8 ¶¶ 1-18).

In the main, these itemized discovery requests fall squarely within the ambit of our determination concerning the government's Brady and Giglio obligations and the required timeline for disclosure. As we have noted, and as the government has acknowledged, the government has an immediate and ongoing obligation to turn

over any <u>Brady</u> material.  We have been assured that any <u>Brady</u> material currently in the government's possession has already been disclosed to the defense.  To the extent White requests disclosure of <u>Giglio</u> impeachment evidence, we have instructed the government to produce that material 30 days in advance of trial, simultaneous with its Jencks disclosures.

White's motion does raise one question not addressed above, and that is one of scope.  That is, the parties appear to have somewhat divergent views with respect to the scope of the government's affirmative obligations under <u>Brady</u> and <u>Giglio</u>.  White contends that the government "must not only turn over what it has[;] it must also collect the information it lacks to ensure the reliability of an informant witness." (Doc. 678 at 14).  According to White, the government must also "seek to corroborate and verify testimony, procure evidence that establishes (or diminishes) its claims, and inquire of all law enforcement agencies involved to ensure that both the prosecution and defense have access to the information required to ensure a fair proceeding and an adequate defense." (<u>Id.</u>)  The government, for its part, says it "understands that it must also disclose evidence that could be used to impeach government witnesses," an obligation that "would include any agreement with a government witness for testimony in exchange for monetary compensation or favorable treatment in the criminal justice system." (<u>See</u> Doc. 727 at 19).

We do not read the government's response, as White does, to express a belief on the government's part that its obligations go no further than disclosing formal deals with government witnesses. (<u>Cf.</u> Doc. 740 at 7).  Nonetheless, it bears clarifying that the government's obligations are significantly broader than stated in

its briefing.  Clearly, the government must disclose explicit cooperation agreements or immunity deals inked by prosecutor and witness.  See Giglio, 405 U.S. at 151-54. But as we have recently explained,

> Brady evidence is not limited to actual "deals" or "agreements" between witnesses and the government. Under firmly established Supreme Court precedent including, *inter alia*, Brady, Giglio, Strickler, Bagley, and Kyles, the prosecution must turn over evidence that is "favorable to the accused."  In the context of a government witness, this could mean impeachment evidence regarding favorable treatment or even the possibility or expectation of favorable treatment; evidence that impugns the reliability of the witness's testimony; and evidence of bias, prejudice, or ulterior motives affecting the witness's credibility.

Harshman v. Superintendent, 368 F. Supp. 3d 776, 790 (M.D. Pa. 2019) (Conner, C.J.) (citing Kyles, 514 U.S. at 441-45; Davis v. Alaska, 415 U.S. 308, 316 (1974)).  The obligation extends "beyond evidence in the prosecutor's actual possession," see United States v. Risha, 445 F.3d 298, 303 (3d Cir. 2006), and imposes on prosecutors an affirmative "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," id. (quoting Kyles, 514 U.S. at 437); see also United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991).

Although the government's Brady and Giglio obligations are far-reaching, they are not limitless.  The government is "not required to undertake a 'fishing expedition' in other jurisdictions to discover impeachment evidence."  Risha, 445 F.3d at 303.  Our court of appeals has offered as an example that prosecutors "are not obligated to learn of all information 'possessed by other government agencies that have no involvement in the investigation or prosecution at issue.'"  Id. (quoting United States v. Merlino, 349 F.3d 144, 154 (3d Cir. 2003)).  To determine whether a

cross-jurisdictional <u>Brady</u> obligation exists, we must ask "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." <u>Id.</u>

Against this backdrop, we agree with White that he is entitled to any exculpatory or impeachment material relating to the government's jailhouse-informant witnesses that is in the possession of the government's attorneys, its case agents, or any other law enforcement agency involved in the investigation of this case.  <u>See</u> <u>Risha</u>, 445 F.3d at 303.  This would include information regarding witness identities and criminal histories, (<u>see</u> Doc. 672 at 5 ¶ 1, at 6 ¶ 8), as well as information revealing a witness's account to be inconsistent or unreliable, (<u>see</u> <u>id.</u> at 5 ¶ 2, at 6 ¶ 7); that the witness was intoxicated, under the influence of drugs, or otherwise incompetent at the time of their observations, statements, or testimony, (<u>see</u> <u>id.</u> at 6 ¶ 5); that the witness has reached a cooperation agreement with the government, or has received or expects preferential treatment in exchange for information, or may be motivated by immigration status or potential immigration consequences, (<u>see</u> <u>id.</u> at 7 ¶¶ 10-12, at 8 ¶ 18); that the witness harbors bias against a defendant or in favor of law enforcement, (<u>see</u> <u>id.</u> at 7 ¶¶ 13-14); that the witness has made false promises or broken promises to government agents or has continued to engage in criminal or deceptive conduct, (<u>see</u> <u>id.</u> at 7-8 ¶¶ 15-16); or that the witness has a mental or physical health problem or substance or alcohol abuse history

impacting credibility, perception, memory, or observation, (see id. at 8 ¶ 17). Although the government does not offer a targeted response to each of these requests, we presume it would agree that, as framed here, the information sought must be disclosed if it exists.  To be abundantly clear, we direct the government to produce all such material in accordance with the disclosure timelines set forth *supra*.

However, we disagree with White's intimation that the government is constitutionally obligated to undertake a scorched-earth investigation of every prospective jailhouse-informant witness.  White's suggestion that the government must seek out such information from persons or entities other than government attorneys, case agents, or law enforcement agencies involved in this case exceeds Brady's scope.  For example, it appears White would have the government collect information about its witnesses' character for truthfulness from "employers, neighbors, probation or parole officers, police officers, jailers, family members, friends, or acquaintances."  (See Doc. 672 at 7 ¶ 9).  If the government or its agents have information that impugns a witnesses' credibility, the government obviously must share it.  But we reject the notion that the government must survey everyone in its witnesses' lives to assess their reliability.  We likewise find no support for White's request that the government identify "any persons" with whom a jailhouse-informant witness has communicated regarding the case.  (See id. at 5 ¶ 3).  That request apparently seeks disclosure of *every* case-related conversation a witness has ever had with anyone, regardless of whether the conversation is exculpatory, impeaching, or within the scope of Jencks.  (See Doc. 672 at 5 ¶ 3; Doc. 740 at 9).

White also provides no binding legal authority for his assertion that the government should canvas all jurisdictions to find out when, how, and in exchange for what its jailhouse-informant witnesses have provided informant testimony in the past.[9] (See Doc. 672 at 5 ¶ 4).  Of course, if the government's attorneys or case agents are in actual or constructive possession of any such information, they must disclose it.  And an especially diligent prosecutor may well choose to seek out such information out.  But existing precedent does not *require* the government to do so. See Risha, 445 F.3d at 303.

For these reasons, we will grant in part and deny in part White's motion concerning jailhouse-informant witnesses.

### 5.    *Cell Phones*

White initially moved the court to compel discovery of any cell phones in the government's possession that belonged to him, (see Doc. 671 at 2-5), and Coles joined that motion, expanding the relief sought by White to include any cell phones allegedly possessed or used by Coles during the charged offenses, (see Doc. 700 ¶ 3). Adgebesan also requests discovery of the contents of his three cell phones seized at the time of his arrest.  (See Doc. 673 ¶ 11(F)).  In its brief responding to White's pretrial motions, the government reports that it has arranged with defense counsel for White's cell phones to be examined by defense experts, (see Doc. 727 at 26-27), and White confirms in his reply brief that this motion is now moot and requests to

---

[9] White does provide the court with a copy of an order entered in Virginia state court granting identical relief to that White requests here.  (See Doc. 672-4). The subject order contains no legal analysis, and it does not convince us that Brady requires such comprehensive impeachment investigations.

withdraw it, (see Doc. 740 at 13-14).  We will grant that request and deem White's

motion for production of his cell phones to be withdrawn without prejudice.

As to Coles' and Adgebesan's requests, the government offers no response.

It has neither opposed their requests nor reported that it has given their defense

teams access similar to that provided to White.  (See generally Docs. 720, 748).

The defendants' cell phones and their contents appear to fall squarely within Rule

16(a)(1)(A) and (B), concerning oral and written statements of the defendant, and

Rule 16(a)(1)(E), concerning objects obtained from or belonging to the defendant.

See FED. R. CRIM. P. 16(a)(1)(A), (B), (E)(iii).  With no objection from the

government, we will grant Coles' and Adgebesan's requests for discovery of

their personal cell phones.

Defendants also seek access to the contents of cell phones, or data from

cell phones, belonging to others.  White requests "all information obtained from"

the cell phone belonging to unindicted coconspirator Angela Barney pursuant to

Rule 16(a)(1)(E).  (See Doc. 589 at 2, 3-4).  Adgebesan similarly asks for "[a]ll digital

contents obtained from the cellular telephone of Angela Barney."  (See Doc. 673

¶ 11(O)).  Coles does not request the contents of Barney's phone *per se*, but he

has joined in Adgebesan's discovery motion, (see Doc. 700 ¶ 5), and he separately

requests, under Rule 16(a)(1)(F), the results of an examination of Barney's phone

conducted by the government, (see Doc. 679-2 at 11).  According to White, Barney

was with Corbett when the triple homicide was committed; her identity is contained

within multiple police reports and interview notes; and she "is alleged to have been

a witness to both the planning leading up to the homicides and the actual murders of Chaney, Jackson, and Cole." (Doc. 589 at 3-4).

As an unindicted coconspirator, Barney's statements are not discoverable at this time except to the extent they contain <u>Brady</u> material. However, we disagree with the government's view that the defendants have offered nothing more than a "bare allegation" that they need information from Barney's phone. (<u>See, e.g.</u>, Doc. 759 at 12). Both White and Adgebesan articulate why they believe the information from Barney's phone is material. (<u>See</u> Doc. 589 at 3-4; Doc. 735 at 6). We can see exactly how it may be material—in particular any geolocation and other data—and the government offers no meaningful argument to the contrary. (<u>See</u> Docs. 720, 748, 759). Accordingly, we will grant these motions to the extent the government must allow Coles, White, and Adgebesan to inspect or to copy or photograph the contents of Barney's phone, redacting any statements falling within the scope of <u>Giglio</u> or the Jencks Act, and must produce any forensic or scientific report prepared with respect to that phone. <u>See</u> FED. R. CRIM. P. 16(a)(1)(E), (F).

Adgebesan asks the court to order the government to disclose the contents of two cell phones seized from Corbett and a black Huawei cell phone seized from coconspirator Joshua Davis. (<u>See</u> Doc. 673 ¶ 11(A), (B), (FF)). He raises this request under Rule 16(a)(1)(E), asserting that the contents of these phones and the data they contain are likely to be material to preparing his defense or used by the government in its case-in-chief at trial. (<u>See</u> Doc. 674 at 2-3). He explains that "the locations and communications of co-defendants relative to the time of the murders [are] indisputably material to defense preparation." (Doc. 735 at 6). As with Barney, we

reiterate that statements of a codefendant or coconspirator are not discoverable. But we again agree that other data from these phones, in particular geolocation data, would be material to preparing a defense. And once more, the government does not argue otherwise. (See generally Doc. 720). We will thus grant Adgebesan's motion, which has been joined by Coles, (see Doc. 700 ¶ 5), and order the government to provide the same access to the contents of and data from these cell phones as described for Barney's phone above. See FED. R. CRIM. P. 16(a)(1)(E).

Finally, Coles asserts that "cell phone analysis for the phone purported[ly] connected with Mr. Coles is incomplete." (See Doc. 679-2 at 11-12). He avers that "native Oxygen information for the smartphone with the serial number 138520086 is missing," and contends that the government must have this information, since it produced a report based on the information. (See id.) The government responds directly to Coles' arguments regarding allegedly missing cell-phone geolocation applications and court orders, but it does not answer this specific claim. (See Doc. 748 at 8 n.5). We will task the parties to meet and confer to attempt to resolve this issue. Coles may return to the court with a renewed motion to compel discovery if the issue is not resolved.

### 6. *Enumerated Items*

We turn next to the laundry list of specific discovery requests set forth in each defendant's motion, cataloguing their requests together when possible.

### a. <u>Specific Statements</u>

White and Adgebesan both request the recorded polygraph interview of potential witness Devin DeStefano, (see Doc. 589 at 2; Doc. 673 ¶ 11(U)), and White,

Adgebesan, and Coles all ask for Barney's recorded interview, (see Doc. 589 at 2;
Doc. 673 ¶ 11(N); Doc. 679-2 at 4).  Additionally, Adgebesan requests audio or video
recordings of interviews with codefendants Preddy, Corbett, Jenkins-Armstrong,
Armstrong, White, and Dickerson, (see Doc. 673 ¶ 11(D), (J), (M), (S), (W), (X)), and
with potential witness DeStefano, (see id. ¶ 11(T)).  Adgebesan and Coles both seek
certain of their codefendants' written communications,[10] (see id. ¶ 11(K), (L), (R);
Doc. 679-2 at 4), and Coles also seeks the recording of an interview with Corbett,
(see Doc. 679-2 at 7).  These specific requests for coconspirator and codefendant
statements will be denied for the reasons explained and with the exceptions
articulated *supra*.

The balance of defendants' requests for statements will also be denied,
albeit for different reasons.  Adgebesan asks for the audio or video recordings
of interviews with Ashley Adkins, Bamidele Adgebesan, Joseph Miller, Brandon
Lamar Wills, Taylor Spessard, Stacy Armstrong, Issachar Boston, Jermaine Foye,
Martin Kettula, and Carrie Jones, (see Doc. 673 ¶ 11(C), (E), (G), (H), (I), (P), (Q), (V),
(Y), (Z)), and with an "undisclosed person on August 23, 2016[,] which took place in
Florida," (id. ¶ 11(BB)).  Coles, too, requests audio or video interview recordings;
his list includes DeStefano, Llesenia Diaz, Yolanda Diaz, Tiffany Jardina, Krystal
Rockwell, Lakin Wolfe, Courtney Smith, Francisco Moreno, Trent Smith, Brent
Smith, Kylie Owens, and Cindy Brown.  (See Doc. 679-2 at 6-7).  Preddy broadly
requests the "complete text of any written, recorded[,] or oral statement made by

---

[10] Adgebesan initially requested Johnson's recorded prison phone calls, (see
Doc. 673 ¶ 11(CC)), but has since withdrawn that request, (see Doc. 735 at 5 n.3).

any witnesses" to law enforcement "that pertain to any alleged co-perpetrator, any statements he or she is alleged to have made, and/or any illegal acts he or she is alleged to have committed." (Doc. 654 at 16).

These requests are not sufficiently justified under Rule 16. Defendants do not explain who these individuals are, how they are connected to the case, or why their statements should be discoverable. (See, e.g., Doc. 674 at 2-3; Doc. 654 at 15; Doc. 679-2 at 6-7; Doc. 735 at 8). We suspect that at least some of them are unindicted coconspirators or potential government witnesses, in which case their statements would not be discoverable under Rule 16. To the extent they are not, defendants give us no basis upon which to find that the interviews are material to their defense. Cf. FED. R. CRIM. P. 16(a)(1)(E)(i). We note only that, if the requested items contain Brady material or will be used in the government's case-in-chief, they must be produced to defendants now, subject to appropriate Giglio or Jencks redactions.

### b.   Address of Suspected Meeting Point

Coles and White request the full address of Lakesha Gibson's residence. (See Doc. 589 at 2; Doc. 679-2 at 5). According to these defendants, Corbett told law enforcement that individuals involved in the triple homicide met at Gibson's home before traveling to Jackson's farm. (See Doc. 679-2 at 5; Doc. 589 at 4). Defendants state that Gibson's full address has been redacted from a disclosed report. Coles contends that he needs the full address to prepare a timeline of events on the day of the triple homicide, (see Doc. 679-2 at 5), and White asserts that he needs it to "investigate the location, compare it to his known location, and compare this

information to data provided by the [g]overnment and obtained by the defense," (see Doc. 589 at 4).

The government rejoins that Coles and White "do[] not explain how" this information is material to their defense and that it is enough for them to know the address is somewhere in Hagerstown, Maryland. (See Doc. 748 at 10; Doc. 759 at 12-13). We disagree. To the contrary, defendants explain exactly what makes this location material, why they believe they need the full address, and how they intend to use that information. It is the government that fails to justify withholding this information in light of its obvious materiality. The government claims only that knowing the address is *somewhere* in Hagerstown—Maryland's sixth-largest city[11]— is enough to allow the defendants to establish a timeline of events on the day of the triple homicide, and that revealing the address may unnecessarily expose the individuals who reside there to harm. (See Doc. 748 at 10 & n.6; Doc. 759 at 12-13 & n.1). We reject the assertion that knowing only the city, and not the exact location, of a suspected rendezvous point is adequate to allow the defense teams to develop a timeline of events, and we find that the full address is material to preparing the defense. Nonetheless, in the exercise of caution given the government's invocation of witness-safety concerns, we will provide the government a brief period of time to submit an *in camera* explanation for its decision to withhold this information.

---

[11] See *Maryland at a Glance*, MARYLAND MANUAL ONLINE, https://msa. maryland.gov/msa/mdmanual/01glance/html/pop.html#cities (based upon 2020 census data) (last visited Jan. 2, 2020).

### c.  **Recorded Prison Phone Calls**

White states that the government has disclosed a recorded prison phone call between Wendy Chaney and an individual identified as Ronald Armstead which occurred at approximately 10:00 p.m. on the night of Chaney's murder.  (See Doc. 589 at 4).  Based on this recording, White broadly claims that "*any* additional phone calls in the possession or control of the [g]overnment attributed to Mr. Armstead *or other persons* recorded by that facility, the Washington County Sheriff's Office and Detention Center, *or any other prison facility*," are material to help place the call with Chaney in context.[12]  (See id. (emphasis added)).  Absent a more specific explanation from White, we will deny his request for discovery of the recorded phone calls of essentially any prisoner at the facility where Armstead was detained or any other prison facility.

### d.  **Polygraph Reports and Analysis**

White asks for discovery of the "full report and all analysis regarding the polygraph examinations conducted on Defendant Torey White and Devin DeStefano on June 27, 2016," including but not limited to the polygraph report, all polygraph charts, all final test questions and the questions used to formulate those final questions, the examiner's score sheet, and the examiner's curriculum vitae.  (See Doc. 589 at 5-8).  According to White, he and DeStefano were the first two individuals to call 911 after the triple homicide on June 25, 2016; both were interviewed early the next morning; and both were subjected to a second interview

---

[12] Adgebesan initially requested similar information, (see Doc. 673 ¶ 11(DD)), but has since withdrawn that request, (see Doc. 735 at 5 n.3).

and polygraph examination on June 27, 2016.  (See id. at 7).  White states that police reports indicate that both he and DeStefano were found to be deceptive, but that only White was charged, and he contends that "[a]ll information surrounding these polygraph examinations is necessary for the defense to investigate the reliability of the police investigation into [him]."  (See id. at 8).  Coles also requests access to "the polygraph questions and examination" of DeStefano.  (Doc. 679-2 at 6).

We see no reason why White should not be able to inspect all information and data related to his own recorded polygraph examination, and the government offers none.  (See generally Doc. 759 at 11-13).  That information falls under Rule 16(a)(1)(A), (a)(1)(B), (a)(1)(E)(i), and (a)(1)(F).  See FED. R. CRIM. P. 16(a)(1)(A), (B), (E)(i), (F).  We will grant White's request for the report and analysis for his own polygraph examination on June 27, 2016.  However, to the extent Coles joins in White's motion, (see Doc. 700 ¶ 5), he articulates no independent basis for discovery of White's polygraph, so Coles' request will be denied.

We will also deny the motion as it pertains to DeStefano.  Other than generally indicating that DeStefano's polygraph information might allow him "to investigate the reliability of the police investigation" and "impact the credibility of several of the investigating officers," (see Doc. 589 at 8), White fails to establish materiality to his defense as required under Rule 16(a)(1)(E).  His request speaks more to the government's disclosure obligations under Brady and Giglio than to a discovery obligation under Rule 16.  Nor does Coles adequately explain why he believes he is entitled under Rule 16 to the list of polygraph questions put to DeStefano.  (See Doc. 679-2 at 6).  Again, to the extent the requested report and

other information contain exculpatory material subject to <u>Brady</u> or impeachment material subject to <u>Giglio</u>, they must be disclosed as set forth above. But White and Coles have not shown the requested information to be discoverable under Rule 16.

### e.    Search Warrants, Affidavits, and Geolocation Monitoring Orders

Coles requests all search warrants, arrest warrants, geolocation monitoring orders, and related information, to include chain-of-custody logs, pertaining to him. (<u>See</u> Doc. 679-2 at 9-10). The government responds that it has provided state and federal search warrants, Title III documentation, and court orders authorizing cell phone tracking to Coles, (<u>see</u> Doc. 748 at 7-8 & n.5), and Coles does not challenge that representation in his reply brief, (<u>see</u> Doc. 764 at 10). He notes, however, that the government has not produced (and has not opposed his request for) related chain-of-custody logs and any law enforcement reports pertaining to execution of the geolocation monitoring orders and Title III warrants. (<u>See</u> <u>id.</u>; <u>see also</u> Doc. 748 at 7-8). We agree that this material is discoverable to the extent it pertains to Coles. This unopposed aspect of Coles' motion will thus be granted.

Coles also requests the arrest warrant and supporting affidavit for Dickerson. Coles asserts that the information contained in those documents is material to his defense since his case is "factually intertwined" with Dickerson's. (<u>See</u> Doc. 679-2 at 10). He also requests all arrest warrants and related affidavits for anyone who will testify at trial because those items are either material to his defense or "will necessarily contain information important to cross examine those witnesses." (<u>See</u> <u>id.</u> at 9-10).

The government does not respond directly to Coles' request for any warrant and supporting affidavit pertaining to Dickerson, and we find that request to be fairly within the scope of Rule 16(a)(1)(E) as evidence material to preparing Coles' defense.  See FED. R. CRIM. P. 16(a)(1)(E)(i).  But Coles' cursory request for *all* warrants and affidavits related to prospective government witnesses is not sufficiently grounded in Rule 16.  Rather, it appears to simply be an end-run attempt to secure a list of prospective government witnesses by way of early Giglio disclosures.  (See Doc. 764 at 10).  We have been assured by the government that it understands and will comply with its obligations under Brady and Giglio.  (See, e.g., Doc. 748 at 8).  To the extent clarification is needed, we note our agreement with Coles that, if the government (or any of its agents) have search or arrest warrants and supporting affidavits for any witness who will testify at trial, that material must be disclosed as part of the government's Giglio production.  But Coles' request for immediate disclosure of all warrants or affidavits pertaining to any prospective government witness will be denied.

### f.   **Unopposed Requests**

Defendants lodge a number of other specific discovery requests which the government has not answered.  White asks for a copy of the timelines prepared by an analyst with the Pennsylvania State Police Criminal Intelligence Center, who White indicates utilized data analysis software to approximate the whereabouts of White, DeStefano, and Chaney on the day of the murders.  (See Doc. 589 at 8-9).  White anticipates a work-product objection from the government and briefs that potential issue at some length, (see id. at 9-11), but the government neither raises a

work-product objection nor responds at all to this request, (see generally Doc. 759 at

11-13). The government is also silent with respect to White's request under Rule

16(a)(1)(E) for any information the government has indicating that White knew

Chaney was cooperating and that he acted in accordance with such knowledge.

(See Doc. 589 at 11-14; see generally Doc. 759 at 11-13). White persuasively argues

why he believes these items are material to preparing his defense, and we will grant

his unopposed motion in this respect.

White requests the following additional items pursuant to Rule 16(a)(1)(F)

and (G):

- a copy of all tracing and registry documents, photographs of, and all ballistics tests conducted on the Walther PF .380 and bullets recovered during a traffic stop conducted on November 2, 2016, as well as all other firearms seized, obtained, tested, or otherwise within the possession or control of the government related to this case;

- laboratory results and reports of any laboratory analysis conducted in conjunction with this matter including all documents related to the laboratory's and utilized equipment's certifications and testing procedures, including but not limited to ballistics analysis and reports for bullets and fragments found in the bodies of the three victims, in or outside Jackson's barn, and in tree sections taken from Jackson's farm;

- laboratory results and reports for any laboratory analysis conducted on the pink arrow, camouflage bolt, and cross bow recovered from Jackson's farm on June 25, 2016, including testing procedures utilized, certifications for testing equipment and the laboratory utilized, and the curriculum vitae for each person conducting such tests;

- any photographs and reports regarding any analysis performed on all footprints found at the crime scene located at Jackson's farm including the testing procedures utilized, certifications for the testing equipment and the laboratory utilized, and the curriculum vitae for each person conducting each test;

- a summary of all expert or other opinions the government intends to offer at trial or any pretrial proceeding relating to this matter, including, but not limited to, reports pertaining to DNA analysis, DNA probability analysis and the likelihood ratio, serology analysis, gun shot residue analysis, and analysis of thermal damage including the full report and curriculum vitae for each proposed expert rendering an opinion.

(See Doc. 589 at 14-15). Again, the government offers no response. (See generally Doc. 759 at 11-13). This material is plainly encompassed by Rule 16(a)(1)(F) and (G), and we will grant this aspect of White's motion.[13]

Preddy also provides an enumerated list of items believed to be in the government's possession that he considers material to preparing his defense. (See Doc. 654 at 15-16). He requests the following:

- copies of all search and arrest warrants, supporting affidavits, and other documents in support of the warrant that resulted in his arrest, his codefendants' arrests, or seizure of any property in this case;

- all documents reflecting by whom the events underlying the charged offenses were reported to authorities, as well as the exact date, time, location, and manner of those reports;

- any recordings (whether tape, audio, electronic, video, or otherwise), complaint logs, or transcripts relating to any 911 or other call authorities received relating to the charged offenses;

- any recordings, dispatcher logs, transcripts, or memoranda recording any police communication during the investigation of the charged offenses, and any notes made by police officials during that investigation, whether to be used at trial or not;

---

[13] Adgebesan echoes White's request for tracing and registry documents and firearm-related evidence, (see Doc. 673 ¶ 11(EE)), and we will grant that request for the same reasons. The only remaining specific discovery request by Adgebesan— for records obtained from a Hampton Inn in White Marsh, Maryland, (id. ¶ 11(AA)) —has been withdrawn, (see Doc. 735 at 5 n.3).

- any reports, forms, memoranda, notes, and recordings made about Preddy or his codefendants pursuant to police department regulations, including, but not limited to, incident, complaint, or complaint follow-up reports; arrest reports or records; memo book entries; probation records; and aided reports; and

- all law enforcement reports, memoranda, or records prepared in connection with investigation of the charged offenses, and with the arrest of any coconspirators including, but not limited to, those made by the Pennsylvania State Police or Franklin County District Attorney's Office.

(Doc. 654 at 15-16). The government does not address these specific requests in its opposition brief. (See generally Doc. 724 at 16-27). We will grant Preddy's request for this material under Rule 16(a)(1)(E), subject to redaction of any Giglio or Jencks material as appropriate.

Finally, we turn to Coles' specific discovery requests. The government indicates that it has already turned over many of the items sought. Coles requested a copy of his criminal record under Rule 16(a)(1)(D), (see Doc. 679-2 at 2), and the government says that it has turned that information over, (see Doc. 748 at 7; Doc. 764 at 2-4). In his reply brief, Coles reports that he has not yet received his criminal record, but that the parties are working to resolve this issue. We will thus deny this aspect of Coles' motion without prejudice to his right to refile his motion if the government does not promptly produce his criminal record.

Coles also requests all expert reports and analysis under Rule 16(a)(1)(F) and (G). (See Doc. 679-2 at 10-12). The government indicates that it has provided "expert reports and analysis in the fields of trace evidence, serology, latent prints, DNA, firearms and tool mark, and drug identification," (see Doc. 748 at 7), and Coles concedes that those specific requests are moot, (see Doc. 764 at 3 n.2). Coles

further alleges that one page of an expert report is missing.  (See Doc. 679-2 at 12).

The government is rectifying that omission, (see Doc. 748 at 7 n.4), so this aspect of

Coles' motion is moot as well.

But as Coles points out, the government's brief is only partly responsive:

Coles additionally sought, pursuant to Rule 16(a)(1)(F), an unredacted version of the

report already disclosed regarding the serious bodily injury (overdose) charged in

Count Eighteen, as well as any other reports of tests or examinations related to that

allegation, (see Doc. 679-2 at 11), and he asserts that the government, to date, has

not disclosed those reports, (see Doc. 764 at 3 n.2).  We agree with Coles that any

reports of examinations, tests, or experiments relating to the charged overdose

would be discoverable under Rule 16(a)(1)(F), and we will order the government to

turn any such reports over forthwith.  As for the report that has been turned over in

heavily redacted form, the government shall submit the unredacted report to the

court for *in camera* review, together with an explanation of the redactions.

Coles, like White, also asks for law enforcement reports documenting

Chaney's statements to authorities and any arrangements with Chaney concerning

her cooperation.  (See Doc. 679-2 at 3-4).  He avers that this evidence goes directly to

an element of several charged offenses (*viz.*, murder of and conspiracy to murder a

federal witness), is both material to preparing a defense and likely to be introduced

in the government's case-in-chief, and is potentially exculpatory in that it may shed

light on who else had motive to harm Chaney.  (See id.; see also Doc. 674 at 2 n.1).

As with White's motion, the government does not argue otherwise.  (See generally

Doc. 748 at 1-11).  We will grant Coles' motion to this extent.

Coles also asks the government to turn over copies of all photographic lineups and other identification procedures that were used to identify him in this case. (See Doc. 679-2 at 14-15). Such evidence is plainly material to preparing a defense, see FED. R. CRIM. P. 16(a)(1)(E)(i), including but not limited to preparing any appropriate suppression motion, and the government has not objected to this request, (see generally Doc. 748 at 1-11). We will grant Coles' motion as to any lineups or other identification procedures used to identify him.[14]

### g.      **Evidence Not in Government's Possession**

Several defendants request a copy of all video or audio obtained from any surveillance or other camera that depicts the events of June 25, 2016, at 11026 Welsh Run Road, Greencastle, Pennsylvania—the address of Jackson's farm and the scene of the triple homicide. (See Doc. 589 at 4-5; Doc. 679-2 at 9). Coles further requests recordings of 911 calls made regarding the May 10, 2016 overdose that is the subject of Count Eighteen. (See Doc. 679-2 at 5; see also Doc. 499 at 35). The government replies that it has neither video or audio surveillance footage of Jackson's farm, nor any 911 calls associated with the overdose. (See Doc. 748 at 11 nn.7-8; Doc. 759 at 13). We will deny White's and Coles' motions as to these items but emphasize that, if the government or its agents unearth any surveillance footage of Jackson's farm or recordings of 911 calls reporting the overdose, they are to be promptly disclosed

---

[14] Coles also seeks a "general order" requiring the government to produce any items not specifically enumerated in his motion that fall within Rule 16(a)(1)(E). (See Doc. 679-2 at 3). Because compliance with Rule 16(a)(1)(E) is mandatory once a defendant requests covered material, see FED. R. CRIM. P. 16(a)(1)(E), and because the government has acknowledged this obligation, we see no need to enter such an order at this time.

to defendants, either as information material to their defense or evidence intended for use in the government's case-in-chief.  See FED. R. CRIM. P. 16(a)(1)(E)(i), (ii).

### h.  Incomplete or Inaccessible Material

Certain defendants have complained that discovery material received to date is either incomplete or otherwise inaccessible.  Coles claims to have received only the middle portion of a recorded interview with Philander Spruill; that a video-recorded interview with someone named "Murk" ends prematurely; and that approximately 30 minutes of an interview with White have been omitted.  (See Doc. 679-2 at 7).  He also identifies missing pages of various federal and state law enforcement reports and requests exhibits he says are referenced in but not attached to certain Pennsylvania State Police reports.  (See id. at 8-9).  Adgebesan indicates that the government has twice attempted to disclose two audio-recorded interview files but that the files cannot be opened.  (See Doc. 735 at 10).

It is unclear to the court if the government is intentionally withholding this material from the defendants or if the omissions are inadvertent.  We will task the government to confer with defense counsel as to these issues and attempt to rectify them.  If the government is intentionally withholding these items from production, defendants may renew their discovery motions as appropriate.

### D.  Rule 404(b) and Rule 609 Notice

Preddy and Coles both seek timely notice of the government's intent to introduce evidence of other crimes, wrongs, or acts under Federal Rule of Evidence 404(b), (see Doc. 654 at 28; Doc. 679-2 at 15), and Coles further requests timely notice of the government's intent to use evidence of dated criminal convictions under Rule

609(b), (see Doc. 679-2 at 15). Preddy proposes a notice deadline of 30 days before trial. (See Doc. 654 at 28). Coles does not propose a specific deadline. (See Doc. 679-2 at 15).

Rule 404(b) requires the government to provide "reasonable notice" of evidence of other crimes, wrongs, or acts that it intends to offer at trial to allow the defendant "a fair opportunity to meet it." FED. R. EVID. 404(b)(3). The notice must be in writing and must articulate the permitted purpose for which the government seeks to offer the evidence. See id. Rule 609(b) similarly requires the government to provide "reasonable written notice of the intent to use" a dated criminal conviction under that rule "so that the party has a fair opportunity to contest its use." FED. R. EVID. 609(b)(2). What constitutes reasonable notice is determined by the "circumstances and complexity of the prosecution." See Johnson, 218 F. Supp. 3d at 461-62.

The government raises no meaningful opposition to Preddy's proposal of a 30-day notice deadline, other than to state generally its view that the request is "more appropriately made in the fourth tier of pretrial motions." (See Doc. 724 at 27). We think it illogical to wait until one month before trial to set a deadline for Rule 404(b) and Rule 609(b) notices. Given the circumstances and complexity of this prosecution, and the anticipated volume of motions *in limine*, we will adopt Preddy's proposal and order the government to notify all defendants whether it intends to offer evidence under Rule 404(b) or Rule 609(b) at least 30 days before trial.

### E.    Protective Order

Dickerson's only discovery-related request is that the court modify the existing protective order to provide him with a tablet on which he can review discovery.  (See Doc. 681 at 9-10).  This request is reasonable in light of visitation restrictions necessitated by the COVID-19 pandemic, and we have already granted a similar accommodation to Coles.  (See Docs. 617-18).  The government is not opposed to Dickerson's request, so long as the modification is subject to the same restrictions imposed on Coles and is approved by the warden of the facility where Dickerson is detained.  (See Doc. 721 at 14).  We will grant Dickerson's unopposed motion for modification of the protective order.

## III.    <u>Conclusion</u>

For the reasons set forth herein, the court will grant in part and deny in part defendants' multitude of discovery requests.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    January 7, 2021