## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:16-CR-212** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **KEVIN COLES,** | : | |
| **DEVIN DICKERSON,** | : | |
| **TOREY WHITE,** | : | |
| **JERELL ADGEBESAN,** | : | |
| **KENYATTA CORBETT,** | : | |
| **NICHOLAS PREDDY,** | : | |
| **JOHNNIE JENKINS-** | : | |
| **ARMSTRONG,** | : | |
| **TERRENCE LAWSON, and** | : | |
| **TYRONE ARMSTRONG,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

In accordance with the court's July 16, 2020 pretrial and trial scheduling order, defendants in the above-captioned action have filed their first-tier pretrial motions.  We addressed defendants' discovery motions in a memorandum and order dated January 7, 2021.  This memorandum addresses defendants' remaining, first-tier motions.

### I.   Factual Background & Procedural History

A grand jury sitting in Harrisburg, Pennsylvania, returned a five-count indictment in August 2016 charging defendants Kevin Coles and Devin Dickerson with various drug-trafficking and firearms offenses.  The grand jury has since returned three superseding indictments.  The first, returned April 12, 2018, added a sixth charge against Coles and Dickerson.  The grand jury then returned a second superseding indictment on December 20, 2018, adding 16 counts, including several

capital charges, and nine new defendants: Torey White, Christopher Johnson, Jerell Adgebesan, Kenyatta Corbett, Michael Buck, Nicholas Preddy, Johnnie Jenkins-Armstrong, Terrance Lawson, and Tyrone Armstrong.  We assigned learned capital counsel to each death-penalty-eligible defendant (Coles, Dickerson, White, Johnson, Adgebesan, Corbett, Buck, and Jenkins-Armstrong) in accordance with 18 U.S.C. § 3005.

We convened a telephonic conference on March 15, 2019, to discuss pretrial scheduling.  We appointed a coordinating discovery attorney at defendants' request, set a discovery schedule, and established February 3, 2020, as the government's deadline to provide notice of intent to seek the death penalty pursuant to 18 U.S.C. § 3593(a).  We then imposed a status-report requirement, tasking the government to file reports at 45-day intervals concerning, *inter alia*, the status of discovery and whether the government had made an initial decision not to seek the death penalty as to any eligible defendant.

The grand jury returned a third superseding indictment on January 29, 2020.  That indictment, *inter alia*, added a new capital charge against the death-penalty-eligible defendants, (see Doc. 499 at 24); added a new noncapital charge against those defendants and Preddy, (id. at 18-19); and added Preddy to all new and existing capital counts, making him death-penalty-eligible for the first time,

(id. at 12-17, 20-23).  The third superseding indictment charges defendants in

22 counts, as follows[1]:

- Count One: conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and Pinkerton v. United States, 328 U.S. 640 (1946), against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Count Two: Hobbs Act robbery, and aiding and abetting same, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2, against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Counts Three, Four, and Five: using, brandishing, and discharging a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness) resulting in the deaths of Phillip Jackson, Brandon Cole, and Wendy Chaney,[2] respectively, and aiding and abetting same, in violation of 18 U.S.C. § 924(c) and (j) and 18 U.S.C. § 2, against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Count Six: conspiracy to use, brandish, and discharge a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness) resulting in the death of Chaney, in violation of 18 U.S.C. § 924(c), (j), and (o), against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Count Seven: conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958 and Pinkerton, against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

---

[1] Johnson and Buck have both entered guilty pleas and are not included in the below list of pending charges.  Johnson pled guilty to Counts One, Three, Four, Five, Six, Seven, Eight, Nine, Ten, and Twenty of the second superseding indictment.  (See Doc. 480).  Buck pled guilty to Count One of the third superseding indictment and to a one-count felony information charging him with using and discharging a firearm during and in relation to a crime of violence under Section 924(c).  (See Doc. 642).

[2] The third superseding indictment uses two different spellings for this victim's last name, switching between "Chaney" and "Cheney."  We use "Chaney" in this memorandum, which we understand to be the correct spelling.

- Counts Eight, Nine, and Ten: murder of witnesses (Chaney, Jackson, and Cole, respectively), and aiding and abetting same, in violation of 18 U.S.C. § 1512(a)(1)(C) and 18 U.S.C. § 2, against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Count Eleven: conspiracy to murder witnesses (Chaney, Jackson, and Cole) in violation of 18 U.S.C. § 1512(k), against Coles, Dickerson, White, Adgebesan, Corbett, Preddy, and Jenkins-Armstrong;

- Count Twelve: conspiracy to distribute and possess with intent to distribute 1,000 grams and more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 846, against Corbett and Adgebesan;

- Count Thirteen: possession with intent to distribute heroin, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, against Corbett and Adgebesan;

- Count Fourteen: conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, and at least 28 grams of a mixture and substance containing a detectable amount of cocaine base and cocaine HCL, in violation of 21 U.S.C. § 846, against Coles and Dickerson;

- Counts Fifteen and Sixteen: possession with intent to distribute a mixture and substance containing a detectable amount of heroin, and a mixture and substance containing a detectable amount of both cocaine HCL and cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, against Coles and Dickerson, respectively;

- Count Seventeen: possession with intent to distribute a mixture and substance containing a detectable amount of heroin and a mixture and substance containing a detectable amount of cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, against Coles and Dickerson;

- Count Eighteen: distribution of a mixture and substance containing a detectable amount of heroin resulting in serious bodily injury, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2, against Coles and Dickerson;

- Count Nineteen: possession of firearms in furtherance of a drug-trafficking crime as alleged in Counts Fourteen through Eighteen, and aiding and abetting same, in violation of 18 U.S.C. § 924(c)(1), 18 U.S.C. § 2, and <u>Pinkerton</u>, against Coles and Dickerson;

- Count Twenty: conspiracy to murder a witness (codefendant Adgebesan) in violation of 18 U.S.C. § 1512(k), against Preddy, Jenkins-Armstrong, Lawson, and Armstrong;

- Count Twenty-One: attempted murder of a witness (codefendant Adgebesan) in violation of 18 U.S.C. § 1512(a)(1)(A) and (C), against Preddy, Jenkins-Armstrong, Lawson, and Armstrong; and

- Count Twenty-Two: accessory after the fact with respect to Hobbs Act robbery and murder, in violation of 18 U.S.C. § 3, against Lawson and Armstrong.

(<u>See</u> Doc. 499 at 8-41).  We appointed learned counsel for Preddy shortly after the third superseding indictment was returned.

On June 4, 2020, following two concurred-in extensions of its Section 3593(a) deadline, the government notified defendants and the court that it would not seek the death penalty as to any eligible defendant.  After hearing from counsel, we issued a memorandum and order authorizing the formerly death-penalty-eligible defendants to continue with two attorneys.  We then entered a pretrial and trial scheduling order which established four tiers of pretrial motions: non-fact-based motions (to sever, to dismiss, for bill of particulars, and concerning discovery), due October 23, 2020; fact-based and suppression motions, due January 11, 2021; expert motions, due August 2, 2021; and motions *in limine*, due November 5, 2021.  That order also established an August 2, 2021 deadline for the parties to provide notice of their experts and adopted the government's proposal for a November 5, 2021 early-disclosure date for its Jencks Act material.  We have since modified this schedule

only to the extent it pertains to fact-based and suppression motions, extending that deadline to February 10, 2021.

Defendants filed 19 individual and omnibus first-tier motions.  (See Docs. 586, 588, 590, 592, 652, 660, 662, 664, 666, 668, 670, 672, 673, 676, 679, 679-3, 680, 683, 685).  After several extensions of briefing deadlines at the government's request, defendants' first-tier motions became ripe for disposition on January 4, 2021.  We issued a memorandum opinion on January 7, 2021, addressing defendants' myriad discovery motions.  This memorandum takes up defendants' remaining motions.

## II.   Discussion

Coles, Dickerson, White, Adgebesan, Preddy, Jenkins-Armstrong, Lawson, and Armstrong have each filed one or more pretrial motions seeking wide-ranging relief.  Their requests can be catalogued into four groups.  Preddy asks the court to strike purportedly prejudicial surplusage from the third superseding indictment. Coles, Dickerson, White, and Jenkins-Armstrong seek dismissal of multiple counts of the indictment.  Coles, Dickerson, and White additionally seek a bill of particulars providing more detail about their alleged involvement in the charged offenses.  And all defendants request that we sever various charges and defendants for trial.  We will address these manifold requests *seriatim*.

### A.   Motion to Strike Surplusage

Preddy asks the court to strike certain language from the third superseding indictment, (see Doc. 654 at 3-6), and Jenkins-Armstrong joins in that motion, (see Doc. 686 at 1).  These defendants take issue with the indictment's references to the street gang known as the "Black Guerilla Family" or "BGF."  (See Doc. 654 at 3-6).

Paragraph 3 of the indictment describes BGF as a "nationwide gang engaged in criminal activities, including murder, robbery, extortion, narcotics trafficking, obstruction of justice, and witness intimidation," and alleges that Preddy, Jenkins-Armstrong, Lawson, Armstrong, and Johnson are members of BGF. (See Doc. 499 ¶ 3). Paragraph 10 alleges that, on the day of the triple homicide, Adgebesan and Corbett travelled to Baltimore, Maryland, to enlist Preddy, Jenkins-Armstrong, Johnson, "and other members of the BGF gang, to prepare for, plan, and execute" the murder of Chaney and the robbery of Jackson. (Id. ¶ 10). Preddy argues that these references are irrelevant and prejudicial and should be stricken pursuant to Federal Rule of Criminal Procedure 7(d) and the Fifth and Sixth Amendments to the United States Constitution. (See Doc. 654 at 3).

Federal Rule of Criminal Procedure 7(d) authorizes a court to "strike surplusage from the indictment or information" upon a defendant's motion. FED. R. CRIM. P. 7(d). A motion to strike surplusage may only be granted if the targeted language is "both irrelevant (or immaterial) *and* prejudicial." See United States v. Hedgepeth, 434 F.3d 609, 612 (3d Cir. 2006) (emphasis added). This "exacting standard . . . is met only in rare cases." United States v. Eisenberg, 773 F. Supp. 662, 700 (D.N.J. 1991) (collecting cases); see also Hedgepeth, 434 F.3d at 611-12 (noting such motions "are rarely granted" (citations omitted)); 1 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 128 & nn.40-41 (4th ed. 2020) (collecting cases).

We will deny defendants' request to strike references to BGF at this time. Preddy is correct that the BGF references do not go directly to an element of any

charged crime. But language in an indictment is not surplusage merely because it is not "essential to the charges." See United States v. Johnson, 262 F.R.D. 410, 414 (D. Del. 2009) (citing United States v. Wecker, 620 F. Supp. 1002, 1006 (D. Del. 1985)). Language that is "generally relevant to the overall scheme charged" may also be properly included. See id. (citing Wecker, 620 F. Supp. at 1006). In its briefing, the government advises that a trial witness will describe how Johnson ordered the "hit" on Adgebesan that is the subject of Counts Twenty through Twenty-Two and will explain "the hierarchy or chain of command through which decisions like this are made." (See Doc. 724 at 4-5). The government indicates it will also introduce evidence that Preddy, in a conversation with a coconspirator, "wondered why Adgebesan did not 'Guerilla up,' that is, follow BGF code and refuse to talk to law enforcement," and that Preddy himself "would not cooperate because of fear of retaliation from the BGF." (Id. at 5). The government believes that its evidence at trial will further "show[] the association, order, structure[,] and manner of operation of the co[]conspirators associated with the BGF who were recruited for the robbery/murders" that are the subject of Counts One through Eleven. (Id.) We agree with the government that the allegations as to certain

defendants' affiliations with BGF are relevant to and properly included in the indictment.[3]

**B.      Motions to Dismiss**

Coles, Dickerson, White, and Jenkins-Armstrong seek dismissal of various counts of the third superseding indictment.  (See Docs. 592, 664, 680, 685).  Motions to dismiss are authorized under Federal Rule of Criminal Procedure 12(b)(3)(A) and (B).  See FED. R. CRIM. P. 12(b)(3)(A), (B).  A motion to dismiss may allege a defect in instituting the prosecution, including improper venue, violation of the right to a speedy trial, or selective prosecution.  See FED. R. CRIM. P. 12(b)(3)(A).  It may also be premised on perceived substantive deficiencies in the charging document, such as duplicity, multiplicity, lack of specificity, improper joinder, or failure to state an offense.  See FED. R. CRIM. P. 12(b)(3)(B).  Importantly, motions alleging a failure to state an offense test only the government's allegations, not its proof.  See United States v. Huet, 665 F.3d 588, 594-95 (3d Cir. 2012).

**1.      *Counts One Through Eleven: Factual Sufficiency***

We first take up defendants' motions to dismiss Counts One through Eleven, all of which concern the triple homicide and robbery on June 25, 2016.  Coles, joined by Dickerson, moves to dismiss all of these counts, arguing that the

---

[3] Preddy also notes that he intends to seek preclusion of evidence about the BGF, the nature of its activities, and the alleged roles of any defendant in that enterprise.  (See Doc. 654 at 5-6 n.1).  Admissibility of evidence is the proper subject of tier-four motions *in limine* or objections at trial, (see Doc. 613 ¶ 5), and we will address Preddy's evidentiary arguments at that time.  We note that, if *no* evidence pertaining to the BGF is admissible at trial, Preddy may renew his motion to have references to the BGF stricken from the indictment before it is provided to the jury.

indictment fails to allege any facts concerning his role in the charged crimes.  (See Doc. 665 at 7-8; see also Doc. 681 at 9).  These defendants also specifically challenge Count Two and Counts Eight through Eleven on the ground that the indictment is silent as to crucial elements of those offenses, (see Doc. 665 at 9-10; see also Doc. 681 at 9), and Count Fifteen as duplicitous, (see Doc. 665 at 11-12; see also Doc. 681 at 9). White moves to dismiss three counts (Counts Eight, Nine, and Ten), contending that the indictment does not allege sufficient facts to satisfy the elements of those charges.  (See Doc. 593 at 3-7).

The Sixth Amendment to the United States Constitution mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation" against him.  See U.S. CONST. amend. VI. Federal Rule of Criminal Procedure 7(c) implements this requirement by setting standards for the contents of indictments.  See FED. R. CRIM. P. 7(c).  Under that rule, an indictment must provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  FED. R. CRIM. P. 7(c)(1). An indictment satisfies Rule 7(c) when it

> (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.

United States v. Willis, 844 F.3d 155, 161 (3d Cir. 2016) (quoting United States v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989)).

Our court of appeals has said that "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense." Id. at 161-62 (quoting Rankin, 870 F.2d at 112). Thus, an indictment will generally pass muster if it identifies the statute allegedly violated, lists the elements of the statutory offense, and identifies the time period of the alleged violation. See Huet, 665 F.3d at 595 (citing United States v. Urban, 404 F.3d 754, 771 (3d Cir. 2005)). "[D]etailed allegations" are not required. Id. at 594 (citing United States v. Resendiz-Ponce, 549 U.S. 102, 110 (2007)). A court must uphold an indictment "unless it is so defective that it does not, by any reasonable construction, charge an offense." Willis, 844 F.3d at 162 (quoting United States v. Vitillo, 490 F.3d 314, 324 (3d Cir. 2007)). Critically though, "if an indictment fails to charge an essential element of the crime, it fails to state an offense." Huet, 665 F.3d at 595 (citing United States v. Wander, 601 F.2d 1251, 1259 (3d Cir. 1979)).

### a.   <u>**Count Two Specifically**</u>

We begin with defendants' count-specific challenges. Coles, joined by Dickerson, asserts that Count Two fails to allege the *mens rea* element of Hobbs Act robbery. (See Doc. 665 at 9; see also Doc. 681 at 9). The government rejoins that the indictment tracks the statutory language of the Hobbs Act. (See Doc. 726 at 5-6). Count Two avers that the named defendants

> did unlawfully obstruct, delay and affect, and attempt
> to obstruct, delay and affect, commerce as that term is
> defined in Title 18, United States Code, Section 1951,
> and the movement of articles and commodities in such
> commerce, by robbery as that term is defined in Title 18,
> United States Code, Section 1951, in that the defendants
> . . . did unlawfully take and obtain and attempt to take

and obtain personal property consisting of United States currency, controlled substances, and firearms from the person of and in the presence of Phillip Jackson, owner and possessor of said property, against his will by means of actual and threatened force, violence, and fear of injury, immediate and future, to his person[,] that is, the defendants physically restrained Jackson and two others at gun point and then shot and killed Phillip Jackson and two others during the course of the robbery, and did aid, abet, counsel, command, induce and procure each other in the commission of this crime.

(Doc. 499 at 10-11).  This language indeed tracks the language of the Hobbs Act as applied to the specific allegations in this case.  See 18 U.S.C. § 1951(a).

Coles is correct that absent from this count is any explicit reference to the judicially recognized *mens rea* requirement, *viz.*, that "the defendant knowingly or willfully" committed the charged robbery.  See United States v. Powell, 693 F.3d 398, 401 (3d Cir. 2012) (citing United States v. Walker, 657 F.3d 160, 178-79 (3d Cir. 2011); United States v. Driggs, 823 F.2d 52, 54 (3d Cir. 1987)).  We agree that the ideal indictment should allege the *mens rea* element for the offense charged.  Our only inquiry, however, is whether the indictment is fatally deficient for failing to do so.

Our court of appeals instructs us that it is not.  In United States v. Hodge, 211 F.3d 74 (3d Cir. 2000), the Third Circuit reviewed a similar issue: the indictment in that case charged the elements of robbery under a Virgin Islands' statute but failed to "explicitly recite the element of specific intent."  See Hodge, 211 F.3d at 76-77.  The court held that the indictment nonetheless satisfied Rule 7(c).  It noted that the indictment's language tracked the statutory definition of robbery—which, like the Hobbs Act, does not expressly include a *mens rea* element.  See id. at 77.  While the

12

court acknowledged case law holding specific intent to be an essential element of the offense, it observed that "[f]ailure to allege the statutory elements will not be fatal provided that alternative language is used or that the essential elements are charged in the indictment by necessary implication."  Id. (quoting Gov't of Virgin Islands v. Moolenaar, 133 F.3d 246, 249 (3d Cir. 1998)).  The court concluded that the indictment "was sufficient to meet all of the requirements of Rule 7(c)(1)."  Id.

Coles claims that Hodge is distinguishable because it concerned a Virgin Islands' robbery statute, not Hobbs Act robbery.  (See Doc. 741 at 7).  We do not view that distinction as material, and Coles does not explain why it is.  The broader point of Hodge is directly applicable here: an indictment like this one, that includes all requisite statutory elements, and by necessary implication any judicially derived elaboration, is sufficient to satisfy Rule 7(c)(1).  See Hodge, 211 F.3d at 77; see also United States v. Oliver, No. 01-3223, 2002 WL 31474532, slip op. at 2 (3d Cir. Nov. 5, 2002) (nonprecedential).  We will deny Coles' motion to dismiss Count Two.

### b. Counts Eight Through Eleven Specifically

The same reasoning defeats Coles' arguments, joined by Dickerson, as to Counts Eight through Eleven.  (See Doc. 665 at 9-10; see also Doc. 681 at 9).  Counts Eight, Nine, and Ten charge Coles, Dickerson, and others with "kill[ing] another person . . . with intent to prevent the communication by [them] to a law enforcement officer of the United States as defined in 18 U.S.C. § 1515(a)(4), with information relating to the commission or possible commission of a Federal offense, and did aid, abet, counsel, command, induce and procure the commission of this crime," (Doc. 499 at 21, 22, 23), and Count Eleven charges conspiracy to commit

13

those substantive offenses, (see id. at 24).  Like the Hobbs Act robbery count, the

language of the indictment tracks the statutory language for these charged offenses

nearly verbatim.  See 18 U.S.C. § 1512(a)(1)(C), (k).

Coles argues that the indictment fails to explicitly allege the essential

elements of the offense as articulated in the applicable case law.  (See Doc. 665 at

9-10).  Our court of appeals has explained that a conviction for witness tampering

requires proof of four elements:

> (1) the defendant killed or attempted to kill a person;
> (2) the defendant was motivated by a desire to prevent
> the communication between any person and law
> enforcement authorities concerning the commission
> or possible commission of an offense; (3) that offense
> was actually a federal offense; and (4) a reasonable
> likelihood that the person whom the defendant believes
> may communicate with law enforcement would in fact
> make a relevant communication with a federal law
> enforcement officer.

Bruce v. Warden Lewisburg USP, 868 F.3d 170, 184 (3d Cir. 2017) (emphasis

omitted) (citing United States v. Tyler, 732 F.3d 241, 252 (3d Cir. 2013)).  Coles

contends that the fourth element—a reasonable likelihood that the victims would

have communicated with authorities— is not explicitly alleged in the indictment.[4]

(See Doc. 741 at 8).  Coles is correct, but we reiterate that this is not a fatal defect.

See supra at 12-13.  The indictment otherwise tracks the statutory language of

---

[4] Coles initially argued that the indictment fails to allege the second
element—that he was motivated by a desire to prevent Chaney's, Phillips', and
Cole's communications with authorities—but he concedes in his reply brief that
the indictment does make that allegation.  (See Doc. 665 at 10; Doc. 741 at 8).  His
separate argument that the government does not allege sufficient facts to buttress
that allegation, (see Doc. 741 at 8), will be addressed infra.

18 U.S.C. § 1512(a)(1)(C) and (k) nearly verbatim, and it incorporates by necessary implication the judicially derived elements of that statutory offense.  See Hodge, 211 F.3d at 77.  We will deny Coles' motion to dismiss Counts Eight through Eleven on this ground.

c.    **Counts One Through Eleven Generally**

Defendants' broader challenge to the sufficiency of Counts One through Eleven on the whole likewise fails.  Coles and Dickerson oppugn all eleven counts for perceived lack of factual specificity.  (See Doc. 665 at 5-8; see also Doc. 681 at 9). Their argument is less about the legal sufficiency of the indictment than it is about fairness: they essentially claim that, when compared to the illuminating narrative provided for each of the BGF defendants, the indictment effectively leaves Coles and Dickerson in the dark as to their alleged roles in the charged offenses.  (See Doc. 665 at 5-8; see also Doc. 741 at 5-7).  White raises similar arguments, albeit limited to Counts Eight through Ten.  (See Doc. 593 at 2-7).  He contends that the indictment fails to make him aware of the essential facts charged against him, particularly with respect to the motive element of those counts.  (See id.)

We note at the outset that this indictment includes far more factual and contextual background than the typical charging document.  A 22-paragraph preamble chronicles the government's theory of the case in some detail.  The preamble alleges that Coles, Dickerson, and White were distributing heroin, cocaine base, and cocaine hydrochloride in the Chambersburg and Mercersburg areas of Franklin County, Pennsylvania, and also in Hagerstown, Maryland; that Jackson was a customer of Coles and White who lived on a farm in Mercersburg,

Pennsylvania, and purchased both personal use and distribution quantities of controlled substances; and that Coles, Dickerson, and White enlisted Chaney and others in their drug-distribution activities.  (See Doc. 499 ¶¶ 5-7).  The preamble explains that Chaney began cooperating with federal and state officials regarding the activities of Coles, Dickerson, White, and others in or about June 2016, and that Coles, Dickerson, and White came to suspect Chaney was working as an informant.  (See id. ¶¶ 8-9).  Elsewhere in the indictment, the government alleges that Coles and Dickerson, "to protect the conspiracy, decided to have [Chaney] killed."  (Id. at 30).

The preamble then explains that Adgebesan and Corbett tapped Preddy, Jenkins-Armstrong, Johnson, and other BGF members to "prepare for, plan, and execute the robbery of Phillip Jackson and the murder of Wendy Chaney."  (See id. ¶ 10).  And it describes in some detail how that plan played out.  Sometime on June 25, 2016, Adgebesan, Corbett, Preddy, Jenkins-Armstrong, Johnson, and others met at Buck's residence.  (See id. ¶ 11).  Corbett and Buck conducted reconnaissance on Jackson's farm that morning, and Buck monitored it throughout the day.  (See id.)  White, who was romantically involved with Chaney, eventually "induced" her to travel to Jackson's farm.  (See id. ¶ 12).  Adgebesan, Corbett, Preddy, Jenkins-Armstrong, Johnson, and the others travelled to Jackson's farm, where they subdued Jackson, Chaney, and Cole "by binding their hands behind them with plastic zip ties."  (See id. ¶¶ 13-14).  All three victims were then shot "in the head and back areas."  (Id. ¶ 15).  Chaney and Cole were both deceased by the time law enforcement arrived; Jackson was alive but succumbed to his injuries the following

day.  (See id. ¶¶ 17-18).  The indictment avers that "[a]ll three individuals had been set on fire."  (Id. ¶ 17).

Rule 7(c)(1) does not require this level of factual detail.  See FED. R. CRIM. P. 7(c)(1); Willis, 844 F.3d at 161-62 (quoting Rankin, 870 F.2d at 112); Huet, 665 F.3d at 594-95 (citing Resendiz-Ponce, 549 U.S. at 110).  And the indictment clearly meets the minimum threshold for what *is* required: Counts One through Eleven name the charged defendants, identify the statutes they are charged with violating, recite the statutory elements nearly verbatim, and specify the date of the crime alleged. (See Doc. 499 at 8-24).  White's conclusory claim that "[b]oth the Supreme Court and the Third Circuit require more" is unsupported in his brief, (see Doc. 762 at 3), and inconsistent with precedent, see Willis, 844 F.3d at 161-62 (quoting Rankin, 870 F.2d at 112); Huet, 665 F.3d at 594-95 (citing Resendiz-Ponce, 549 U.S. at 110).  The indictment provides defendants "sufficient factual orientation"—*viz.*, the alleged participants, the specific offenses charged, the elements thereof, and the date and location of the alleged violations—to allow them to prepare a defense and, if needed,

invoke double jeopardy.  See Willis, 844 F.3d at 161-62 (quoting Rankin, 870 F.2d at 112).  This is all that Rule 7(c)(1) requires.[5]

Our reading of defendants' briefing reveals that they are not so much concerned with the sufficiency of the indictment as they are the fairness of the government's chosen approach to the factual narrative.  Defendants essentially posit that, because the government chose to provide additional factual context in a lengthy preamble, and because it chose to provide detailed allegations as to certain defendants in that preamble, the indictment is fatally defective for failing to provide that same level of detail for all defendants.  (See, e.g., Doc. 741 at 5).  We agree with the defense observation that the indictment provides *far* more factual information about the criminal conduct of certain defendants.  These issues, however, are not the concern of Rule 7(c)(1); they are more properly addressed under Rule 7(f)'s

---

[5] White cites United States v. Stansfield, 101 F.3d 909 (3d Cir. 1996), as support for his assertion that the government has "fail[ed] *to set forth sufficient evidence in this case* to support the charges of Witness Tampering by Murder alleged against" him.  (See Doc. 593 at 6-7 (emphasis added)).  Stansfield involved a posttrial challenge to the sufficiency of the evidence, not a pretrial challenge to the sufficiency of the indictment.  See Stansfield, 101 F.3d at 917-18.  To the extent White believes that the government must produce some evidence to support the charges against him prior to trial, he is mistaken.  It is well settled that "[t]here is no criminal corollary to the civil summary judgment mechanism," and the government "is not required to set forth its entire case in the indictment."  See Huet, 665 F.3d at 595.  White's additional argument, concerning inconsistencies in the government's theory regarding the witness-tampering counts, is likewise an issue for trial, not for a motion to dismiss.  We too are perplexed by the government's new claim that "Phillip Jackson and Brandon Cole witnessed the defendants kill Wendy Chaney" and so were killed to "prevent . . . [them] from reporting a crime," (Doc. 759 at 6), which is inconsistent with the government's statement during Johnson's change of plea hearing that Jackson and Cole were killed *first* (and while Chaney was not even in the room) and thus could not have been witnesses to her murder, (see Doc. 490 at 31:16-32:8).  But this is an issue of proof, not one of pleading, and is more appropriately addressed by the jury.

authorization of bills of particulars.  We will address Rule 7(f) concerns in Section C of this memorandum.

## 2.     *Counts Three Through Six: Legal Sufficiency*

Jenkins-Armstrong, joined by Coles and Dickerson, challenges the legal sufficiency of Counts Three through Six.  (<u>See</u> Doc. 686 at 2-8; <u>see also</u> Doc. 681 at 8; Doc. 700 ¶ 1).[6]  Counts Three, Four, and Five charge the moving defendants and others with using, brandishing, and discharging a firearm during and in relation to a crime of violence, causing the death of Jackson, Cole, and Chaney, respectively, in violation of 18 U.S.C. § 924(c) and (j), and aiding and abetting same, in violation of 18 U.S.C. § 2.  (<u>See</u> Doc. 499 at 12-17).  Count Six charges the same defendants with conspiring to use, brandish, and discharge a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c), (j), and (o).  (<u>See</u> <u>id.</u> at 18-19).  Each count alleges two predicate crimes of violence: Hobbs Act robbery and killing of a witness.  (<u>See</u> <u>id.</u> at 12-19).  Defendants apparently do not dispute that killing a witness qualifies as a crime of violence and would thus independently sustain a Section 924(c) conviction.  Their arguments focus exclusively on whether

---

[6] The government objects to Coles' joinder in various of his codefendants' motions.  (<u>See</u> Doc. 726 at 20).  Coles expressly sought the court's permission to join in those motions, (<u>see</u> Doc. 684), and the government *concurred in* that request, (<u>see</u> Doc. 694).  We granted Coles' request by order of October 29, 2020, and allowed him to file a notice identifying the motions in which he would join by November 2, 2020.  (<u>See</u> Doc. 697).  The government offers no explanation for its change of position.  We also note that the government does not challenge Dickerson's joinder.  (<u>See</u> Doc. 721 at 13-14).  For the sake of clarity, the court overrules the government's objection to Coles' joinder.  We recognize that defense counsel have raised a host of pretrial issues, but we admonish the government to avoid in the future this type of glaring inconsistency on minor procedural issues.

Hobbs Act robbery qualifies as a crime of violence.  (See Doc. 686 at 2-8).  We thus limit our discussion to that offense.

Section 924(c) establishes enhanced punishments for any individual who uses, carries, brandishes, or discharges a firearm "during and in relation to any crime of violence."  18 U.S.C. § 924(c)(1)(A).  A felony offense is a "crime of violence" for purposes of Section 924(c) if it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," see id. § 924(c)(3)(A), or "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," see id. § 924(c)(3)(B).  Courts refer to these clauses as the "elements clause" and the "residual clause," respectively.  See United States v. Robinson, 844 F.3d 137, 140-41 (3d Cir. 2016), cert. denied, 138 S. Ct. 215 (2017), abrogated on other grounds by United States v. Davis, 588 U.S. ___, 139 S. Ct. 2319 (2019).  In Davis, the Supreme Court of the United States invalidated Section 924(c)'s residual clause, holding that it was unconstitutionally vague.  See Davis, 139 S. Ct. at 2336.

Jenkins-Armstrong contends that, with the residual clause gone, Hobbs Act robbery can no longer qualify as a crime of violence, because it does not have as an element the use, attempted use, or threatened use of physical force against the person or property of another required by the elements clause.  (Doc. 686 at 2-8).  The Hobbs Act defines "robbery" as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property."  18 U.S.C. § 1951(b)(1).  Jenkins-Armstrong asserts (correctly)

that a court must "ascertain the least culpable conduct hypothetically necessary to sustain a conviction" for Hobbs Act robbery in determining whether that offense constitutes a crime of violence.  (See Doc. 686 at 3 (quoting United States v. Dahl, 833 F.3d 345, 350 (3d Cir. 2016))).  He then reasons (incorrectly, we conclude) that because "property" can include intangible property, "Hobbs Act robbery can be committed via threats to devalue some intangible economic interest like a stock holding or contract right."  (See id. at 6-7 (citations omitted)).  Accordingly, he posits, it does not necessarily encompass the violent force required by Section 924(c)'s elements clause.  (See id.)

The Third Circuit Court of Appeals rebuffed this exact argument in a nonprecedential opinion just three weeks ago.  See United States v. Monroe, No. 19-1494, ___ F. App'x ___, 2021 WL 50161, at *1 (3d Cir. Jan. 6, 2021) (nonprecedential). We recognize that Monroe is nonbinding, but we are persuaded by both its sound reasoning and its consistency with the robust consensus of our sister circuits.  The Monroe court first rejected the defendants' hypotheticals as nothing "more than the application of legal imagination," noting that defendants had not identified a single case where Hobbs Act robbery has been prosecuted as they hypothesized.  See id. at *2 (quoting Gonzales v. Duenas-Alvarez, 549 U.S. 183, 193 (2007)).  So too here— Jenkins-Armstrong does not identify one case in which a defendant was prosecuted for Hobbs Act robbery on a theory that they nonviolently threatened to devalue an intangible, economic interest.  (See generally Doc. 686 at 2-8; Doc. 742 at 2-7).  The court opined that defendants' theory rested entirely on misunderstandings of both the term "injury" and the term "physical force."  See Monroe, 2021 WL 50161, at *2.

21

The court concluded that "applying the appropriate 'fear of injury' definition . . .
to the correct definition of physical force, Hobbs Act robbery is clearly a crime
of violence." Id.

The court of appeals' nonprecedential decision in Monroe is in accord with
the decisions of every court of appeals to address the question to date, all of which
hold that Hobbs Act robbery is categorically a crime of violence under the elements
clause of Section 924(c). See United States v. García-Ortiz, 904 F.3d 102, 105-09
(1st Cir. 2018); United States v. Hill, 890 F.3d 51, 55-60 (2d Cir. 2018); United States
v. Mathis, 932 F.3d 242, 265-66 (4th Cir. 2019); United States v. Buck, 847 F.3d 267,
274-75 (5th Cir. 2017); United States v. Gooch, 850 F.3d 285, 292 (6th Cir. 2017);
United States v. Rivera, 847 F.3d 847, 848-49 (7th Cir. 2017); United States v. House,
825 F.3d 381, 387 (8th Cir. 2016); United States v. Dominguez, 954 F.3d 1251, 1260-61
(9th Cir. 2020); United States v. Melgar-Cabrera, 892 F.3d 1053, 1060-66 (10th Cir.
2018); In re Saint Fleur, 824 F.3d 1337, 1340-41 (11th Cir. 2016); see also Robinson,
844 F.3d at 150-51 (Fuentes, J., concurring).  Jenkins-Armstrong concedes that
the weight of authority is against him, but he contends that these cases are not
dispositive because they did not resolve the "specific" theory asserted here.  (See
Doc. 742 at 5).

Not so.  In addition to our court of appeals' nonprecedential decision in
Monroe, several court of appeals' decisions have addressed the precise argument
that Jenkins-Armstrong now raises.  Indeed, the First Circuit shot down the exact
hypothetical now offered by Jenkins-Armstrong—that one could commit Hobbs Act
robbery "by threatening to 'devalue some intangible economic interest like a stock

holding or contract right'"—stating that it "sounds to us like Hobbs Act *extortion*."
See García-Ortiz, 904 F.3d at 107; (see also Doc. 686 at 6). The Second Circuit and
Ninth Circuit also found no "realistic probability" that an individual could commit
Hobbs Act robbery by placing his victim in fear of injury to an intangible, economic
interest without using physical force.  See Hill, 890 F.3d at 57 n.9 (citing Duenas-
Alvarez, 549 U.S. at 193); Dominguez, 954 F.3d at 1260-61 (same).  We agree with the
*ratio decidendi* of Monroe and the unanimous consensus of our sister circuits, and
we conclude that Hobbs Act robbery is categorically a crime of violence under
Section 924(c)'s elements clause.

   In conclusory footnotes, Jenkins-Armstrong also asserts that aiding and
abetting Hobbs Act robbery cannot qualify as a crime of violence, and that Counts
Three through Six should be dismissed to the extent they are premised on a theory
of aiding and abetting.[7]  (See Doc. 686 at 8 n.8).  Our court of appeals recently held
in a nonprecedential decision that it "does not matter" whether a defendant is
convicted as a principal or an aider and abettor since aiding and abetting "is not a
separate crime."  See United States v. McKelvey, 773 F. App'x 74, 75 (3d Cir. 2019)

---

   [7] Jenkins-Armstrong contends that attempted Hobbs Act robbery and
conspiracy to commit Hobbs Act robbery also are not crimes of violence under the
elements clause of Section 924(c).  (See Doc. 686 at 8 nn.6-7).  We need not concern
ourselves with this issue, however, because the indictment does not charge
attempted Hobbs Act robbery or conspiracy to commit Hobbs Act robbery as a
predicate crime of violence underlying Counts Three through Six.

(nonprecedential).[8]  As we have previously noted, see Green, 467 F. Supp. 3d at 256-57 & n.2, the McKelvey decision is consistent with every other court of appeals to address this question.  See García-Ortiz, 904 F.3d at 109; United States v. Brayboy, 789 F. App'x 384, 385 (4th Cir. 2020) (nonprecedential); United States v. Richardson, 948 F.3d 733, 741-42 (6th Cir. 2020); United States v. Grissom, 760 F. App'x 448, 454 (7th Cir. 2019) (nonprecedential); Johnson v. United States, 774 F. App'x 334, 334-35 (8th Cir. 2019) (nonprecedential); United States v. Deiter, 890 F.3d 1203, 1214-16 (10th Cir. 2018); In re Colon, 826 F.3d 1301, 1305 (11th Cir. 2016).  We agreed with the reasoning of McKelvey and our sister circuits in Green, and we reaffirm that agreement now.  See Green, 467 F. Supp. 3d at 257; Green, 2020 WL 5939161, at *4.

For all of these reasons, we hold that the charged offenses of Hobbs Act robbery and aiding and abetting Hobbs Act robbery are categorically crimes of violence under the elements clause of Section 924(c).  We will deny Jenkins-Armstrong's motion to dismiss Counts Three through Six to the extent they are premised on those crimes.

---

[8] In McKelvey, the court of appeals concluded that aiding and abetting Hobbs Act robbery qualifies as a crime of violence under Section 924(c)'s elements clause, relying on the court's now-abrogated decision in Robinson, 844 F.3d 137. See McKelvey, 773 F. App'x at 75.  As we have observed, the Supreme Court's Davis decision reopened debate within our circuit regarding Hobbs Act robbery's status as a crime of violence, but it did not disturb McKelvey's separate reasoning on the nature of aiding-and-abetting liability.  See United States v. Green, 467 F. Supp. 3d 252, 256 n.2 (M.D. Pa. 2020) (Conner, J.), appeal filed, No. 20-2459 (3d Cir.).  As previously, we find McKelvey to be persuasive.  See id.; see also United States v. Green, No. 1:11-CR-361, ___ F. Supp. 3d ___, 2020 WL 5939161, at *4 n.3 (M.D. Pa. 2020) (same), appeal filed, No. 20-3262 (3d Cir.)

### 3.    *Counts Fifteen and Sixteen: Duplicity*

Coles moves to dismiss Count Fifteen on duplicity grounds, and Dickerson joins in that motion, presumably as to the parallel charge brought against him in Count Sixteen.  (See Doc. 665 at 11-12; see also Doc. 681 at 9).  These counts charge Coles and Dickerson, respectively, with possessing with intent to distribute heroin, cocaine base, and cocaine hydrochloride "[b]eginning on or about April 1, 2016, up to and including July 7, 2016, in Chambersburg, Franklin County, Pennsylvania, within the Middle District of Pennsylvania, and elsewhere."  (Doc. 499 at 32-33).  Coles argues that, because each separate act of possession of a controlled substance is its own substantive offense, these counts are duplicitous in that they contemplate multiple possessions in multiple locations over a span of three months.  (See Doc. 665 at 11-12; see also Doc. 681 at 9).

 "Duplicity is the improper joining of distinct and separate offenses in a single count."  United States v. Rigas, 605 F.3d 194, 210 (3d Cir. 2010) (*en banc*) (quoting United States v. Haddy, 134 F.3d 542, 548 (3d Cir. 1998)).  Duplicitous counts raise several concerns: they "may conceal the specific charges, prevent the jury from deciding guilt or innocence with respect to a particular offense, exploit the risk of prejudicial evidentiary rulings, or endanger fair sentencing."  See id. (quoting Haddy, 134 F.3d at 548).  As our court of appeals has explained, "'[i]f the doctrine of duplicity is to be more than an exercise in mere formalism, it must be invoked only when an indictment affects the policy considerations' that underlie the doctrine."  United State v. Root, 585 F.3d 145, 155 (3d Cir. 2009) (citation omitted).  Thus, a count should not be found impermissibly duplicitous simply because it

"contains several allegations that could have been stated as separate offenses." Id. Rather, a count should be found impermissibly duplicitous "only when the failure to do so risks unfairness to the defendant." Id.

The first step in determining if a count is duplicitous is to identify "the allowable unit of prosecution." United States v. Moyer, 674 F.3d 192, 204 (3d Cir. 2012) (quoting Root, 585 F.3d at 150). To do so, we must ascertain congressional intent by looking to the language of the statute. Id. (quoting Root, 585 F.3d at 150). Section 841(a)(1) provides, in relevant part, that "it shall be unlawful for any person knowingly or intentionally . . . to . . . possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Because the statute uses the singular form—"a controlled substance"—it could be read to imply that the allowable unit of prosecution is the controlled substance itself; that is, that each controlled substance possessed must be charged in a separate count. Cf. United States v. Bennafield, 287 F.3d 320, 323 (4th Cir. 2002) (recognizing but rejecting this possible reading of identical phrasing in simple possession statute, 21 U.S.C. § 844(a)). Yet the statute is by no means unambiguous, and the Supreme Court has cautioned that the inquiry into the allowable unit of prosecution "cannot be answered merely by a literal reading" of the statute's terms. See United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221 (1952).

Section 841(a)(1) is chiefly concerned with the act of possession. See United States v. Johnson, 909 F.2d 1517, 1518 (D.C. Cir. 1990) ("The *actus reus* for this crime is the act of possession."); United States v. Anthony, No. 1:CR-01-336, 2010 WL 956649, at *2 (M.D. Pa. Mar. 11, 2010) (Rambo, J.) ("Section 841(a)(1) criminalizes

the possession of a 'controlled substance'—not possession of a specific controlled substance or group of controlled substances." (citations omitted)); <u>see also</u> 21 U.S.C. § 841(a)(1). We find that the "allowable unit of prosecution" for this offense is the incident of possession itself. Logically, then, Counts Fifteen and Sixteen, which charge a single (albeit continuous) incident of possession, are not duplicitous. The counts do not charge "distinct and separate offenses" merely because they identify multiple controlled substances. Rather, they permissibly charge that Coles and Dickerson committed this single offense in distinct and separate ways. <u>See, e.g.,</u> <u>United States v. McCourty</u>, 562 F.3d 458, 473 n.4 (2d Cir. 2009) (one count charging possession with intent to distribute both cocaine and cocaine base was "considered a single offense for purposes of . . . duplicity"); <u>Anthony</u>, 2010 WL 956649, at *2 ("An indictment charging . . . simultaneous possession of different controlled substances is not duplicitous."); <u>see also</u> <u>United States v. Gomberg</u>, 715 F.2d 843, 845-46 (3d Cir. 1983) (count charging conspiracy to possess with intent to distribute more than one controlled substance not duplicitous), <u>overruled on other grounds by</u> <u>Garrett v. United States</u>, 471 U.S. 773 (1985). The indictment is not duplicitous for charging possession with intent to distribute multiple substances in a single count.[9]

---

[9] Defendants express concern that, if the jury returns a general verdict on these counts, there would be no way of knowing which controlled substance the jurors found that the defendants possessed with intent to distribute, and no way of ensuring that the jurors were unanimous in that decision. To the contrary, the court's general unanimity instructions will make clear to the jury that they must be unanimous as to each element of the offense. Moreover, as is the court's standard practice, we will submit special interrogatories to the jury as to each of the controlled substances charged. In the event of a guilty verdict, there will be no uncertainty as to which controlled substance the jury finds that these defendants possessed with intent to distribute.

Coles and Dickerson seemingly also take issue with the amount of time that Counts Fifteen and Sixteen span—just shy of 100 days.  (See Doc. 665 at 11-12; Doc. 741 at 3).  Possession with intent to distribute, however, is a "continuing offense." See United States v. Rowe, 919 F.3d 752, 760 (3d Cir. 2019) (citing United States v. Zidell, 323 F.3d 412, 422 (6th Cir. 2003)).  "A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy."  Id. (quoting United States v. Midstate Horticultural Co., 306 U.S. 161, 166 (1939)).  Generally, a count that charges a single continuing offense will not be dismissed as duplicitous.  See, e.g., United States v. Morris, 561 F. App'x 180, 187 (3d Cir. 2014) (nonprecedential) (citing United States v. Mancuso, 718 F.3d 780, 792 (9th Cir. 2013); United States v. Cohen, 444 F. Supp. 1314, 1320 (E.D. Pa. 1978)).  We conclude that Counts Fifteen and Sixteen are not duplicitous solely because the incident of possession is alleged

to have spanned several months.  We will accordingly deny defendants' motion to dismiss Counts Fifteen and Sixteen on duplicity grounds.[10]

### C.    Motions for Bill of Particulars

White moves for a bill of particulars as to Counts Six and Eleven, (see Doc. 586), and in his motion to dismiss, he also requests that the government be directed to "provide additional information" addressing the elements of Counts Eight, Nine, and Ten, (see Doc. 593 at 7).  Coles joins in both of White's motions.  (See Doc. 700 ¶ 4).  Coles also separately moves for a bill of particulars as to Counts One through Twelve, Count Fifteen, and Count Nineteen, (see Doc. 662), and Dickerson joins in

---

[10] Although the indictment is not duplicitous on its face, we can foresee scenarios where the proof at trial may raise duplicity concerns.  This is especially true given the government's suggestion that it could prove separate, "intermittent" incidents of possession to obtain a guilty verdict on Counts Fifteen and Sixteen— with the jury being unanimous on the elements of possession, but not necessarily identifying *which* incident of possession (it unanimously agreed) had occurred.  (See Doc. 726 at 13-15).  In its recent decision in Rowe, our court of appeals articulated clear boundaries for each incident of possession, explaining that the "continuing offense" of possession with intent to distribute "begins when a defendant has the power and intention to exercise dominion and control over" the specific controlled substance "and ends when his possession is interrupted by a complete dispossession."  Rowe, 919 F.3d at 760 (holding that government could not aggregate drug weights associated with separate incidents of possession to meet 1000-gram threshold for mandatory minimum sentence).  We read Rowe as defendants do—to mean that each instance of possession, however long that possession may continue, becomes a separate offense once the possession ends.  (See Doc. 741 at 2 (quoting Rowe, 919 F.3d at 761)); see also Rowe, 919 F.3d at 760.  The indictment is consistent with this reading, charging that Coles and Dickerson continuously possessed one or more of the three controlled substances identified during the three-month time period identified in Counts Fifteen and Sixteen.  The government may endeavor to prove that offense as charged.  It may not, however, obtain a verdict based on the theory espoused in its brief—one of scattered possessions occurring intermittently throughout that time period.  Coles and Dickerson may make an appropriate motion should the government's case at trial raise new duplicity concerns.

that motion, again presumably substituting the parallel charge against him in Count Sixteen for the charge against Coles in Count Fifteen, (see Doc. 681 at 8-9). Both Coles and White (and Dickerson, through joining Coles' motion) include long lists of specific information to which they believe they are entitled.

A district court may order the government to file a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f). See FED. R. CRIM. P. 7(f). A bill of particulars is a "formal, detailed statement of the claims or charges brought by a . . . prosecutor." Urban, 404 F.3d at 771 (quoting Bill of Particulars, BLACK'S LAW DICTIONARY (8th ed. 2004)). The bill of particulars is not intended to "permit 'wholesale discovery'" of the government's case. See United States v. Eufrasio, 935 F.2d 553, 575 (3d Cir. 1991) (quoting United States v. Armocida, 515 F.2d 49, 54 (3d Cir. 1975)). Rather, it serves "to inform the defendant of the nature of the charges brought against him, to [allow him to] adequately prepare his defense, to avoid surprise during the trial[,] and to protect him against a second prosecution for an inadequately described offense." Urban, 404 F.3d at 771 (quoting United States v. Addonizio, 451 F.2d 49, 63-64 (3d Cir. 1971)). Access to "[f]ull discovery" may "obviate[] the need for a bill of particulars." See id. at 772 (quoting United States v. Giese, 597 F.2d 1170, 1180 (9th Cir. 1979)). Whether to grant a request for a bill of particulars is a matter of trial court discretion. See Eufrasio, 935 F.2d at 575 (citing Armocida, 515 F.2d at 54).

Much of the information requested by defendants falls beyond the scope of a bill of particulars. Requests for dates, times, locations; for details regarding firearms and controlled substances allegedly possessed; and for the identities of

unindicted coconspirators and specifics of any communications among alleged coconspirators—these are simply impermissible attempts to conduct "wholesale discovery" of the government's case, and the moving defendants have not established a fundamental need for the specified particulars.  See id. (quoting Armocida, 515 F.2d at 54); (see also Doc. 662 ¶¶ 6, 7, 11-12, 14-16; Doc. 586 ¶¶ 1-2). We will deny their motions to that extent.  We will also deny Coles' requests that the government detail what thing of value was allegedly promised as consideration for the murders charged in Count Seven, (see Doc. 662 ¶¶ 8-9), and for more information as to the nature of the controlled-substance and firearms charges in Counts Fifteen and Nineteen, (see id. ¶¶ 13, 17).  And we will deny Coles' request for additional information regarding Count Twelve, as he has established no basis for entitlement to a bill of particulars for a count on which he is not charged.  (See id. ¶ 10).

These denials comprise all information requested in White's motion for a bill of particulars on Counts Six and Eleven, so that motion will be denied in full.  To the extent that White also requests "additional information" as to Counts Eight, Nine, and Ten, (see Doc. 593 at 7), that motion will also be denied.  White premises this request on his claim that information provided to date fails to establish that he had a motive to kill Chaney and fails to establish a connection between White and his alleged coconspirators.  (See generally id. at 3-7).  The indictment itself provides much of the purportedly missing information: it charges, *inter alia*, that White trafficked heroin, cocaine base, and cocaine hydrochloride; that he (and others) enlisted Chaney to assist in those drug-distribution activities; that he (and others)

suspected Chaney was an informant; and that, on the day of the triple homicide, he induced Chaney to travel to Jackson's farm, where she was shot and killed.  (See Doc. 499 ¶¶ 5, 7, 9, 12).

The indictment itself does not bridge the gap between White's suspicion of Chaney and his actions on June 25, 2016—and as we have explained *supra,* it does not need to.  But the government later articulated that link anyway during Buck's change of plea hearing, explaining that White was one of the individuals present at Buck's home while Chaney's murder was planned:

> When all of these individuals [including Johnson, Jenkins-Armstrong, Corbett, Preddy, and Adgebesan] arrived back in Hagerstown, Maryland that evening the group went to Mr. Buck's home.  Corbett arrived back at the Buck residence, accompanied by other individuals who I said were arriving in a different vehicle.  Codefendant Torey White arrived on foot.  All gathered in the kitchen of Mr. Buck's home where the group was told about the layout of Jackson's property and that the informant, who would be Chaney, that was to be killed was supposed to be there.

(See Doc. 646 at 28:13-21).  We reject White's claim that he has no idea what the government believes his role was leading up to the triple homicide.

The same cannot be said of Coles and Dickerson.  The indictment's factual narrative as to these defendants ends at their suspicion of Chaney as a cooperator, (see Doc. 499 ¶ 9), with the exception of an allegation in Count Fourteen, the drug-trafficking conspiracy count, that Coles and Dickerson believed Chaney "was cooperating with law enforcement and, to protect the conspiracy, decided to have her killed," (see id. at 30).  Although the government stated during Johnson's and Buck's change of plea hearings that Coles and Dickerson "plotted to kill [Chaney],"

it has not elaborated further.  (See Doc. 490 at 26:23-25; Doc. 646 at 24:25-25:2).

Nothing in the record offers any indication of what it is the government believes

Coles and Dickerson did in furtherance of that "plot."  (See generally Docs. 490,

499, 646, 726).  Coles asserts that he has yet to receive any discovery filling in these

gaps.  (See Doc. 663 at 8-9; Doc. 741 at 6-7, 11, 14).  We have no reason to doubt this

representation, particularly when we know the government's case-in-chief will rely

heavily on cooperating witnesses and informants who will not be disclosed until 30

days prior to trial.  (See Doc. 766 at 14-15).

     The government rejoins that its indictment "alleges facts with such

particularity that in many respects it 'weaves' the information into a fully integrated

trial theory."  (See Doc. 726 at 18).  While this may be true as to their codefendants,

it is not as to Coles and Dickerson.  Other than positing that it does not believe

additional information is necessary, (see Doc. 726 at 17-20), the government fails to

identify a compelling reason *against* providing a bill of particulars,[11] see United

States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989) (explaining that court must balance

the defendant's "legitimate interest in securing information" and "countervailing

considerations ranging from the personal security of witnesses to the unfairness

that can result from forcing the government to commit itself to a specific version of

---

[11] The government asserts that "identification of all known coconspirators
and participants is tantamount to disclosure of cooperating government witnesses."
(See Doc. 726 at 19).  We have already denied defendants' requests for disclosure of
cooperating witnesses, both in addressing their discovery motions, (see Doc. 766 at
16-28), and to the extent requested in their motions for bills of particulars, see *supra*
at 30-31.

the facts before it is in a position to do so").  The government invokes no such consideration in its responsive briefing.

Given the limited information provided to Coles and Dickerson thus far, we find that a bill of particulars is necessary to allow these defendants to understand the nature of the charges against them, to conduct their own investigations and adequately prepare their defenses, and to avoid surprise at trial.  See Urban, 404 F.3d at 771 (quoting Addonizio, 451 F.2d at 63-64).  Accordingly, we will order the government to provide a bill of particulars as to two of Coles' requests.  In its bill of particulars, the government shall identify (1) whether Coles and Dickerson are alleged to have been present at Jackson's farm at or around the time of the alleged robberies and the triple homicide, and (2) whether Coles and Dickerson are charged as principals or aiders and abettors on Counts One through Eleven.  (See Doc. 662 ¶¶ 4-5).

### D.    Motions to Sever

All defendants move to sever at least some counts for trial.  For purposes of this discussion, we catalogue the indictment's counts into three groups: the triple-homicide group (Counts One through Eleven), the controlled-substance group (Counts Twelve through Nineteen), and the attempted-murder group (Counts Twenty through Twenty-Two).

All defendants—Coles, Dickerson, Adgebesan (joined by Jenkins-Armstrong), Preddy, Lawson, and Armstrong—move to sever the attempted-murder group for

trial.[12]  (See Doc. 654 at 7 & n.1; Doc. 661 at 3-9; Doc. 667 at 5-16; Doc. 677 at 1-10;

Doc. 679-5 at 8-13; Doc. 681 at 4-5; Doc. 686 at 1).  Preddy and Jenkins-Armstrong

seek severance of the controlled-substance group.  (See Doc. 654 at 7-13; Doc. 686

at 8-9).  Coles asks to have his trial severed from Dickerson's based on Bruton

v. United States, 391 U.S. 123 (1968), (see Doc. 679-5 at 4-8), and both Coles and

Dickerson ask the court to sever Counts Twelve and Thirteen (the Corbett and

Adgebesan controlled-substance counts) for lack of a relationship to the other

conspiracies or to them, (see id. at 9-13; Doc. 681 at 4-5).  Dickerson also raises

concerns about the logistics of conducting a trial of this size under existing public-

health guidance, (see Doc. 681 at 5-8), and Jenkins-Armstrong raises several

evidentiary and racial-stereotyping concerns in light of the number of defendants,

(see Doc. 686 at 9-15).  Lastly, White moves to be tried separately from all of his

codefendants, asserting that the government has failed to establish a basis for

joining him in this case.  (See Doc. 669 at 2-15).  We take up each argument

seriatim, after generally overviewing the principles that govern joinder and

severance in the federal judicial system.

### 1.    *Joinder and Severance Generally*

Federal Rule of Criminal Procedure 8 governs joinder of offenses and

defendants in a single charging document.  Rule 8(a) permits joinder of multiple

offenses against a single defendant "if the offenses charged . . . are of the same or

---

[12] Corbett filed a motion to sever as well.  (See Doc. 683).  Because Corbett is scheduled for a change of plea hearing on February 9, 2021, we will defer ruling on Corbett's motion.

similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P 8(a).  Rule 8(b) addresses joinder of multiple defendants; it states that an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions."  See FED. R. CRIM. P. 8(b).  Rule 8(b) has the "stricter standard" of the two, since it does not include the "more permissive" language allowing joinder of offenses of the "same or similar character" that is included in Rule 8(a).  See United States v. Lacerda, 958 F.3d 196, 224 (3d Cir. 2020) (quoting United States v. Jimenez, 513 F.3d 62, 82 (3d Cir. 2008); United States v. Irizarry, 341 F.3d 273, 287 n.4 (3d Cir. 2003)).  Rule 8(a) applies only to single-defendant prosecutions; "in a multi-defendant case such as this, the tests for joinder of counts and defendants [are] merged in Rule 8(b)."  Id. (quoting Irizarry, 341 F.3d at 287); Walker, 657 F.3d at 169.[13]

Joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  United States v. Lore, 430 F.3d 190, 204-05 (3d Cir. 2005) (quoting Urban, 404 F.3d at 775).  As a result, a preference

---

[13] Although our court of appeals has suggested in *dicta* that Rule 8(a) may nonetheless supply the standard for challenging joinder of offenses against a single defendant, even in multidefendant cases, see Irizarry, 341 F.3d at 287 n.4 (quoting Eufrasio, 935 F.2d at 570 n.20), it has continued to apply Rule 8(b) alone in such cases, see Lacerda, 958 F.3d at 224-25 (applying Rule 8(b) to defendant's claim that substantive counts against her were misjoined in multidefendant case).

has developed in the federal system for joint trials of defendants indicted together.[14]
See Zafiro v. United States, 506 U.S. 534, 537 (1993); Lore, 430 F.3d at 204-05 (citing Urban, 404 F.3d at 775). Nonetheless, Rule 14 provides a mechanism for severance of properly joined defendants when joinder "appears to prejudice a defendant or the government." FED. R. CRIM. P. 14(a). A court should sever defendants for trial "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539.

### 2.   *The Attempted-Murder Group*

We turn first to the most vigorously contested joinder. The indictment joins the triple-homicide group (the 11 charges against Coles, Dickerson, White, Adgebesan, Preddy, and Jenkins-Armstrong for the triple murder and robbery of Chaney, Phillips, and Cole in June 2016) with the attempted-murder group (the three charges against Preddy, Jenkins-Armstrong, Lawson, and Armstrong for the attempted murder of Adgebesan in May 2017). (See Doc. 499 at 8-24, 37-41). All

---

[14] The government repeatedly states that "there 'is a strong preference in the federal system for' joinder." (See, e.g., Doc. 721 at 2 (citing Zafiro, 506 U.S. at 537)). This statement misquotes and misunderstands Zafiro. That decision recognizes a "preference" for joint trials, but does not describe the preference as a "strong" one. See Zafiro, 506 U.S. at 537. The government's statement also incorrectly suggests that Zafiro expresses a preference for "joinder" itself, rather than a preference for joint trials of defendants who are properly indicted together. See id. ("There is a preference in the federal system for joint trials of defendants who are indicted together."); see also United States v. Voigt, 89 F.3d 1050, 1094 (3d Cir. 1996) ("*[W]hen defendants have been properly joined* . . . , 'a district court should grant severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" (emphasis added) (quoting Zafiro, 506 U.S. at 539)).

defendants except White contend that these counts are misjoined, that the joinder results in unfair prejudice, or both.

Before considering whether joinder of these groups is unfairly prejudicial, we must first consider whether they were properly joined in the first place.  The government offers the generalized refrain that the third superseding indictment provides "both a narrative and a description of the criminal conduct engaged in by the co[]defendants and their association with each other" and a "seamless account of the inter-connected conspiratorial activities."  (See Doc. 717 at 7-8; Doc. 720 at 7; Doc. 721 at 6-7; Doc. 722 at 6-7; Doc. 723 at 20; Doc. 748 at 15, 22).  The government suggests, in essence, that a factual relationship between counts and defendants is sufficient for purposes of Rule 8(b).

The central question here is whether the remaining defendants in the triple-homicide group can be said to have "participated in the same act or transaction, or in the same series of acts or transactions" as those in the attempted-murder group.[15] See FED. R. CRIM. P. 8(b).  It is indisputable that the triple homicide and robbery conspiracies are not part of "the same act or transaction" as the attempted murder conspiracy.  Thus, we must ask whether those separate conspiracies can fairly be

---

[15] The government's analysis does not meaningfully engage with this standard or how it has been applied by our court of appeals.  It instead borrows a test from the First Circuit Court of Appeals, which asks "whether the charged offenses fall under the same statute, whether the crimes involved similar victims, locations, or modes of operation, as well as when the purported conduct occurred." See United States v. Monteiro, 871 F.3d 99, 107 (1st Cir. 2017).  The government recites these factors but never applies them.  This test arguably favors defendants: although there is some overlap of substantive charges, the victims are different, the locations are different, the alleged mode of operation is different, and the alleged events are separated by nearly a year.

considered part of the same "series of acts or transactions." While our court of appeals has not addressed this precise scenario, it has offered plenty of illustrative guidance.

For joinder to be appropriate under Rule 8(b), "[i]t is not enough that defendants are involved in offenses of the same or similar character; there must be a transactional nexus in that the defendants must have participated in 'the same act or transaction, or in the same series of acts or transactions.'" Jimenez, 513 F.3d at 82-83 (quoting FED. R. CRIM. P. 8(b)). Our court of appeals has described this nexus as requiring that joined counts either "originate 'in the same act or transaction,' or have otherwise been integral to one another." See Lacerda, 958 F.3d at 224 (citing United States v. Riley, 621 F.3d 312, 334 (3d Cir. 2010)). Likewise, joinder may be appropriate if an offense is "a logical predicate" to another, see Walker, 657 F.3d at 165, such that the subsequent offense is the "culminating act 'in the same series of acts,'" see Walker v. United States, No. 1:07-CR-263, 2008 WL 2247136, at *3 (M.D. Pa. May 30, 2008), aff'd, 657 F.3d at 165.

A good-faith allegation of conspiracy will generally supply the requisite transactional nexus to join substantive offenses against multiple defendants, so long as those offenses "aris[e] out of" the commonly charged conspiracy. See United States v. Somers, 496 F.2d 723, 729-30 (3d Cir. 1974). In such circumstances, "the claim of conspiracy provides a common link, and demonstrates the existence of a common scheme or plan." Id.; see also United States v. Lane, 474 U.S. 438, 447 (1986) (noting joinder is proper when the indictment charges "all the defendants with one overall count of conspiracy" (citing Schaffer v. United States, 362 U.S. 511

(1960))).  An allegation of vicarious coconspirator liability, even without a common conspiracy count, can also suffice to connect a "string" of separate, substantive offenses.  See United States v. Green, 563 F. App'x 913, 916-17 (3d Cir. 2014) (nonprecedential) (citing Pinkerton v. United States, 328 U.S. 640 (1946)).

The lack of a commonly charged conspiracy, however, is not dispositive. "[J]oinder may still be proper in the absence of a conspiracy count covering the time period for every substantive offense if those substantive offenses were part of the same series of transactions."  Walker, 657 F.3d at 169.  The nature, timing, and location of the separate offenses matter too.  In United States v. Rickey, 457 F.2d 1027 (3d Cir. 1972), for example, the court of appeals held that defendants who were not jointly indicted on any count were nonetheless properly joined in a single indictment when they were both alleged to have stolen travelers checks from the same store over the course of a weekend in "one 'series of acts or transactions.'" Rickey, 457 F.2d at 1029-30.  In Walker, the court identified the "short span of time" between separate offenses as a relevant consideration.  See Walker, 657 F.3d at 170 (joinder appropriate of charges that "arose directly from" one another and occurred in "a period of a little over a month").  And in Green, it suggested that the greater the similarity of participants, nature, and location, the less temporal proximity may be required.  See Green, 563 F. App'x at 916-17 (citing Walker, 657 F.3d at 170, and holding that three armed bank robberies each separated by a month were properly joined when they "were perpetrated by the same defendants in a similarly violent nature and took place in the same area of the state").

The propriety of joining all defendants in this case is a close call.  We agree, however, with the moving defendants that the government takes too broad a view of Rule 8(b).  This case is materially different than the racketeering cases the government cites throughout its briefing.  In those cases, the indictments properly joined separate and unrelated crimes against numerous defendants because all were commonly joined under a racketeering conspiracy umbrella and the separate but unrelated offenses were all charged as racketeering predicates.  See Irizarry, 341 F.3d at 286-90; Eufrasio, 935 F.2d at 567.  As the court explained in Eufrasio, "the law of joinder in RICO cases" supports inclusion of separate counts against different defendants charged in the same racketeering conspiracy when "all the acts charged against each joined defendant (even separately charged substantive counts) are charged as racketeering predicates or as acts undertaken in furtherance of, or in association with, a commonly charged RICO enterprise or conspiracy." See Eufrasio, 935 F.2d at 567.  Thus, all defendants were commonly linked by one "act or transaction"—the racketeering enterprise or conspiracy.

The instant case also lacks a commonly charged general conspiracy count that might otherwise provide the requisite transactional nexus between all defendants.  Cf. Lane, 474 U.S. at 447; Somers, 496 F.2d at 729-30.  The triple-homicide group charges one set of defendants (Coles, Dickerson, White, Adgebesan, Preddy, and Jenkins-Armstrong) with the June 2016 murders, while the attempted-murder group charges a separate set of defendants (Preddy, Jenkins-Armstrong, Lawson, and Armstrong) with the May 2017 attempted murder.  We do not suggest that Venn diagrams of the participants in two conspiracies must be fully concentric

to satisfy Rule 8(b).  But we are aware of no authority, and the government supplies none, for its apparent suggestion that two common-denominator defendants in temporally distinct schemes would suffice.  Cf. United States v. Welch, 656 F.2d 1039, 1049 (5th Cir. 1981) ("It is clear that defendants charged with two separate albeit similar conspiracies having one common participant are not, without more, properly joined." (citing United States v. Nettles, 570 F.2d 547, 551 (5th Cir. 1978))).

Without a common charge uniting all defendants, we are left with the government's argument that the indictment "weaves a narrative" that supplies the requisite link.  (See, e.g., Doc. 748 at 15).  We reject the government's argument, which finds no footing in joinder jurisprudence.  Rule 8(b) requires more than a well-structured narrative to connect the various defendants.  That is, even if "the [g]overnment may be able to link each of the conspiracies together . . . in a linear chain, it does not necessarily follow that all counts involved 'the same series of acts or transactions.'"  Jimenez, 513 F.3d at 83.  Rather, Rule 8(b) demands "a transactional nexus" among joined defendants, see id. at 82-83, such that we could find from the indictment that their separate actions were "integral to" or the "logical predicate" of one another, see Lacerda, 958 F.3d at 224; Walker, 657 F.3d at 165.  All of this suggests that there must be some material, substantive relationship between the joined counts, rather than a purely "narrative" or "descri[ptive]" one. (Cf. Doc. 748 at 15).

The only substantive connection between the triple-homicide group and the attempted-murder group is the government's allegation in Count Twenty-Two that Lawson's and Armstrong's actions in May 2017 make them accessories after

the fact to the June 2016 robbery and murders.  (See Doc. 499 at 41).  There are undoubtedly scenarios in which an accessory offense will be properly joined with the underlying charges as constituting part of the same "act" or "series of acts." See, e.g., United States v. Mills, 597 F.2d 693, 695-96 (9th Cir. 1979) (companion of getaway driver properly charged with defendants who committed armed bank robbery); United States v. Dorsey, No. RDB-18-0347, 2019 WL 3804113, at *12-13 (D. Md. Aug. 13, 2019) (same for Hobbs Act robbery); United States v. Dye, 508 F.2d 1226, 1231, 1236 (6th Cir. 1974) (accessory who helped principal change appearance "shortly after" theft of hundreds of cases of whiskey properly joined).  In traditional accessory cases such as these, it is clear that the offenses—occurring as one fluid and logically connected chain of events in a brief span of time—are transactionally linked for purposes of Rule 8(b).

We are unpersuaded that offenses as attenuated as the triple-homicide and attempted-murder conspiracies here constitute part of the same "act" or "series of acts."  The triple homicide and robbery occurred on June 25, 2016.  The attempted murder is not alleged to have occurred until early May 2017, more than ten months later, at a time when many defendants allegedly involved in the June 2016 murders were already incarcerated.  The crimes involved different victims, different motives, different means, different objectives, and (mostly) different defendants, and they occurred in two different states.  Accordingly, we find that the defendants charged in the triple-homicide group are not alleged to have "participated in the same act or transaction, or in the same series of acts or transactions" as those charged on the attempted-murder counts.  See FED. R. CRIM. P. 8(b).

Even if these offenses *were* properly joined, severance would be appropriate. Severance is proper when a joint trial would work "clear and substantial prejudice" to the moving defendant.  See United States v. Avila, 610 F. Supp. 2d 391, 397 (M.D. Pa. 2009) (Conner, J.) (quoting United States v. Davis, 397 F.3d 173, 182 (3d Cir. 2005)).  The Supreme Court has enumerated several scenarios in which such prejudice might be expected, explaining

> [s]uch a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.  For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.  When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.  Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice.  Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial.

Zafiro, 506 U.S. at 539 (citing Kotteakos v. United States, 328 U.S. 750, 774-75 (1946); Bruton, 391 U.S. 123).  Where spillover of evidence is concerned, the question is whether "the jury will be able to 'compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility.'"  See Davis, 397 F.3d at 182 (quoting Somers, 496 F.2d at 730).  Ultimately, whether to grant a severance is a matter of discretion for the trial court.  See Lore, 430 F.3d at 205; United States v. Sandini, 888 F.2d 300, 305 (3d Cir. 1989) (collecting cases).  In exercising that discretion, we must "balance[] the potential prejudice to the

defendant against the advantages of joinder in terms of judicial economy." Sandini, 888 F.2d at 305 (citing United States v. Sebetich, 775 F.2d 412, 427 (3d Cir. 1985)).

The moving defendants contend that all of the concerns identified in Zafiro would be implicated if the triple-homicide and robbery charges are tried with the attempted-murder charges. Adgebesan emphasizes that, because he is a defendant on the front half of the indictment but the intended victim on its final three counts, a joint trial would place him in the difficult position "of weighing his right to remain silent at trial against his civic duty to testify about the May 2017 incident and tell what he knows." (Doc. 661 at 6). He notes that hearsay evidence that would be admissible against the coconspirators charged in the attempted-murder group likely would not be admissible against him on the triple-homicide counts,[16] see FED. R. EVID. 801(d)(2)(E); (see also Doc. 661 at 8), and he underscores the damaging assumptions about his guilt on the triple-homicide counts that necessarily underlie the attempted-murder counts,[17] (see Doc. 661 at 5-6). Coles postulates that the jury

---

[16] While this argument has merit as to Adgebesan and to other codefendants not charged in the attempted-murder group, it fails to the extent raised by Lawson and Armstrong: those defendants are named as coconspirators on Count Twenty, and as such, statements of their coconspirators made in furtherance of that offense would be admissible against them. (See Doc. 677 at 9-10; see also Doc. 667 at 15); see generally FED. R. EVID. 801(d)(2)(E).

[17] We share Adgebesan's concerns about the propriety of trying him as a defendant on the same indictment in which he is named as an attempted-murder victim. This unique consideration contributes to our view that severance is appropriate. Joinder in this situation is likely to raise evidentiary issues, to complicate the crafting of appropriate jury instructions, and to cause juror confusion. Moreover, we are unable to conceive of *any* instruction that would possibly overcome a juror's natural assumption that Adgebesan simply must be guilty because of his codefendants' unsuccessful attempt to silence him.

might find him guilty on the triple-homicide counts solely based on association with defendants charged on both the triple-homicide counts and the attempted-murder counts.  (See Doc. 679-5 at 12-13).  All moving defendants also raise broad concerns regarding (1) evidence admissible as to some defendants but not others, (2) the inability of codefendants to provide exculpatory testimony, (3) juror confusion, (4) cumulating evidence, and (5) evidentiary issues under the Confrontation Clause and Bruton.  (See Doc. 654 at 7 n.2; Doc. 667 at 8-16; Doc. 677 at 6-10; Doc. 679-5 at 10-13; see also Doc. 686 at 9, 13-14).

At this procedural juncture, we do not have a clear picture of which defendants will proceed to trial or, of those who do not, which defendants may testify at trial as government witnesses.  So we cannot say with certainty that any defendant has identified a "specific trial right" that would likely be compromised by a joint trial.  But given the number of defendants, the nature and complexity of the case, the differences between the joined conspiracies, and the volume of issues anticipated even at this early stage, it is likely that at least *some* of the rights contemplated by Zafiro will be implicated and potentially compromised by a joint trial of the triple-homicide and attempted-murder groups.  And while we might presume, in the ordinary case, that proper limiting and unanimity jury instructions could cure any resulting prejudice, see Zafiro, 506 U.S. at 540, the effectiveness of such instructions is not unbounded.  Particularly given the anticipated length of trial, we have serious misgivings about a lay jury's ability to manage the avalanche of limiting instructions that a joint trial of this nature would entail.  We also have

serious concerns about the substantial risk of prejudice that would almost inevitably result.

Finally, we are not compelled by the government's invocation of judicial economy. The government asserts that severance will put the court through "multiple identical multi-week jury trials." (See Doc. 720 at 13). There will surely be some overlap and repetition between the separate trials. But as we have already observed, the charges in the triple-homicide group are distinct—in time, place, manner, motive, victims, and participants—from the charges in the attempted-murder group, and we cannot fathom that *all* evidence admitted in the first trial would be admissible in the second, or *vice versa*. In any event, concern over judicial economy must necessarily take a back seat when misjoinder and potential prejudice are established. For all of these reasons, we will grant defendants' motions to sever Counts Twenty through Twenty-Two for trial.

### 3. *The Controlled-Substance Group*

We reach a different result as to defendants' motions for severance of the controlled-substance group. Coles and Dickerson seek severance of the controlled-substance offenses charged against Adgebesan and Corbett in Counts Twelve through Thirteen, (see Doc. 679-5 at 8-13; Doc. 681 at 4-5), and Preddy, who is not named on any controlled-substance count, seeks severance of the entire controlled-substance group, (see Doc. 654 at 7-13). Although phrased differently, all three defendants essentially maintain that the controlled-substance offenses charged against others "have quite literally nothing to do with" either their own controlled-substance charges or the murders and robbery at Jackson's farm. (See Doc. 681 at

4; <u>see also</u> Doc. 654 at 9 (claiming lack of "evidentiary connection or 'causal link'"
between triple-homicide group and controlled-substance group); Doc. 679-5 at 13
(claiming controlled-substance offenses as to Adgebesan and Corbett are "entirely
unrelated to Coles' alleged involvement in a conspiracy to distribute narcotics with
Dickerson, as well as the Murder conspiracy")).

We have little difficulty concluding that the controlled-substance counts—
even those on which the moving defendants are not charged—arise out of the same
series of acts or transactions underlying the commonly charged triple-homicide and
robbery conspiracies and therefore are properly joined.  The controlled-substance
offenses occurred at approximately the same time and in the same general area as
the events underlying the triple homicide and robbery, and they involved many of
the same defendants.  (<u>Compare</u> Doc. 499 at 8-24 <u>with</u> <u>id.</u> at 25-36).  Several of those
counts form the asserted basis of the triple-homicide and robbery plot: it is alleged
that Coles', Dickerson's, and White's drug-trafficking activities, and their concern
that Chaney was cooperating with authorities about those activities, are the reason
they chose to have her killed.  (<u>See</u> <u>id.</u> at 30).  Moreover, the controlled-substance
charges against Adgebesan and Corbett supply the requisite nexus between the
Hagerstown and Baltimore defendants.  (<u>See</u> Doc. 748 at 16; <u>see also</u> Doc. 499 at
25-27).

As we have set forth at length *supra*, it is appropriate to join separate
substantive offenses against defendants who are commonly linked under a single
conspiracy if those offenses relate to or arise out of the conspiracy.  See <u>Somers</u>, 496
F.2d at 729-30; <u>see also</u> <u>Lane</u>, 474 U.S. at 447.  All moving defendants are commonly

charged in the conspiracies at Counts One, Six, Seven, and Eleven.  (See Doc. 499 at 8, 18, 20, 24).  And the connection goes beyond a commonly charged conspiracy and contemporaneity: the allegations in this case are such that the controlled-substance counts are both "integral" and the "logical predicate" to the triple-homicide and robbery counts.  See Lacerda, 958 F.3d at 224; Walker, 657 F.3d at 165.  Accordingly, defendants have not shown that the controlled-substance group is misjoined.

Nor have the moving defendants shown prejudice flowing from joinder of these charges in one indictment.  The defendants invoke generalized concerns of juror confusion, but none of them identifies a specific trial right that will (or is likely to) be compromised by a joint trial.  See Zafiro, 506 U.S. at 539; Urban, 404 F.3d at 775.[18]  A properly instructed jury will have no difficulty compartmentalizing the controlled-substance-related evidence from the triple-homicide-related evidence or understanding the relationship between those charged counts.

---

[18] Preddy invokes United States v. Gomez, 111 F. Supp. 2d 571 (E.D. Pa. 2000), in favor of severance.  There, Santos Gomez was charged on a multicount, multidefendant indictment.  The only charges against Gomez were for distribution of and conspiring to distribute controlled substances.  See Gomez, 111 F. Supp. 2d at 572.  His codefendants in that conspiracy were charged in separate counts of the same indictment with offenses related to murder in aid of racketeering.  See id. The court found that severance of Gomez's trial was appropriate: since "*the most serious conspiracy charge is one with which Mr. Gomez has not been charged*, the risk of juror confusion in disentangling the two conspiracies seems peculiarly high and the potential prejudicial impact of such confusion seems significant."  Id. at 574 (emphasis added).  The opposite is true here: Preddy is already charged on the most serious counts of the indictment, so the risk of juror confusion and prejudicial impact from joinder of drug counts on which he is not charged is minimal.

### 4.     *Other Severance Arguments*

The other severance arguments raised by the defendants are either meritless or premature.  White asks the court to sever his case for trial based on his belief that neither the indictment nor the discovery provided to date adequately establish his involvement in the alleged conspiracy.  (See generally Doc. 669 at 2-9).  His entire argument (both the misjoinder component and the prejudice component) rises and falls on his belief that the indictment fails to connect him to the commonly charged conspiracies.  But as we have explained above, the indictment does properly charge White in the triple-homicide and robbery counts.  See *supra* at 15-19.  Moreover, the government provided additional information during Buck's change of plea hearing that, if true, would link White directly to the BGF defendants.  (See Doc. 646 at 28:13-21).  The commonly charged conspiracy counts and White's alleged role within them are more than sufficient to justify joinder.  White's belief that the government cannot *prove* its allegations is an issue for trial, not Rule 14.

Coles separately argues that his case should be severed from Dickerson's.  Coles asserts that Dickerson made a "powerfully compelling" inculpatory statement to law enforcement that would be admissible against Dickerson at trial but would be inadmissible against Coles under Bruton.[19]  (See Doc. 679-5 at 4-8).  We have not seen this statement.  However, given the nature of the relationship alleged between

---

[19] Coles also raises Bruton prejudice concerns regarding statements that Dickerson made to a jailhouse informant.  (See Doc. 679-5 at 4).  Although other admissibility issues may arise with such statements, they do not raise a Bruton issue: Bruton applies only to inculpatory *testimonial* statements by codefendants. See United States v. Berrios, 676 F.3d 118, 128-29 (3d Cir. 2012).

this pair, we are inclined to agree with Coles that redaction would not alone resolve the <u>Bruton</u> problem with Dickerson's statement.  Nonetheless, we decline to sever on this basis at this time.  Since trial is still more than ten months away, this <u>Bruton</u> issue is currently hypothetical.  We will thus deny Coles' motion without prejudice to his right to reassert his request for severance later should it appear that both he and Dickerson will be proceeding to trial.  Likewise, if other defendants become aware of probable <u>Bruton</u> issues as we approach trial, they too may file appropriate motions as the issues arise.

Jenkins-Armstrong raises concerns with the anticipated presence of multiple Deputy United States Marshals and contends that there is an exacerbated risk of racial stereotyping in a simultaneous trial of eight Black males.  (<u>See</u> Doc. 686 at 10-13).  As to the first argument, the Deputy United States Marshals who secure our courtrooms during criminal trials are not uniformed and are inconspicuously seated throughout the courtroom to eliminate the "armed-camp atmosphere" that Jenkins-Armstrong envisions.  (<u>See</u> <u>id.</u> at 10); <u>cf.</u> <u>Holbrook v. Flynn</u>, 475 U.S. 560, 562, 570-71 (1986) (finding no "unacceptable risk of prejudice" when "customary courtroom security force was supplemented by four uniformed state troopers sitting in the first row" of the gallery).  As to the second, we note that the authorities Jenkins-Armstrong cites concern racial bias as between Black and Caucasian defendants and do not speak directly to compounding prejudice in a case involving defendants of the same race.  (<u>See</u> Doc. 686 at 12-13).  We will deny Jenkins-Armstrong's motion to sever on this basis.  We will, however, consider any appropriate jury instruction counsel would like to submit concerning implicit bias, and we would encourage all

defense counsel and the government to work together to craft an appropriate instruction in this case.

Finally, we note defendants' pandemic-related concerns.  Several defendants raise arguments with regard to conducting a large, multidefendant trial in light of the COVID-19 pandemic and related public-health guidance.  (See, e.g., Doc. 681 at 2, 5-8; Doc. 686 at 15).  The court is well aware of the unique logistical challenges of conducting jury trials under current public-health restrictions.  We are confident in the ability of this court and its staff to manage even a large, multidefendant trial. This is particularly so when that trial is still more than ten months away, the court has already reduced the number of defendants by severing three counts, and still more defendants may enter guilty pleas prior to trial.  The court and its staff will communicate with counsel as trial approaches to discuss appropriate protocols and any necessary adjustments to the district's existing COVID-19 trial procedures to ensure that defendants' trial rights and the health and safety of all trial participants are protected.  Defendants' motion to sever on this basis, therefore, will be denied.

III.    **Conclusion**

For the reasons set forth herein, the court will grant in part and deny in part defendants' multitude of pretrial motions.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    January 29, 2021