**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:16-CR-212** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **KEVIN COLES,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

Defendant Kevin Coles moves the court to suppress evidence and statements

obtained by law enforcement during the initial stages of their investigation into the

triple homicide and other crimes charged in this case.[1]  We will grant in part and

deny in part Coles' motions.

**I.    Factual Background and Procedural History**

The criminal investigation and charges in this case originate with a

triple homicide and robbery on June 25, 2016.  The third superseding indictment

identifies the homicide victims as Wendy Chaney,[2] Phillip Jackson, and Brandon

Cole.  The murders and robbery occurred in a barn on Jackson's farm, located

at 11026 Welsh Run Road in Mercersburg, Franklin County, Pennsylvania.  The

---

[1] In addition to the four motions addressed herein, Coles also moves the court to suppress evidence obtained from a search warrant executed on his cell at Adams County Prison, while he was held there as a pretrial detainee.  We will address that motion in a separate memorandum.

[2] The third superseding indictment uses two different spellings for this victim's last name, switching between "Chaney" and "Cheney."  We use "Chaney" in this memorandum, which we understand to be the correct spelling.

alleged events leading up to the triple homicide and robbery have been detailed in the court's prior opinions in this case and are incorporated herein by reference.

Relevant here, on June 30, 2016, Franklin County Court of Common Pleas Judge Angela R. Krom granted two applications filed by the District Attorney of Franklin County seeking to collect information from Coles' cell phone.  The first order, issued under 18 PA. CONS. STAT. § 5743, required listed telecommunications providers to disclose records for Coles' cell phone for the past 90 days including, *inter alia*, call detail records for incoming and outgoing calls and text messages, internet and data usage, historical cell-site location information ("CSLI"), text message content, and subscriber information for phone numbers interacting with Coles' phone.  (See Doc. 821-1 at 8-12).  The second order, issued under 18 PA. CONS. STAT. § 5773, authorized disclosure of 30 days of historical CSLI and 60 days of real-time CSLI for Coles' phone.  (See Doc. 823-2 at 6-12).  We refer to these orders as the Section 5743 order and Section 5773 order, respectively.

At some point during their investigation, law enforcement learned that Coles was wanted on an arrest warrant issued by the New York State Division of Parole on July 10, 2015.  (See Doc. 811-1; 7/18/17 Tr. 10:20-11:16, 12:3-13, 26:2-27:2).  Using real-time CSLI collected under the Section 5773 order, the Maryland State Police fugitive apprehension team, in conjunction with local police, tracked Coles to a Days Inn hotel in Hagerstown, Maryland, where he was arrested, searched, and taken into custody on the New York state parole warrant.  See United States

v. Coles, 264 F. Supp. 3d 667, 671 (M.D. Pa. 2017)[3]; (see also Doc. 867 at 5; Doc. 875 at 3).  Officers recovered one cell phone from Coles' person and another from the rear seat of the vehicle that Coles had entered just before his arrest.  See Coles, 264 F. Supp. 3d at 671.  Detective Jesse Duffy of the Hagerstown Police Department then applied for and received a search warrant for the vehicle; the ensuing search produced, among other things, several cell phones, a tablet, a plastic bag containing suspected heroin, and a white trash bag containing clothing.  See id. at 672; (see also Doc. 867 at 6).

Coles was transported to the Hagerstown Police Department, where he was met by Pennsylvania State Police ("PSP") Corporal Paul Decker and PSP Trooper Antwjuan Cox.  See Coles, 264 F. Supp. 3d at 672; (Doc. 819-2).  Trooper Cox read Coles his Miranda rights, and Coles indicated he understood those rights.  (See Doc. 819-2 at 2:13-3:7).[4]  Coles spoke with the PSP officers and initially answered their questions.  (See id. at 3:8-7:14).  Three minutes and 54 seconds into the interview, however, Coles invoked his right to an attorney, stating, "Well, I think I would like to ask for a lawyer at this point in time."  (Id. at 7:15-16).  Questioning continued for roughly six more minutes—during which Coles repeated his request for counsel

---

[3] On September 28, 2017, we issued a memorandum opinion granting in part and denying in part various motions to suppress evidence filed by Coles through his former counsel.  See generally Coles, 264 F. Supp. 3d 667.

[4] The court's citations are to the written transcript of the video-recorded interview.  Counsel have also submitted a flash drive containing the video as an exhibit, and the court has reviewed the video to confirm the accuracy of the cited portions of the transcript as well as to confirm relevant timestamps.

and also invoked his right to remain silent—before the officers eventually terminated the interview.  (See id. at 7:21-14:18).

The instant prosecution commenced with the filing of an indictment against Coles and codefendant Devin Dickerson charging various drug-trafficking offenses in August 2016.  The grand jury has since returned three superseding indictments, adding new defendants as well as capital charges along the way.  The case is now proceeding on a third superseding indictment, which charges Coles as follows:

- Count One: conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and Pinkerton v. United States, 328 U.S. 640 (1946);

- Count Two: Hobbs Act robbery, and aiding and abetting same, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

- Counts Three, Four, and Five: using, brandishing, and discharging a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness) resulting in the deaths of Phillip Jackson, Brandon Cole, and Wendy Chaney, respectively, and aiding and abetting same, in violation of 18 U.S.C. § 924(c) and (j) and 18 U.S.C. § 2;

- Count Six: conspiracy to use, brandish, and discharge a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness) resulting in the death of Chaney, in violation of 18 U.S.C. § 924(c), (j), and (o);

- Count Seven: conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958 and Pinkerton;

- Counts Eight, Nine, and Ten: murder of witnesses (Chaney, Jackson, and Cole, respectively), and aiding and abetting same, in violation of 18 U.S.C. § 1512(a)(1)(C) and 18 U.S.C. § 2;

- Count Eleven: conspiracy to murder witnesses (Chaney, Jackson, and Cole) in violation of 18 U.S.C. § 1512(k);

- Count Fourteen: conspiracy to distribute and possess with intent to distribute at least 100 grams of heroin and at least 28 grams of cocaine base and cocaine hydrochloride in violation of 21 U.S.C. § 846;

- Count Fifteen: possession with intent to distribute heroin, cocaine hydrochloride, and cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

- Count Seventeen: possession with intent to distribute heroin and cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

- Count Eighteen: distribution of heroin resulting in serious bodily injury, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2; and

- Count Nineteen: possession of firearms in furtherance of a drug-trafficking crime, and aiding and abetting same, in violation of 18 U.S.C. § 924(c)(1), 18 U.S.C. § 2, and <u>Pinkerton</u>.

(<u>See</u> Doc. 499 at 8-24, 28-32, 34-36).

After the government filed its notice of election not to pursue the death penalty on June 4, 2020, we established a pretrial and trial schedule, including separate phases of pretrial motions practice. Coles timely filed the four suppression motions addressed herein on March 3, 2021. The motions are fully briefed and ripe for disposition.

II.   **Discussion**

Coles raises multiple arguments in his motions to suppress evidence and statements.  We begin with his challenge to authorities' use of the New York state parole warrant to arrest him on July 7, 2016.[5]

A.   **Administrative Warrant**

The Fourth Amendment protects individuals from unreasonable searches and seizures.  See U.S. CONST. amend. IV; Horton v. California, 496 U.S. 128, 133 (1990).  The constitutional default is that an arrest must usually be "effectuated with a warrant based on probable cause."  See United States v. Torres, 961 F.3d 618, 622 (3d Cir. 2020) (quoting United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002)).  So too for searches: a warrant supported by probable cause is typically required.  See Payton v. New York, 445 U.S. 573, 586 & n.25 (1980) (citations omitted); see also Illinois v. Gates, 462 U.S. 213, 238 (1983).  The United States Supreme Court has carved an exception, however, for certain administrative searches: "government investigators conducting searches pursuant to a regulatory scheme need not adhere

---

[5] The government takes issue with Coles raising new challenges to evidence already tested by his former counsel during the first round of suppression motion practice in this case.  (See Doc. 875 at 7-9); see generally Coles, 264 F. Supp. 3d 667. The government likens Coles' recast arguments to a motion for reconsideration and urges the court to reject them as untimely and failing to meet the high bar for such motions.  We will exercise our discretion to allow Coles to raise his instant theories. As Coles notes, the nature of this case has fundamentally shifted: it is no longer just a drug-trafficking case and now includes charges for triple homicide, robbery, and attempted murder.  Indeed, the government itself acknowledges the significance of this shift, reporting that, due to "the additional charges brought," it will now seek to introduce evidence previously considered unnecessary.  (See Doc. 875 at 4 n.2).

to the usual warrant or probable-cause requirements as long as their searches meet 'reasonable legislative or administrative standards.'" Griffin v. Wisconsin, 483 U.S. 868, 873 (1987) (quoting Camara v. Mun. Ct. of City & Cnty. of S.F., 387 U.S. 523, 538 (1967)).

    We held, during the first round of suppression motion practice in this case, that the New York state parole warrant provided a valid basis for Coles' arrest on July 7, 2016, and that the search of his person incident to that arrest was likewise lawful. See Coles, 264 F. Supp. 3d at 675-76 (citing Arizona v. Gant, 556 U.S. 332, 335 (2009)). Coles does not challenge that holding directly in his instant motion. Rather, he contends that the warrant was administrative in nature and issued by a government agency on less than probable cause; hence, criminal investigators in Maryland could not use it to arrest him if their "primary purpose" was to ask him about the triple homicide and robberies committed on June 25, 2016. (See Doc. 815 at 8-9). According to Coles, his arrest violated the Fourth Amendment and all evidence derived therefrom must be suppressed as fruit of the poisonous tree. The government does not dispute that the parole warrant was administrative in nature. (See Doc. 875 at 19-20). It does dispute Coles' claim, however, that authorities could not arrest him on the parole warrant if they were separately and primarily interested in him for the triple homicide and robbery. (See id. at 20-23).

    The foundation for Coles' theory is the Supreme Court's decision in Abel v. United States, 362 U.S. 217 (1960). There, noncitizen Rudolf Ivanovich Abel was arrested on an administrative arrest warrant issued by United States Immigration

and Naturalization Service ("INS") officials who believed Abel was in the country illegally. See Abel, 362 U.S. at 221.  The officials had been alerted to Abel's illegal immigrant status by agents of the Federal Bureau of Investigation ("FBI"), who suspected he had committed espionage but lacked sufficient evidence to arrest or indict him. See id.  An INS official signed an administrative arrest warrant to facilitate Abel's deportation, and INS and FBI agents coordinated on a plan for executing it: FBI agents would escort INS agents to Abel's hotel and interview him about his suspected espionage, and if Abel was not cooperative with the FBI agents, the INS agents would arrest him on their warrant.  See id. at 222-23.  Abel did not cooperate, so the INS agents arrested him and searched the hotel room for weapons or evidence of immigration status.  See id. at 223-24.  Abel was then handcuffed and taken into INS custody, where his property was searched more thoroughly.  See id. at 224-25.  The FBI agents remained on scene, obtained permission from hotel staff to search the vacated hotel room, and conducted an extensive search of the room. See id. at 225.  Abel remained in an immigration detention center for several weeks before being charged with, tried for, and eventually convicted of conspiracy to commit espionage.  See id.

    At trial and on appeal, Abel claimed the immigration warrant "was a pretense and sham" to allow law enforcement to conduct a search without probable cause, in an attempt to circumvent the Fourth Amendment.  See id. at 225-26.  The Supreme Court upheld the search, relying on the lower courts' findings that the INS agents arrested Abel in good faith, the FBI did not direct or supervise the

arrest, and the administrative arrest proceeded no differently than it would have for any other deportable noncitizen.  See id. at 226-28.  The Court contrasted the permissible interagency cooperation before it with an impermissible situation in which immigration authorities merely act "as the cat's paw" of law enforcement investigators.  See id. at 229-30 (citing Colyer v. Skeffington, 265 F. 17 (D. Mass. 1920)).  The Court nonetheless noted that, had Abel's position been substantiated by the record, "it would indeed reveal a serious misconduct by law-enforcing officers," cautioning that "deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts."  Id. at 226.  In closing, the Court articulated a test for assessing whether such misuse has occurred, tasking courts to ask "whether the decision to proceed administratively . . . was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime."  Id. at 230.

Coles frames out his argument with legal principles developed in the administrative search context.  He notes, for example, the Supreme Court's holding in Michigan v. Clifford, 464 U.S. 287 (1984) (plurality opinion), which concerned fire officials' post-fire search of a residence.  The Court explained that an administrative search warrant will suffice if "the primary object" is administrative in nature—*e.g.*, to identify the cause and origin of a fire—but a criminal search warrant supported by probable cause is required when the primary object is to investigate a potential crime—*e.g.*, to search the entire home for evidence of suspected arson.  See Clifford, 464 U.S. at 294.  Coles also notes, *inter alia*, the Ninth Circuit Court of Appeals'

decision in <u>United States v. Grey</u>, 959 F.3d 1166 (9th Cir. 2020), where, under the guise of a "protective sweep" before city officials executed a property inspection warrant, nine armed deputies arrested the homeowner and searched the residence for at least 15 to 20 minutes, even though they had yet to develop probable cause in their own criminal investigation.  <u>See Grey</u>, 959 F.3d at 1182-83.  The court of appeals held that, because law enforcement's "primary purpose" was not to assist the city inspectors but to "gather evidence in support of an ongoing criminal investigation," their conduct violated the Fourth Amendment.  <u>See id.</u> at 1183-84.

Coles' motion rests on a fusion of these lines of authority, but chiefly on <u>Abel</u>. He claims that law enforcement's primary object in arresting him on the New York state parole warrant was not to apprehend and extradite him to New York, but to take him into custody and question him about the triple homicide and robbery in Pennsylvania.  As a threshold matter, that proposition is flatly refuted by the record from the first suppression hearing in this case, during which Detective Duffy testified that the only reason Coles was stopped on July 7, 2016, was to be arrested on the New York state parole warrant for extradition to New York.  (<u>See</u> 7/18/17 Tr. 16:4-7 (Q: "And the only reason that you stopped that car was because Kevin Coles was in it and you believe that Kevin Coles would be extradited by New York, is that right?" A: "Yes.")).  Detective Duffy detailed the process by which the Maryland State Police fugitive apprehension team had alerted him to Coles' presence in Hagerstown and requested local assistance in apprehending him.  (<u>See id.</u> at 16:7-12).  That Detective Duffy also knew Coles was a person of interest in a homicide

investigation does not change the fact that his primary purpose on July 7, 2016, was to apprehend a known fugitive.  (See id. at 7:10-12; see also id. at 12:20-25 (Q: "So he wasn't in custody for the murders, correct?"  A: "No, sir.  The warrant."  Q: "He wasn't in custody for any drug offense, correct?"  A: "Correct."  Q: "You arrested him on a New York warrant, correct?"  A: "Yes, sir.")).

More problematic for Coles, however, is that the circumstances animating Abel's admonitory *dicta* are absent here.  The Court in Abel faced a claim that FBI agents had influenced INS officials to *issue* an immigration arrest warrant for Abel to circumvent the Fourth Amendment when the FBI could not get its own criminal espionage investigation off the ground.  The Court asked whether INS's decision to "proceed administratively toward deportation" had been influenced by the FBI's separate agenda.  See Abel, 362 U.S. at 230; id. at 226 (noting relevant inquiries as "[w]hat the motive was of [INS] officials who determined to arrest petitioner, and whether [INS] in doing so was not exercising its powers in the lawful discharge of its own responsibilities but was serving as a tool for the FBI").  In this case, *per contra*, the decision to "proceed administratively" as to Coles—to issue a warrant for his arrest for an alleged parole violation—was made by New York state parole officials in July 2015.  The triple homicide occurred nearly one year later, in June 2016.  Coles' entire bad-faith theory thus rests on the implausible premise that New York state parole officers are clairvoyants: that, when issuing their administrative

warrant in 2015, they acted as the "cat's paw" for a criminal investigation that had not yet begun, into a triple homicide that had not yet occurred.  Cf. id. at 230.

Nor are we persuaded by Coles' reliance on cases exploring the permissible scope of administrative searches.  Those decisions involve entirely different facts, legal principles, and rationales.  In Clifford, for example, the Supreme Court found a Fourth Amendment violation when an arson investigator entered a fire-damaged home to conduct a criminal investigation hours after first responders extinguished the fire and left the scene.  See Clifford, 464 U.S. at 289-90, 294-95.  The Court held that, while the exigent circumstances exception to the warrant requirement allows fire officials to enter a home to extinguish a blaze and to remain for "a reasonable time" to conduct an "administrative search" as to its cause, see id. at 293-94 (citing Michigan v. Tyler, 436 U.S. 499, 510 (1978)), the arson investigator exceeded the scope of that exception when he returned to the scene well after any exigency had abated, see id. at 296-98.  Likewise, Grey involved law enforcement officers whose conduct greatly exceeded the permissible scope of a "protective sweep" purportedly undertaken to assist city officials in their execution of an administrative inspection warrant.  See Grey, 959 F.3d at 1182-83.  Other cases cited by Coles are similarly distinguishable.  See, e.g., United States v. Russo, 517 F. Supp. 83, 83-84, 86 (E.D. Mich. 1981) (officers exceeded scope of warrant to conduct administrative audit of physician's records and equipment when they had already initiated criminal investigation and sought evidence of criminal activity); United States v. Lawson,

502 F. Supp. 158, 164-65 (D. Md. 1980) (similar when law enforcement deliberately employed administrative search warrant with its lesser standard of probable cause to search pharmacy for evidence of criminal activity).

Coles extracts the "primary purpose" and "primary object" language from these administrative search decisions, positing that his arrest was unlawful because officers were not primarily concerned with him as a fugitive, but as a suspect in the triple homicide.  The analogy simply does not fit.  Administrative *search* cases necessarily involve questions of scope and a balancing of administrative objectives with Fourth Amendment privacy interests; when the primary purpose of the search shifts from administrative to criminal, the Fourth Amendment requires a warrant supported by full probable cause.  See Clifford, 464 U.S. at 294-95; see also Grey, 959 F.3d at 1183 (discussing scope of administrative searches and observing that, even in cases of improper motive, there is no Fourth Amendment violation if that motive "did not affect the scope of the search or the manner in which a warrant was executed").  This makes good sense, because the scope of a physical search, and its degree of intrusiveness relative to the privacy interests implicated, can and does vary.

Coles has not identified any authority extending the rationales of these administrative search cases to the preexisting arrest warrant context.  His briefs are likewise devoid of decisional law supporting his contention that, because Maryland and Pennsylvania investigators were also interested in him for a triple homicide, the Fourth Amendment prohibited them from arresting him on that preexisting

warrant.  Nor has our research uncovered any.  This is unsurprising, since the scope of an arrest, unlike the scope of a search, is binary: officers either do or do not have lawful authority to arrest a person.  And as we have already concluded in this case, the officers who arrested Coles had in their possession a valid warrant authorizing his arrest.  See Coles, 264 F. Supp. 3d at 675-76.  We thus reiterate our prior conclusion that the parole warrant provided a lawful basis for Coles' arrest, and for the search of his person incident to his arrest, on July 7, 2016.  See id. at 676. We will deny Coles' motion to suppress evidence obtained following his arrest pursuant to the New York state parole warrant.

### B.    Section 5743 and Section 5773 Orders

We turn next to Coles' challenges to two related orders: the Section 5773 order, authorizing real-time CSLI tracking of his cell phone, and the Section 5743 order, authorizing disclosure of historical CSLI and various other records from his cell phone.[6]  Both orders were issued by Franklin County Court of Common Pleas Judge Angela R. Krom on June 30, 2016.  Coles argues that the applications for the orders, and the orders themselves, fail to satisfy state statutory requirements and federal constitutional standards and, as to the Section 5773 order, the affidavit of probable cause deliberately or recklessly omitted material information within the

---

[6] The Section 5773 order also appears to authorize disclosure of Coles' historical CSLI.  We agree with Coles that historical CSLI is governed by Section 5743, not Section 5773.  Because law enforcement sought and obtained an order for disclosure of historical CSLI under Section 5743 as well, the overbreadth of the Section 5773 order is immaterial.

scope of <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).  We address these arguments *seriatim*.

### 1.   *Statutory Requirements*

Coles first marches through the statutory requirements for Section 5743 and Section 5773 and contends that the applications for both orders conflate and ultimately fail to meet several of them.  (<u>See</u> Doc. 868 at 5-8); <u>see also</u> 18 PA. CONS. STAT. §§ 5743, 5773.  He maintains that all evidence gathered as a result of those orders must be suppressed for failure to "meet the requirements" set forth in or to "comply with" the respective Pennsylvania statutes.  (<u>See</u> Doc. 867 at 7-10; Doc. 868 at 5-8).

The two applications and resulting orders do not fully comply with the applicable Pennsylvania statutes.  In federal prosecutions, however, admissibility of evidence is tested by its conformity to federal, not state, law.  <u>See</u> <u>United States v. Rickus</u>, 737 F.2d 360, 363-64 (3d Cir. 1984); <u>United States v. Stiver</u>, 9 F.3d 298, 300 (3d Cir. 1993) (quoting <u>Rickus</u>, 737 F.2d at 363-64).  That is, "evidence obtained in accordance with federal law is admissible in federal court—even though it was obtained by state officers in violation of state law." <u>Rickus</u>, 737 F.2d at 363 (citing <u>United States v. Shaffer</u>, 520 F.2d 1369, 1372 (3d Cir. 1975)).  Consequently, law enforcement's noncompliance with Pennsylvania's statutory requirements does not *ipso facto* fell the challenged orders.  We will deny Coles' motion to the extent it is

based on perceived violations of state law, and will instead consider whether the

orders meet applicable federal standards.[7]

_____

[7] Coles claims <u>Rickus</u> does not apply here because that case concerned searches prohibited under Pennsylvania constitutional law, whereas the instant motions concern orders authorized under Pennsylvania statutory law.  Coles has not cited any authority invalidating state process in federal court for failure to comply with state statutory requirements.  The court of appeals in <u>Rickus</u> suggested that the source of the state rule is not dispositive.  See <u>Rickus</u>, 737 F.2d at 364 (finding "no authority for" district court's inverse holding "that an exception exists where state agents have violated state constitutional, as opposed to state statutory, law").  And it has repeatedly held that alleged violations of state statutory law are not of concern in federal court, "[s]o long as the information was lawfully obtained under federal law and met federal standards of reasonableness."  <u>United States v. Armocida</u>, 515 F.2d 49, 52 (3d Cir. 1975) (warrantless recording of phone call where only one party consented, which would be violation of Pennsylvania statute, admissible since it is "perfectly proper under federal law"); <u>see Shaffer</u>, 520 F.2d at 1371-72 (similar for Delaware statute).  Coles attempts to distinguish those cases by emphasizing that here, a state statute was "the vehicle to obtain certain evidence," (Doc. 900 at 4), as opposed to an alleged bar to it.  But the Third Circuit has applied <u>Rickus</u> to challenges to process "applied for, issued, and executed by state officers" under state law.  <u>See, e.g.</u>, <u>Stiver</u>, 9 F.3d at 300; <u>see also</u> <u>United States v. Williams</u>, 570 F. App'x 137, 141-42 & n.4 (3d Cir. 2014) (nonprecedential) (state search warrant's "failure to comply" with state rules not dispositive in federal court).  We note that one of our sister courts has specifically applied this principle to a Section 5743 order.  <u>See</u> <u>United States v. Wilson</u>, 216 F. Supp. 3d 566, 588-89 (E.D. Pa. 2016) (failure to meet statute's probable cause standard not dispositive when there was no search under federal law).  We are also unpersuaded by Coles' reliance on <u>United States v. Bedford</u>, 519 F.2d 650 (3d Cir. 1975), where the court observed in a footnote that a "warrant, <em>assuming proper issuance under state law</em>, need only conform to federal constitutional requirements," <u>see</u> <u>Bedford</u>, 519 F.2d at 654 n.1 (emphasis added), since <u>Bedford</u> predates <u>Rickus</u> by nearly a decade.  Finally, Coles invokes <u>United States v. McClellan</u>, 350 F. App'x 767 (3d Cir. 2009) (nonprecedential), for the proposition that "the Third Circuit has applied state law in analyzing similar questions."  (Doc. 900 at 5).  The defendant in <u>McClellan</u> challenged the state judge's jurisdiction to authorize a pen register, so the panel examined state law to determine the scope of the issuing judge's jurisdiction.  <u>See</u> <u>McClellan</u>, 350 F. App'x at 769-70 (citing <u>Commonwealth v. Bethea</u>, 828 A.2d 1066, 1074 (Pa. 2003)).  That analysis is consistent with <u>Rickus</u>, because issuance of a warrant without jurisdiction raises a Fourth Amendment problem.  <u>See, e.g.</u>, <u>United States v. Werdene</u>, 883 F.3d 204, 209-10 (3d Cir. 2018).  Indeed, we relied on Pennsylvania state law to answer the exact same jurisdictional challenge during the first round of motion practice in this case.  (Doc. 217 at 3 & n.1 (citing <u>Bethea</u>, 828 A.2d at 1074)).

## 2.   *Constitutional Requirements*

Coles asserts that both the Section 5743 order (which sought his historical CSLI, call detail records, internet and data access, and subscriber information for phones interacting with his phone) and the Section 5773 order (which sought his real-time CSLI) are invalid for lack of probable cause.[8]  (See Doc. 867 at 10-12; Doc. 868 at 11-13).  The Section 5743 application and order make no mention of probable cause and appear to have been grounded in Section 5743's requirement that the information sought be "relevant and material to an ongoing criminal investigation." See 18 PA. CONS. STAT. § 5743(d); (Doc. 821-1 at 2-6, 8-11).  Coles argues that not only do the application and order fail to supply the probable cause now required for historical CSLI collection under Carpenter v. United States, 585 U.S. ___, 138 S. Ct. 2206 (2018), they fail to meet the statute's lesser "relevant and material" standard. (See Doc. 868 at 6 n.5, 11-13).  Coles acknowledges the Section 5773 order includes a finding of probable cause, but argues the accompanying affidavit does not support it.  (See Doc. 867 at 10-12).

### a.   Section 5743 Order

The Supreme Court held in Carpenter that law enforcement must obtain a warrant supported by probable cause to collect a defendant's historical CSLI.  See Carpenter, 138 S. Ct. at 2221.  It is indisputable that the Section 5743 order is not a warrant, is not premised upon a finding of probable cause, and thus violates the

---

[8] Coles raises this same argument with respect to the Section 5743 order's apparent authorization for T-Mobile to turn over the content of his text messages. The government reports that T-Mobile did not turn over any text messages.  (See Doc. 875 at 14).  We will thus deny this aspect of Coles' motion as moot.

Fourth Amendment.  See United States v. Goldstein, 914 F.3d 200, 203 (3d Cir.

2019).  Importantly, however, Carpenter was not the law at the time the Section

5743 order issued.  As we observed in our first suppression opinion in this case,

before Carpenter, the Third Circuit Court of Appeals had held repeatedly that CSLI

collection was not a search for purposes of the Fourth Amendment.  See Coles, 264

F. Supp. 3d at 674-75 (citing United States v. Stimler, 864 F.3d 253, 266-67 (3d Cir.

2017) (citing In re Application, 620 F.3d 304, 312-13 (3d Cir. 2010))).  For this reason,

the court of appeals has concluded that "the good faith exception applies when the

government obtained CSLI data without a warrant prior to Carpenter."  Goldstein,

914 F.3d at 204-05 ("Excluding evidence obtained through methods that complied

with the law at the time of the search cannot serve any deterrent purpose.").

That holding squarely applies here.  At the time authorities applied for the

Section 5743 order, federal law only required them to show "reasonable grounds

to believe" that Coles' historical CSLI (and other call detail records)[9] were "relevant

and material to an ongoing criminal investigation."  See Stimler, 864 F.3d at 266-67.

The Section 5743 order unquestionably meets this standard.  The application

establishes that law enforcement were investigating a triple homicide at Jackson's

farm during which Chaney, Jackson, and another individual were killed; that Coles

was the "estranged boyfriend" of Chaney; that Coles "threatened to hurt Chaney in

the past"; that Chaney believed Coles had broken into her apartment a week prior

---

[9] Coles does not claim that a higher standard applies to the other information
sought by the Section 5743 order.  (See Doc. 868 at 7-8); cf. Smith v. Maryland, 442
U.S. 735, 742-46 (1979) (no reasonable expectation of privacy in call detail records).

to her murder; and that Chaney had sent a text message to Jackson "that if she ended up dead, 'Kevin' did it." (Doc. 821-1 at 3). On these facts, Judge Krom could readily find that information about Coles' location and contacts in the weeks and months preceding Chaney's murder was relevant and material to the ongoing criminal investigation into her death.[10] The government thus "complied with the law at the time of the search," see Goldstein, 914 F.3d at 204-05, and we will deny Coles' motion to suppress the historical CSLI and other records obtained pursuant to the Section 5743 order.

### b.   Section 5773 Order

Coles also challenges the Section 5773 order, which authorized collection of his real-time CSLI, for lack of probable cause. The Supreme Court did not address in Carpenter whether collection of real-time CSLI data is a search subject to the Fourth Amendment's warrant requirement, see Carpenter, 138 S. Ct. at 2220 ("We do not express a view on matters not before us: real-time CSLI or 'tower dumps.'"), and our court of appeals has not yet confronted that question. The Seventh Circuit has suggested Carpenter should be read narrowly to apply only to historical and not real-time CSLI. See United States v. Hammond, 996 F.3d 374, 389-92 (7th Cir. 2021) (noting Carpenter's particular concern with the "retrospective quality" of historical CSLI and finding defendant had no reasonable expectation of privacy in six hours

---

[10] We agree with the government that the Section 5743 order's failure to make an explicit finding of materiality is not fatal. It can be reasonably inferred from Judge Krom's references to Section 5743 in issuing the order that she found the requirements of both relevance and materiality to be satisfied. (See Doc. 821-1 at 8, 10 (citing 18 PA. CONS. STAT. § 5743)).

of real-time CSLI (quoting Carpenter, 138 S. Ct. at 2218)).  Assuming *arguendo* that a heightened probable cause standard applies to both historical and real-time CSLI, we find it to be met here.

Our Supreme Court views probable cause as an amorphous concept, "not readily, or even usefully, reduced to a neat set of legal rules."  See Ornelas v. United States, 517 U.S. 690, 695-96 (1996) (quoting Gates, 462 U.S. at 232).  In reviewing the probable cause finding *sub judice*, our job is "not to decide probable cause *de novo*," but to assess whether Judge Krom "had a substantial basis for concluding that probable cause existed."  United States v. Stearn, 597 F.3d 540, 554 (3d Cir. 2010) (quoting Gates, 462 U.S. at 238).  Probable cause for a Fourth Amendment search exists when, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Id. (quoting Gates, 462 U.S. at 238).

Judge Krom had a substantial basis for concluding that probable cause existed to believe information relevant to the triple homicide investigation would be obtained by collecting Coles' real-time CSLI.  The Section 5773 application was accompanied by an affidavit of probable cause authored by PSP Trooper Jeffrey Baney.  (See Doc. 823-1).  Trooper Baney's affidavit explains that three victims (Chaney, Jackson, and Cole[11]) were shot and killed at Jackson's farm on June 25, 2016.  (Id. at 2).  The affidavit then provides information about Coles, specifically:

---

[11] The affidavit of probable cause misspells Brandon Cole's last name as "COLES."  (Doc. 823-1 at 2).  Given the context supplied by the affidavit, we do not believe Trooper Baney's conflation of defendant *Coles*' name with victim *Cole*'s name impacted the finding of probable cause.

- According to Chaney's mother, Coles and Chaney had been in a romantic relationship, Chaney "was afraid of" Coles, Coles "had threatened to hurt" Chaney in the past, and Chaney believed Coles had broken into her apartment one week before her murder.  (See id.)

- According to codefendant Torey White, Chaney had introduced Coles to Jackson, Coles and Jackson exchanged drugs, Jackson "sold weapons" to Coles in the past, and Chaney had related to White "that if she were to be killed COLES would be the one to do it."  (See id. at 2-3).

- According to Jackson's widow, she had observed Coles and Jackson "shooting weapons at the residence where the incident occurred," and, after the triple homicide, she checked the gun safe located in the barn where "weapons are normally kept" and reported that "they are unaccounted for."  (See id. at 3).

These allegations provide a substantial basis for Judge Krom to find probable cause to believe evidence related to the triple homicide at Jackson's farm would be gleaned from collecting Coles' real-time CSLI.  The affidavit links Coles to two of the three victims (Chaney and Jackson) and establishes that Coles had threatened Chaney and that she believed he would harm—indeed, would *kill*—her.  (See id. at 2-3).  It also establishes that Coles engaged in illegal activities (drug-trafficking and possibly unlawful sale of weapons) with Jackson at the farm and that Chaney was aware of Coles' illegal activities, establishing a potential motive.  (See id.)  In addition, it reveals that Coles had been seen shooting firearms with Jackson at the crime scene and that the firearms regularly stored there were missing after the triple homicide.  (See id.)  These facts supply a substantial basis for Judge Krom's conclusion that there was probable cause to believe real-time CSLI from Coles' cell

phone would provide information relevant to the triple homicide investigation, including but not limited to Coles' physical location.[12]

### 3.    *Material Omission*

Coles further argues that the Section 5773 affidavit omitted information material to the assessment of probable cause.  Specifically, Coles claims Trooper Baney knowingly or recklessly omitted from his affidavit that codefendant Torey White—one of three witnesses whose statements feature in the affidavit—was a prime suspect in the triple homicide and had displayed reactions "indicative of deception" during a polygraph examination about the triple homicide two days prior.  (See Doc. 867 at 4, 12-15).

A criminal defendant may challenge the truthfulness of factual statements in an affidavit of probable cause through what is commonly known as a Franks hearing.  If a defendant makes "a substantial preliminary showing" that the affidavit in question contains a false statement or omission which was both knowingly or recklessly made and material to the probable cause finding, the court must conduct an evidentiary hearing to examine the sufficiency of the affidavit.  See United States v. Aviles, 938 F.3d 503, 508 (3d Cir. 2019) (citing Franks, 438 U.S. at

---

[12] The cases Coles cites to support his claim that this affidavit creates nothing more than "mere suspicion" are distinguishable.  See Wong Sun v. United States, 371 U.S. 471, 479-80 (1963) (no probable cause to arrest defendant James Wah Toy when only information available was statement from first-time informant that "a person described only as 'Blackie Toy,' the proprietor of a laundry somewhere on Leavenworth Street, had sold one ounce of heroin"); United States *ex rel.* Campbell v. Rundle, 327 F.2d 153, 163 (3d Cir. 1964) (no probable cause to search when affidavit alleged no facts and no crime and officer stated only that he had "just cause to suspect that articles and instruments to procure abortions are possessed" in the property to be searched).

155-56); <u>United States v. Yusuf</u>, 461 F.3d 374, 383 (3d Cir. 2006)).  However, if the information challenged by the defendant is immaterial—that is, unnecessary to the finding of probable cause—no hearing is required.  <u>See</u> <u>id.</u> at 508-09; <u>see also</u> <u>United States v. Gordon</u>, 664 F. App'x 242, 245 (3d Cir. 2016) (nonprecedential).

As a threshold matter, Coles does not allege, much less make a "substantial preliminary showing," that Trooper Baney *knew* White was a prime suspect in the triple homicide investigation or had provided deceptive answers during a polygraph examination on June 27, 2016, two days prior to the Section 5773 application.  The PSP officers who attended the examination (Corporal Nicholas Bloschichak and Trooper Jeremy Matas) plainly were aware of it, (<u>see</u> Doc. 823-2 at 2-4), but Coles does not allege in his motion or brief that *Trooper Baney* knew about it when he signed his affidavit on June 29, 2016, (<u>see</u> Doc. 823-4 ¶¶ 2-5; Doc. 867 at 2-4, 12-14).  Moreover, the polygraph report itself is dated August 2, 2016—three days *after* the Section 5773 affidavit.  (<u>See</u> Doc. 823-2 at 2).  There is no indication in the report that Trooper Baney was present during or aware of the polygraph examination and no indication in the record that he was made aware of the results before the report was approved.  Accordingly, Coles has not made a substantial preliminary showing that Trooper Baney knowingly or recklessly omitted information about White's status as a suspect or his polygraph results from his Section 5773 affidavit.

Assuming *arguendo* that the omission was knowingly or recklessly made,
Coles also has not shown that the omitted information was material.[13]  We assess
materiality of an omission by inserting the missing information and determining
whether the "corrected" affidavit would still establish probable cause.  See Yusuf,
461 F.3d at 383-84; see also Dempsey v. Bucknell Univ., 834 F.3d 457, 470 (3d Cir.
2016) (instructing courts to perform "literal, word-by-word reconstructions of
challenged affidavits").

Reconstructing the affidavit to include the omitted information still
supplies probable cause to support the Section 5773 order.  The reconstructed
affidavit would read:

> 2.  On 06/25/16 at approximately 2327 hours, PSP
> Chambersburg was notified by Torey WHITE that his
> brother was "tied up and bleeding" in a barn at the
> address of 11026 Welsh Run Rd. Montgomery Twp.,
> Franklin County.
>
> 3.  Upon arrival of PSP Troopers to the scene, it was
> found that there were two deceased persons and one
> person severely injured.  There was also a fire in the barn.
> Upon further examination it was found that the individual
> that was severely injured was Philip JACKSON (occupant
> of residence).  He was flown to York Hospital with life
> threatening injuries.  Jackson later died of his injuries.
> Inside of the barn a black male identified as Brandon

---

[13] We agree with Coles, and the government apparently does not dispute,
that it would be material to the review of a warrant application to learn that one
of three witnesses whose accounts were relied upon in the probable cause affidavit
had failed his own polygraph two days prior and was himself a prime suspect in the
investigation.  Cf. United States v. Glover, 755 F.3d 811, 817 (7th Cir. 2014) (holding
affiant's "complete omission of known, highly relevant, and damaging information
about [witness's] credibility" deprived judge of information material to probable
cause determination).  If the information about White's credibility was known to
Trooper Baney, it should have been included in his affidavit.

COLES, B/N-M, 47 YO was found bound and deceased. A second individual inside of the barn was also located and identified as, Wendy CHANEY, W-N/F, 39 YO, that was found bound and deceased. It was later determined all three individual [sic] had been shot.

4. Through the course of this investigation various interviews have been conducted with the victim's families and associates. During the course of an interview with Lucille Maria CHANEY who is the mother of one of the victims Wendy CHANEY it was discovered that Wendy was in a romantic relationship with an individual identified as Kevin COLES B-N/M, 30 YO. Lucille CHANEY also related in the same interview that Wendy believed approximately one week prior to this incident COLES had broken into her apartment and stole an iPad. Lucille went on to relate that Wendy had related that she was afraid of COLES and that he had threatened to hurt her in the past.

5. During the course of an interview with Torey WHITE information was discovered indicating that COLES had known two of three victims. WHITE related that Wendy CHANEY had introduced COLES to Philip JACKSON. WHITE went on to further relate that he too was in a romantic relationship with Wendy CHANEY. WHITE related that CHANEY had told him that COLES and JACKSON would exchange drugs. WHITE related that JACKSON at one point also sold weapons to COLES. WHITE added that CHANEY related that if she were to be killed COLES would be the one to do it. WHITE related that he told CHANEY at various times to avoid COLES. *It should be noted that WHITE is also a prime suspect in the triple homicide and that WHITE provided responses deemed deceptive by the polygraph examiner during a polygraph examination on June 27, 2016, about his involvement in the triple homicide.*

6. During the course of an interview with Philip JACKSON's wife Amber JOHNSON it was discovered that JOHNSON had observed COLES with JACKSON shooting weapons at the residence where the incident occurred. During the course of JOHNSON checking the residence to account for missing items she related that a gun safe located in the barn where the incident occurred

> was empty.  JOHNSON related that weapons are
> normally kept in that safe and they are unaccounted for.
> *During a search of the residence by the Pennsylvania
> State Police the weapons were not located either.*

(See Doc. 823-1 at 2-3 (reconstructed additions in italics)).

The information about White's credibility, while relevant, does not defeat a finding of probable cause.  It is not at all clear that Judge Krom would have outright rejected *all* statements attributable to White based on this information.  Most of his relevant statements are generally corroborated by two additional witness accounts set forth in the affidavit.  See, e.g., United States v. Carney, 717 F. App'x 185, 187 (3d Cir. 2018) (nonprecedential) (omission of information about informant's credibility immaterial when other facts corroborated informant's statements); United States v. Brooks, 358 F. Supp. 3d 440, 475 (W.D. Pa. 2018) (omission of alleged impeaching information about complainants immaterial when, *inter alia*, corroborated by other physical evidence).  White's statement that Chaney suspected Coles might kill her, for example, is consistent with Chaney's mother's statement that Chaney was afraid of Coles, that he had threatened Chaney previously, and that Chaney suspected he had broken into her apartment a week before the triple homicide.  (See Doc. 823-1 at 2-3).  Similarly, White's statement that Jackson sold weapons to Coles is consistent with Jackson's wife's statement that she observed Coles and Jackson shooting weapons on the property.  (See id.)

Moreover, even if we were to fully extract White's statements, the affidavit still contains enough facts to establish probable cause to believe Coles' cell phone might contain information about the triple homicide, namely: that Coles was in a

romantic relationship with one victim (Chaney) and was associated with another (Jackson), that Coles had threatened Chaney in the past and had possibly broken into her apartment a week prior to her murder, and that Chaney was found shot to death on a property with which Coles was familiar and where Coles had been observed shooting firearms with another of the victims.  (See id.)  We will thus deny Coles' motion to the extent it is premised on an alleged material omission.

### 4.   *Good Faith Exception*

Finally, even if we found merit in Coles' principal arguments, the good-faith exception to the exclusionary rule would apply.  As we recently noted in addressing a codefendant's suppression motion, (see Doc. 906 at 26), courts will not suppress evidence obtained through a subsequently invalidated search warrant if officers acted in good faith, that is, "in the objectively reasonable belief that their conduct did not violate the Fourth Amendment."  United States v. Leon, 468 U.S. 897, 918 (1984); see Stearn, 597 F.3d at 560 (quoting Leon, 468 U.S. at 918).  The test is "whether a reasonably well trained officer would have known that the search was illegal despite the [judge's] authorization."  United States v. Hodge, 246 F.3d 301, 307 (3d Cir. 2001) (quoting United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999) (quoting Leon, 468 U.S. at 922 n.23)).  Our court of appeals has recognized four "rare" exceptions to this rule, only one of which is relevant here: evidence will be suppressed if "the warrant was based on an affidavit so lacking in indicia of

probable cause as to render official belief in its existence entirely unreasonable."[14] See United States v. Pavulak, 700 F.3d 651, 664 (3d Cir. 2012) (quoting Stearn, 597 F.3d at 561 & n.19 (internal quotation marks and citations omitted)).

Trooper Baney's belief that probable cause existed to support real-time CSLI tracking of Coles' phone was reasonable under the circumstances. The supporting affidavit included information about Coles' relationship with Chaney and Jackson, two of the three victims; his connection to the scene of the triple homicide; and his threats to Chaney, his suspected recent burglary of her apartment, and her fear of him as reported to multiple people. The affidavit offers enough information to permit a reasonable law enforcement officer to believe—and to lead Judge Krom to conclude—that probable cause to collect Coles real-time CSLI existed. Cf. Hodge, 246 F.3d at 307-08 (noting "mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception" (citing Leon, 468 U.S. at 922)).

We also agree with the government that the drastic sanction of exclusion would net little deterrent value under these circumstances. The Supreme Court has explained that "the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." Davis v. United States, 564 U.S. 229, 238 (2011) (quoting Herring v. United States, 555 U.S. 135, 143 (2009)). The sanction of

---

[14] A second exception applies when "the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit." See Pavulak, 700 F.3d at 664 (quoting Stearn, 597 F.3d at 561 & n.19 (internal quotation marks and citations omitted)). We found *supra* that Coles has not made a showing that the omitted information was either deliberately or recklessly omitted from the affidavit.

exclusion "is appropriate only where law enforcement conduct is both 'sufficiently deliberate' that deterrence is effective and 'sufficiently culpable' that deterrence outweighs the costs of suppression." United States v. Katzin, 769 F.3d 163, 171 (3d Cir. 2014) (quoting Herring, 555 U.S. at 144). As a general rule, only when police "exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights" will the deterrent value of exclusion "tend[] to outweigh the resulting costs." Davis, 564 U.S. at 238 (quoting Herring, 555 U.S. at 144) (internal quotation marks omitted).

There is no indication of deliberate, reckless, or grossly negligent conduct in this case. *Per contra*, law enforcement officers objectively and reasonably believed their conduct was lawful—based on the facts set forth in the affidavit of probable cause and judicial approval of the search. Under such circumstances, "exclusion cannot 'pay its way.'" Id. (quoting Leon, 468 U.S. at 907 n.6). We thus hold, in the alternative, that the good-faith exception to the exclusionary rule applies to the real-time CSLI order.[15]

---

[15] Coles remonstrates that this case presents "an important opportunity" to communicate to state court prosecutors that noncompliance with state statutory procedures will not be tolerated in federal court. (See Doc. 900 at 7-8). We reiterate what our court of appeals observed in Rickus: "We are not insensitive to the claim that we should not encourage state officials to violate principles central to the state's social and governmental order. But sanctions already exist to control the state officer's conduct. He is 'punished' by the exclusion of evidence in the state criminal trial, and the state can, if it chooses, enforce its policies with respect to its own officers by permitting civil suits. We are persuaded that the additional deterrent effect to be gained from excluding this evidence in federal trials for federal offenses is small, and is far outweighed by the costs to society of excluding the evidence." See Rickus, 737 F.2d at 364 (internal citations omitted).

### C.     Post-Arrest Statements

Finally, Coles moves to suppress all statements made to PSP investigators during his post-arrest interview on July 7, 2016.  We detailed the legal landscape concerning statements made during custodial interrogation in our first suppression opinion in this case.  See Coles, 264 F. Supp. 3d at 681-83.  Relevant to Coles' instant motion, statements made by a suspect during custodial interrogation are admissible only if police apprise the suspect of their rights under Miranda v. Arizona, 384 U.S. 436 (1966), and the suspect chooses to waive them knowingly and voluntarily.  See Miranda, 384 U.S. at 444, 475.  Once a suspect invokes the right to counsel, police must immediately cease interrogation until counsel is present.  See Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

After Coles' arrest on the New York state parole warrant on July 7, 2016, officers transported him to the Hagerstown Police Department, where he was met and interviewed by PSP Corporal Decker and Trooper Cox.  Trooper Cox began the interview by reading Coles his Miranda rights.  (See Doc. 819-2 at 2:18-3:7).  Coles proceeded to speak with the PSP officers and answer their questions for a few minutes.  (See id. at 3:9-7:14).  Three minutes and 54 seconds into the interview, Coles invoked his right to counsel, stating, "Well, I think I would like to ask for a lawyer at this point."  (Id. at 7:15-16).  Despite this clear invocation, Corporal Decker and Trooper Cox continued to ask Coles questions for roughly six minutes before terminating the interview.  (See id. at 7:21-14:19).

The government appropriately concedes that the interrogation should have ceased at the moment Coles invoked his right to counsel.  (See Doc. 875 at 24).  We

agree.  Coles clearly and unequivocally invoked his right to counsel, and Corporal

Decker and Trooper Cox failed to scrupulously honor that invocation—indeed, to

honor it at all.  Instead, they proceeded to question him for another six minutes,

during which Coles repeatedly invoked his <u>Miranda</u> rights.  (<u>See</u> Doc. 819-2 at 9:9-11

("I'm definitely stoppin' this question."); <u>id.</u> at 10:4-6 ("At this point in time, I'm

definitely invokin' my right to what you call it, you know, to a lawyer.")).  This post-

invocation questioning constitutes a plain violation of Coles' constitutional rights.

We will thus grant Coles' motion to the extent it seeks to suppress any statement

Coles made after he invoked his right to counsel.

     For his part, Coles concedes that no statement made after he waived

his <u>Miranda</u> rights but before he invoked his right to counsel violated the Sixth

Amendment.  (<u>See</u> Doc. 900 at 13).  And Coles does not suggest that there were any

other constitutional infirmities with the interview up to that point.  (<u>See</u> <u>id.</u> at 13-14;

<u>see also</u> Doc. 869 at 2-5).  He contends, however, that any statements made during

that approximately four-minute window must nonetheless be suppressed based

on arguments raised in his other motions—that the arrest on the New York state

parole warrant and the orders authorizing CSLI collection were unlawful.  (<u>See</u>

Doc. 900 at 13-14).  We have rejected those arguments above, and thus reject this

contingent argument now.  For these reasons, we will deny Coles' motion to

suppress statements made prior to his invocation of his right to counsel during

the July 7, 2016 interview.

III.   **Conclusion**

The court will grant in part and deny in part Coles' motions (Docs. 811, 819,

821, 823-4) to suppress evidence.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:       August 2, 2021