IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:16-CR-212 |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| KEVIN COLES, | : | |
| DEVIN DICKERSON, | : | |
| TOREY WHITE, | : | |
| JERELL ADGEBESAN, and | : | |
| NICHOLAS PREDDY, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

Defendants jointly move the court to implement protections from unconscious racial bias during the upcoming trial in this case. For the reasons that follow, the court will grant in part and deny in part defendants' motion.

**I.     Factual Background & Procedural History**

The criminal investigation and charges in this case originate with a triple homicide and robbery on June 25, 2016. The third superseding indictment identifies the homicide victims as Wendy Chaney,[1] Phillip Jackson, and Brandon Cole. The murders and robbery occurred in a barn on Jackson's farm, located at 11026 Welsh Run Road in Mercersburg, Franklin County, Pennsylvania. The alleged events leading up to the triple homicide and robbery have been detailed in the court's prior opinions in this case and are incorporated herein by reference.

---

[1] The third superseding indictment uses two different spellings for this victim's last name, switching between "Chaney" and "Cheney." We use "Chaney" in this memorandum, which we understand to be the correct spelling.

The case is currently proceeding on a third superseding indictment which charges defendants Kevin Coles, Devin Dickerson, Torey White, Jerell Adgebesan, and Nicholas Preddy with multiple offenses related to the triple homicide and robbery. Those charges include, *inter alia*, Hobbs Act robbery; using, brandishing, and discharging firearms during and in relation to crimes of violence resulting in death; murder of witnesses; conspiracy to commit murder for hire and murder of witnesses; and various drug-trafficking crimes. (See Doc. 499 at 1-36). Trial in this matter will commence with jury selection on January 10, 2022, and is expected to last roughly six weeks. On October 4, 2021, defendants jointly filed the instant motion for implementation of certain protections from racial bias during the upcoming trial. The motion is fully briefed and ripe for disposition.

## II. Discussion

Defendants request that the court show all prospective jurors a video developed by a group of judges and attorneys in the United States District Court for the Western District of Washington on the subject of unconscious bias. (See Doc. 992 at 4-5); see also *Unconscious Bias Juror Video*, U.S. DIST. CT. FOR THE W. DIST. OF WASH., https://www.wawd.uscourts.gov/jury/unconscious-bias (last visited Nov. 2, 2021). The video, which is approximately 11 minutes long, first explains unconscious bias and how it can impact decisionmaking, before encouraging prospective jurors to question their implicit assumptions and reflect on their objectivity throughout trial. The video does not focus exclusively on racial bias; rather, it speaks to unconscious bias in all forms, using age, race, and gender as primary examples. Defendants also ask the court to supplement the instructional

video by (1) before *voir dire*, providing preliminary instructions about unconscious bias and (2) during *voir dire*, eliciting individualized assurances from prospective jurors that they will take steps to guard against unconscious bias if they are selected as jurors to try the case.  (See Doc. 992 at 4-7).  The government opposes all three requests.  (See Doc. 1002).

      We will deny defendants' request that the court show the unconscious bias video to prospective jurors prior to *voir dire*.  As a threshold matter, we believe the decision whether to incorporate an unconscious bias video as a part of the juror-orientation process is a decision to be made as a district (as the Western District of Washington has done) and not on a case-by-case basis.  Simply put, a district-wide approach on any changes to jury orientation promotes consistency.  That consistency concern, however, is not our primary reason for denying defendants' request.  We agree with our colleagues in this district who have opined that playing an 11-minute video about unconscious bias risks jurors elevating this one aspect of their responsibilities over all others.  See United States v. Jessamy, 464 F. Supp. 3d 671, 678 (M.D. Pa. 2020) (Mannion, J.); see also United States v. Wright, No. 3:16-CR-255, Doc. 95 (M.D. Pa. Nov. 17, 2020) (Mariani, J.).  Moreover, defendants have not identified any objective evidence that the unconscious bias video has actually succeeded in its well-meaning objectives.  Cf. Tiffany L. Green & Nao Hagiwara, *The Problem with Implicit Bias Training*, Sci. Am. (Aug. 28, 2020), https://www.scientificamerican.com/article/the-problem-with-implicit-bias-training/ (observing that implicit bias training without "rigorous evaluations" and empirical data can be ineffective and possibly even harmful).  The lack of objective measures of success is

particularly troubling, because too strong an emphasis on the issue of bias during the jury selection process "could well exacerbate whatever prejudice might exist without substantially aiding in exposing it." See Peña-Rodriguez v. Colorado, 580 U.S. \_\_\_, 137 S. Ct. 855, 869 (2017) (noting that courts and counsel face "dilemma" in deciding whether to ask pointed questions about racial bias during *voir dire* (quoting Rosales-Lopez v. United States, 451 U.S. 182, 195 (1981) (Rehnquist, J., concurring in result))). For all these reasons, we will deny defendants' request to play the unconscious bias video for prospective jurors before *voir dire*.

We will also deny defendants' request that the court conduct brief questioning of each prospective juror "that seek[s] to elicit a promise from each potential juror that they will do their best to guard against [unconscious] bias." (See Doc. 992 at 6). Individualized questioning of this nature would considerably prolong what is already anticipated to be a lengthy jury selection process. We acknowledge such individualized assurances are required during the sentencing phase of capital cases. (See id. at 6-7 (citing 18 U.S.C. § 3593(f) (requiring each juror to certify race and certain other characteristics were not involved in their decision))). But this case is no longer a capital case, (see Doc. 577), and we do not find such assurances to be necessary here.

Nonetheless, we agree with defendants that race may feature more prominently in this trial than the average case. The five remaining defendants in this case are people of color. Two of the three victims of the triple homicide and robbery are Caucasian. And the venire will be drawn from an overwhelmingly

4

Caucasian demographic region.[2] The government suggests that to provide an instruction on unconscious bias based solely on these circumstances—that is, to assume that some amount of unconscious bias will be present in the jury pool—would constitute an "unacceptable . . . stereotyping of Caucasian jurors." (See Doc. 1002 at 2).

We reject the government's argument for two reasons. First, defendants do not claim Caucasian persons *alone* harbor unconscious biases. Their point is that *everyone* harbors some amount of unconscious bias, and that given the race of the defendants and two of the three victims, as well as the likely composition of the venire, unconscious biases held by Caucasian persons toward persons of color could be especially harmful in this case. (See Doc. 1003 at 1-2). Second, the government's own agent has already presaged racial bias as a potential issue in this trial. During his interrogation of defendant Adgebesan, Pennsylvania State Police Trooper Antwjuan Cox, who is also a person of color, cautioned that a jury pool in Franklin County, where the triple homicide and robbery occurred, would not treat a group of Black defendants from Baltimore fairly. Specifically, Trooper Cox stated: "Them people up in Franklin County, where this shit happened, Franklin County,

---

[2] The Harrisburg vicinage of this judicial district embraces 11 counties: Adams (88.1% Caucasian); Cumberland (82.8% Caucasian); Dauphin (63.2% Caucasian); Franklin (86.3% Caucasian); Fulton (94.6% Caucasian); Huntingdon (89.9% Caucasian); Juniata (93.9% Caucasian); Lebanon (82.7% Caucasian); Mifflin (94.6% Caucasian); Perry (94.2% Caucasian); and York (81.8% Caucasian). See *Pennsylvania: 2020 Census*, U.S. CENSUS BUREAU, https://www.census.gov/library/stories/state-by-state/pennsylvania-population-change-between-census-decade.html (last visited Nov. 2, 2021) (select counties on interactive map under "Race and Ethnicity").

Mercersburg, . . . They don't fuck around.  You think they give a fuck about some n[*]ggas down in Baltimore?  Hell no.  Fuck no!  I'm telling you that."  (See 4/26/17 Rec. 2:32:15-2:32:35).

Under these circumstances, we agree with defendants that additional precautions—albeit something short of an 11-minute video or individualized *voir dire* regarding conscious bias—are appropriate in this case.  To that end, the court will instruct the parties to meet and confer and jointly propose the following for the court's consideration:

(1) a short paragraph to be read to prospective jurors during *voir dire* defining conscious and unconscious biases and reminding prospective jurors that neither type of bias should inform their decisionmaking, after which the court will ask whether any prospective juror will be unable to follow the court's instruction,[3] and

(2) a more thorough instruction to be read to the jury during the court's preliminary instructions, and reiterated during final instructions, on the subjects of conscious and unconscious biases and the need to guard against both throughout the trial and during deliberations.[4]

---

[3] Counsel are advised that the court's standard *voir dire* includes the following instruction and question: "If you are selected as a member of the jury in this case, you will be instructed that you must reach your verdict without discrimination, that is, you must disregard not only the defendant's race or color, but also their religious beliefs, national origin, sexual orientation, or gender.  This instruction also applies to witnesses and to the lawyers.  Do any of you believe, for any reason, that you will be unable to follow this instruction?"  We anticipate the instruction and question concerning conscious and unconscious biases will follow this question.

[4] Counsel are further advised that the court's standard final instructions include the following instruction: "In resolving the issues presented to you for decision in this trial you must not be persuaded by bias, prejudice, or sympathy for or against any of the parties to this case or by any public opinion.  You must also not be influenced by any person's race, color, religion, national ancestry, gender, profession, occupation, economic circumstances, or position in life or in the community."  We anticipate the instruction concerning conscious and unconscious biases will follow this question.

6

These measures adequately balance defendants' goals of educating jurors on the subjects of conscious and unconscious biases, the government's concern with placing too much emphasis on such biases, and the court's interest in judicial economy.

### III.     Conclusion

The court will grant in part and deny in part defendants' joint motion as set forth herein. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     November 3, 2021