## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:16-CR-212 |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| KEVIN COLES, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

In April of this year, a jury found defendant Kevin Coles guilty of all 16 counts charged against him.  Those convictions reflect the jury's unanimous and unequivocal determination that the government had proved beyond a reasonable doubt its theory of this prosecution, namely, that Coles was a major drug trafficker in southcentral Pennsylvania and in Maryland and that he conspired with others to murder a woman who had begun cooperating with authorities about those drug-trafficking activities.  Coles now moves for judgment of acquittal on most counts of conviction or, in the alternative, for a new trial.  We will grant in part and deny in part Coles' motion for judgment of acquittal and deny his motion for a new trial.

## I.    Factual Background & Procedural History

The criminal investigation and charges in this case originate with a triple homicide and robbery on June 25, 2016.  The third superseding indictment identifies the homicide victims as Wendy Chaney,[1] Phillip Jackson, and Brandon

---

[1] The third superseding indictment uses two different spellings for this victim's last name, switching between "Chaney" and "Cheney."  We use "Chaney" in this memorandum, which we understand to be the correct spelling.

Cole.  The murders and robbery occurred in a barn on Jackson's farm, located at 11026 Welsh Run Road in Mercersburg, Franklin County, Pennsylvania.

The evidence at trial established that Coles and codefendants Devin Dickerson and Torey White were distributing heroin, cocaine base, and cocaine hydrochloride in the Chambersburg and Mercersburg areas of Pennsylvania, as well as in Hagerstown, Maryland.  Chaney and Jackson each had drug-trafficking relationships with Coles in the spring of 2016.  Chaney was also in a personal relationship with Coles for part of that time.

Chaney was arrested for possessing controlled substances in Maryland on March 30, 2016, and immediately began cooperating with law enforcement in the hope of having her charge dropped.  Over the next three months, Chaney named many drug traffickers in the Hagerstown community, including Coles, Dickerson, White, and others, and detailed the relationships between them.  Word of Chaney's cooperation soon reached Coles, who became angry and told several people Chaney was "running her mouth," "talking too much," and "had to go now."  (See 4/21/22 Tr. 109:6-111:4).  On the evening of June 25, 2016, Coles told another girlfriend of his, Llesenia Woodard, that Chaney was going to be killed that night; Coles ignored Woodard's entreaties not to go through with it, instead ordering Woodard to secure an alibi for herself by going to the movies.  The jury heard evidence that, in the days before and on the day of her death, Chaney told others she believed Coles was going to kill her.

Defendants Christopher Johnson and Michael Buck provided harrowing testimony about the plot to murder Chaney and what happened on the evening of

June 25.  Johnson told the jury he was approached in Baltimore late that afternoon by defendants Jerell Adgebesan and Kenyatta Corbett—who sold drugs in some of the same communities as Coles, Dickerson, and White—about a murder-for-hire opportunity.  Johnson relayed that he and defendants Nicholas Preddy and Johnnie Jenkins-Armstrong, along with Adgebesan, Corbett, and unindicted coconspirator DeAndre Coleman, travelled to Buck's home in Hagerstown to discuss a plan for the hit.  According to Johnson, it was at this point he learned the target of the hit was a woman who was cooperating with authorities, the location would be a farm in Pennsylvania, and there would be a safe at the farm containing cash, drugs, and guns Johnson could keep as payment for the killing.  Buck testified that White arrived separately from the others and assured the group Chaney would be at Jackson's farm that night.

Johnson, Adgebesan, Corbett, Preddy, Jenkins-Armstrong, and Coleman then drove to Jackson's farm, where all but Corbett exited their vehicles and approached the barn.  Johnson testified that they came across Chaney outside of the barn and forced her inside, where they encountered Jackson and third victim Brandon Cole.  Johnson and his crew held the three victims at gunpoint and tied their hands behind their backs using zip ties, before ransacking the barn looking for the cash, drugs, and guns they had been promised.  Jackson insisted the property had been cleared out because it was under surveillance; Johnson did not believe him and beat him into unconsciousness trying to find his promised bounty.  In the meantime, Jenkins-Armstrong and Coleman took Chaney to the main house to search there for any cash, drugs, or guns they could steal.

At some point, Jackson regained consciousness and charged at Johnson, who shot Jackson in response.  Johnson then shot Cole execution-style in the back of the head.  When Jenkins-Armstrong and Coleman returned to the barn with Chaney, Johnson told Jenkins-Armstrong "she has to go, too."  (See 4/13/22 Tr. 57:22-57:8).  Jenkins-Armstrong shot Chaney as directed; Johnson shot her a second time because he thought Jenkins-Armstrong had missed.  Before fleeing the scene, the group lit the victims' clothing on fire in attempt to burn down the barn and destroy any evidence.

Woodard testified that Coles came home drunk in the early morning hours of June 26.  She recalled Coles "kept apologizing, saying he was sorry" in his sleep, and that he was gone before she awoke the following day.  (See 4/21/22 Tr. 123:7-13).  Woodard also testified that Coles shared details of how the three victims were killed long before those details were made public in the media.

Coles was arrested on drug charges in Maryland on July 6, 2016, less than two weeks after the triple homicide.  At trial, the government introduced prison phone recordings of conversations Coles had with Dickerson and Woodard after his arrest, in which Coles sought information about the murder investigation.  Coles asked Dickerson about the "Wendy situation" and learned from him that someone "[o]utside of us" had been picked up for the murders.  (See id. at 39:16-40:8).  Three days later, Coles asked Woodard to confirm if "they had another actor for the off Broadway play that I was playing in."  (See Gov't Exs. 38.21, 38.22; 4/21/22 Tr. 43:20-44:6, 127:11-25).  Woodard testified that this was code for Coles' involvement in the triple homicide.  (See 4/21/22 Tr. 127:11-25).  Multiple jailhouse informants testified

4

that Coles spoke openly to them about the killings and his role in ordering the hit. According to one of these witnesses, Coles bragged that he intentionally structured the contract killing so the trigger man could not identify him.

A federal grand jury returned a five-count indictment in August 2016 charging Coles and Dickerson with various drug-trafficking and firearms offenses. The grand jury has since returned three superseding indictments. In April 2022, Coles proceeded to trial on the operative third superseding indictment, which charged him as follows:

- Count One: conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) and Pinkerton v. United States, 328 U.S. 640 (1946);

- Count Two: Hobbs Act robbery, and aiding and abetting same, in violation of 18 U.S.C. § 1951(a) and 18 U.S.C. § 2;

- Counts Three, Four, and Five: causing the deaths of Jackson, Cole, and Chaney, respectively, by using, brandishing, and discharging a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness), and aiding and abetting same, in violation of 18 U.S.C. § 924(c) and (j) and 18 U.S.C. § 2;

- Count Six: conspiracy to cause the death of Chaney by using, brandishing, and discharging a firearm during and in relation to a crime of violence (Hobbs Act robbery and killing a witness), in violation of 18 U.S.C. § 924(c), (j), and (o);

- Count Seven: conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958 and Pinkerton;

- Counts Eight, Nine, and Ten: murder of witnesses (Chaney, Jackson, and Cole, respectively), and aiding and abetting same, in violation of 18 U.S.C. § 1512(a)(1)(C) and 18 U.S.C. § 2;

- Count Eleven: conspiracy to murder witnesses (Chaney, Jackson, and Cole) in violation of 18 U.S.C. § 1512(k);

- Count Fourteen: conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, and at least 28 grams of a mixture and substance containing a detectable amount of cocaine base and cocaine HCL, resulting in serious bodily injury to another person, in violation of 21 U.S.C. § 846;

- Count Fifteen: possession with intent to distribute a mixture and substance containing a detectable amount of heroin, and a mixture and substance containing a detectable amount of both cocaine HCL and cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

- Count Seventeen: possession with intent to distribute a mixture and substance containing a detectable amount of heroin and a mixture and substance containing a detectable amount of cocaine base, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2;

- Count Eighteen: distribution of a mixture and substance containing a detectable amount of heroin resulting in serious bodily injury to another person, and aiding and abetting same, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2; and

- Count Nineteen: possession of firearms in furtherance of a drug-trafficking crime, and aiding and abetting same, in violation of 18 U.S.C. § 924(c)(1), 18 U.S.C. § 2, and <u>Pinkerton</u>.

Trial began with jury selection on April 11, 2022.  After ten days of evidence, and less than four hours of deliberation, the jury found Coles guilty on all 16 counts.

## II.   <u>Legal Standards</u>

### A.   **Rule 29 Motion for Judgment of Acquittal**

On motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, the court must decide whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial.  See <u>United States v. Caraballo-Rodriguez</u>, 726 F.3d 418, 431 (3d Cir. 2013) (*en banc*) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319

(1979)); see also United States v. Freeman, 763 F.3d 322, 343 (3d Cir. 2014).  The

court must view the evidence in the light most favorable to the prosecution and

must deny the motion "if there is substantial evidence . . . to uphold the jury's

decision."  See Caraballo-Rodriguez, 726 F.3d at 430 (quoting United States v.

Gambone, 314 F.3d 163, 170 (3d Cir. 2003)).  Under this highly deferential standard

of review, it is not the court's task to "act as a thirteenth juror," weigh credibility,

assign weight to evidence, or "substitut[e] [its] judgment for that of the jury."  See

id. (citations omitted).  A court may only overturn a conviction for insufficient

evidence "where the prosecution's failure is clear," see United States v. Leon, 739

F.2d 885, 890-91 (3d Cir. 1984) (quoting Burks v. United States, 437 U.S. 1, 17 (1978)),

or where the verdict is "so insupportable as to fall below the threshold of bare

rationality," see Caraballo-Rodriguez, 726 F.3d at 431 (quoting Coleman v. Johnson,

566 U.S. 650, 656 (2012)).

### B.    Rule 33 Motion for New Trial

Under Federal Rule of Criminal Procedure 33, "the court may vacate any

judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM.

P. 33(a).  Granting or denying a motion for a new trial "lies within the discretion of

the district court."  See United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006)

(citing United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000)).  A court evaluating a

Rule 33 motion does not view the evidence in a light favorable to the government

but instead must "exercise[] its own judgment in assessing the Government's case."

United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (citations omitted).  Rule

33 motions are disfavored and should be "granted sparingly and only in exceptional

cases." United States v. Silveus, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting Gov't of

V.I. v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987)).  Exceptional cases include those in

which trial errors "so infected the jury's deliberations that they had a substantial

influence on the outcome of the trial."  United States v. Thornton, 1 F.3d 149, 156

(3d Cir. 1993) (citing United States v. Hill, 976 F.2d 132, 145 (3d Cir. 1992)).

## III.   Discussion[2]

### A.    Motion for Judgment of Acquittal: Counts One Through Eleven

Coles challenges the sufficiency of the evidence for each of the murder-

related charges (Counts One through Eleven) in addition to raising a legal challenge

to Count Six.  We begin our discussion with Coles' "general" challenge to Counts

One through Eleven.  (See Doc. 1386 at 8).

#### 1.    *General Challenge to Counts One Through Eleven*

Coles' challenge to Counts One through Eleven reprises an argument he

made to the court and to the jury at trial.  According to Coles, the government's

evidence "[a]t most . . . shows [he] wanted Ms. Chaney to be killed and knew that

Ms. Chaney was going to be murdered." (Doc. 1386 at 9)  Coles claims there was

---

[2]   At first blush, we considered summarily denying the instant motion
pursuant to our criminal practice order.  (See Doc. 959 ¶ 10(f) ("The court will
summarily deny any motion for which the supporting brief fails to adequately
describe the factual background for the motion, fails to cite legal authority
supporting the requested relief, or otherwise offers only conclusory assertions or
rationale.")).  Coles offers no legal support for many of his assertions, nor citations
to the record.  Myriad arguments are conclusory and underdeveloped, compelling
the court to do the work of unpacking and analyzing them in the context of an
extensive trial record.  Moreover, we previously considered and rejected variations
of most of these arguments in denying Coles' Rule 29 motion.  For the sake of
completeness, we incorporate that analysis herein in full.  (See 4/26/22 Tr. 135:2-
148:23).  This memorandum will echo and supplement our earlier analysis.

no proof he acted on that desire; he cites the lack of "evidence of an agreement" between himself and trigger man Christopher Johnson and avers this failure of proof fells all murder-related conspiracy counts (and presumably, likewise defeats the Pinkerton theory supporting the nonconspiracy murder counts).  (See id. at 8-9).

To the extent Coles believes the law requires direct proof of an agreement to murder Chaney, he is mistaken.  Our court of appeals has repeatedly held the government may prove a conspiratorial agreement by circumstantial evidence.  See United States v. McKee, 506 F.3d 225, 238 (3d Cir. 2007) (collecting cases).  Indeed, the court has recognized it is the *rare* conspiracy that will explicitly reduce its nefarious objectives to a written or verbal contract.  See id.  A conspiratorial agreement therefore "can be, and almost always is, an implicit agreement among the parties to the conspiracy."  See id. (citing United States v. Price, 13 F.3d 711, 728 (3d Cir. 1994)).  The question is whether the record contains enough circumstantial evidence from which the jury could infer, based on "actions and statements of the conspirators" and "the circumstances surrounding the scheme," that there was an implicit conspiratorial agreement to murder Chaney, and that Coles was a part of it. See id.

The answer to that question is a resounding yes.  Llesenia Woodard, Coles' former girlfriend, provided a damning, detailed account of Coles' conduct in the days and hours before Chaney's death.  During the week preceding the murders, Woodard overheard Coles in conversations with defendant Devin Dickerson (his drug-trafficking partner) and with someone named "Unc" in which Coles said Chaney "had to go now" because she was "talking too much" and "running her

mouth." (See 4/21/22 Tr. 109:6-111:4). Woodard told the jury Coles had her perform a case search to confirm whether Chaney had pending criminal charges. (See id. at 107:11-109:5). And she testified that, on the night of the triple homicide, Coles told her Chaney "was going to be killed that night, that he was basically tired of her running her mouth, starting up trouble." (See id. at 119:10-14). Woodard "told [Coles] no," but "[h]e did it anyway." (See id. at 119:15-18).

Woodard further explained that Coles directed her to set up an alibi for herself by going to the movies, and that he checked in with her to make sure she had done as she was told. (See id. at 119:19-122:18). Woodard relayed that Coles came home after midnight on the night Chaney died, that he was drunk, and that he kept saying he was "sorry" in his sleep. (See id. at 122:22-123:10). Finally, Woodard testified that Coles shared details about the murders soon afterward, long before media coverage made them publicly accessible. (See id. at 123:19-124:11). Coles told Woodard: "[T]hat's how OGs[3] do it to shut people up, to tie them up and then torture them to teach them to be quiet, to teach them a lesson." (See id. at 124:14-18).

Woodard's recounting of Coles' conduct and exact words would arguably support the verdict on its own. But hers was not the only testimony establishing Coles' role in the murders. The government's witnesses wove a cohesive narrative during the two-week trial, confirming Chaney was a known cooperator, Coles knew and was angry about her cooperation, and many people either knew or suspected—

---

[3] "OG" stands for "original gangster." (See id. at 124:12-13).

consistent with what Coles told Woodard—that he was going to do something about

it.  As we explained in our initial Rule 29 ruling, the government's evidence

included, but was not limited to:

- testimony from Washington County Drug Task Force Agents Thomas Cox and Brian Hook that in the days and weeks before her death, Chaney provided information to them about drug-trafficking activities of Coles and Dickerson, as well as defendant Torey White, Jermaine Foye (also known as "Boogie"), and others with whom they were associated, (see generally 4/13/22 Tr. 179:3-210:5; 4/14/22 Tr. 51:23-67:11);

- testimony from defendant Michael Buck that it was generally known in the spring of 2016 that Chaney was an informant, (see 4/14/22 Tr. 145:19-151:12);

- testimony from Zach Bowie that, according to victim Phillip Jackson, in the days before Chaney's murder, Coles had become increasingly suspicious regarding potential cooperators and started acting "uneasy," asking Jackson questions and treating Jackson like "the police," after which Jackson twice expressed to Bowie he did not "have a good feeling" and believed "something is fitting to happen to Wendy," (see 4/18/22 Tr. 67:18-69:1);

- a text message exchange from the afternoon of June 24, 2016, in which Coles shared with Foye a screenshot of text messages from Chaney and then told Foye, "[N] we can talk, but she is a dead issue," (see 4/26/22 Tr. 40:15-17);

- cell phone records revealing Chaney texted White on June 24, 2016, that "This dude has got a loaded gun and he's trying to kill me," and "If I end up dead, Kevin did it," (see id. at 41:3-18);

- further testimony from Buck that defendant Kenyatta Corbett twice stated Chaney was "no good" and "she's gotta fucking go," and that, also on the day of the murders, Corbett said Chaney was "telling on his boys Drop [White's nickname] and K [Coles' nickname]," she was "getting ready to fuck a lot of shit up," and "a lot of shit's getting ready to go down. Like she's gotta go," (see 4/14/22 Tr. 147:15-151:12, 152:25-153:19);

- testimony from Task Force Agent Cox that, two days before her murder, Chaney expressed fear via text messages that Coles knew she was cooperating, (see 4/13/22 Tr. 196:8-203:17);

- further testimony from Bowie that on the day of the triple homicide, he overheard Jackson on the phone with a male who sounded "frantic," and after the call, Jackson reiterated his belief that something was about to happen to Chaney, (see 4/18/22 Tr. 65:7-66:8);

- testimony from Chaney's son, Tyler, that on the morning of the murders, she told him "K and Drop was trying to kill her. She thought that they was trying to kill her," (see 4/14/22 Tr. 199:5-200:10); and

- a recorded phone call between inmate Ronald Armstead and Chaney, from less than an hour before her death, in which Chaney told Armstead she had been "running scared" for two days, she was afraid Coles was going to kill her, and she was out in the woods, in the country, with White, whom she referred to as her "brother," (see 4/26/22 Tr. 72:18-74:25; Gov't Exs. 11.3, 11.4).

The jury also heard from Coles himself—albeit indirectly—about his involvement in Chaney's murder. Coles did not testify at trial, but the government introduced two recorded prison phone calls in which Coles spoke with Dickerson and Woodard about his role in the murders. During the call between Coles and Dickerson on July 12, 2016, the pair discussed the "Wendy situation" and their belief that someone else—in Coles' words, "[o]utside of us"—had been picked up for the murder charges. (See 4/21/22 Tr. 39:16-40:8). In another prison phone call just three days later, Coles asked Woodard whether it was true "they had another actor for the off Broadway play that I was playing in." (See Gov't Exs. 38.21, 38.22; 4/21/22 Tr. 43:20-44:6, 127:11-25). Woodard told the jury this was "code" for Coles' involvement in the triple homicide. (See 4/21/22 Tr. 127:17-25).

Lastly, the jury heard from a parade of jailhouse informant witnesses, all of whom Coles bragged to at various times during his pretrial detention about his involvement in the triple homicide. Richard Walker testified that Coles told him

a woman Walker knew only as Coles' "baby mom" was cooperating against "Shy Money" (Dickerson), that Coles said "he had to do what he had to do," that Coles spoke with Dickerson about the situation, and that Dickerson "contacted this guy named Basehead [defendant Jerell Adgebesan], and Basehead just basically ordered the hit." (See 4/25/22 Tr. 27:3-31:13). Cordaress Rogers testified that a white woman Coles had been in a relationship with owed Coles money and was cooperating with the DEA; per Rogers, Coles said he had to "run down on" her because of it but could not do it himself because of their relationship, so "he was going to find somebody else to do it." (See id. at 61:3-64:9). Rogers testified that Coles "had to get with the dude Shy Mack, and they knew how to get some dudes from Baltimore to do something to [the white] girl," and ultimately "him and Shy Mack got the people from Baltimore" to murder her. (See id.) Both men explained to the jury that, per their recollection of Coles' comments, the plan was for these people from Baltimore to kill the woman by cutting her throat; Rogers added that they were also supposed to burn down the scene to destroy any evidence. (See id. at 39:12-40:5, 63:23-64:19).

Another prisoner witness, Eric Jackson, testified that Coles said a woman he was in a relationship was a "cop or a CI" and she "had to go" and "had to be dealt with." (See id. at 107:7-20, 108:23-109:2, 109:21-23). Jackson testified that Coles "said he put the push through" on this woman by putting "some guy named B'More [Adgebesan] . . . on to a lick . . . [o]ut in the sticks in a barn." (See id. at 109:21-112:7). Coles says this testimony at most proves he arranged a robbery—Jackson explained a "lick" is essentially a robbery. (See id. at 110:1-12). But when

asked by the prosecution if "the push" had "anything to do with anything more than just a robbery," Jackson clarified that Coles said "the girl had to be outed, the girl had to be dealt with." (See id. at 111:18-21). Jackson's testimony also answers Coles' claim that the jury could not convict him of the murders because the trigger man did not know who he was. According to Jackson, this was no accident: Coles intentionally structured the hit to distance himself from the shooter.[4] (See id. at 110:15-111:3 ("[H]e told me that . . . the people who did it, that they wasn't going to be able to point him out because they don't know he put the push through.")).

Finally, Sirvonn Taylor testified that Coles told him a woman named Wendy had been "snitching" on Coles and Dickerson and the pair agreed "we gotta kill her because she's snitching." (See id. at 136:11-138:17). Coles did not tell Taylor "how it was arranged," but he did share "in depth details" about the night of the murders and emphasized, per Taylor, "they weren't supposed to kill the dude that owned the house." (See id. at 140:8-141:7). Coles also told Taylor he was not worried about getting caught because police could not find his second cell phone. (See id. at 139:19-140:7). According to Taylor, Coles said "if they found his second phone that they would have him red handed, but since they didn't find the second phone, they don't have nothing on him, because the second phone is where the texts from Shy Mack came about killing her and everything." (See id.)

---

[4] Moreover, "[i]t is well-established that one conspirator need not know the identities of all his co-conspirators, nor be aware of all the details of the conspiracy in order to be found to have agreed to participate in it." United States v. Fattah, 914 F.3d 112, 166 n.19 (3d Cir. 2019) (quoting United States v. Riccobene, 709 F.2d 214, 225 (3d Cir. 1983), abrogated on other grounds by Griffin v. United States, 502 U.S. 46 (1991)).

A rational juror could *easily* find from this evidence that Coles not only wanted Chaney dead, but also orchestrated her contract killing and intentionally structured it to avoid getting caught.  The government may not have Coles, in his words, "red handed," but circumstantial evidence of his guilt is overwhelming.  The record establishes Coles had a strong motive to kill Chaney; he told others he was going to have her killed; he knew when Chaney would die, how she was to die (and how she ultimately died), and other details about the killing before they were made public; and he had his former girlfriend establish an alibi to insulate herself on the night of the murders.  Most critically, the record also establishes Coles spoke with at least half a dozen people—Woodard, Dickerson, Walker, Rogers, Jackson, and Taylor—after Chaney's murder and admitted, with varying degrees of specificity, his role in bringing it about and why he thought he would get away with it.  This trial record, construed, as it must be, in the light most favorable to the government,

provides ample evidence to uphold the jury's verdict.[5]  We will deny Coles' motion to the extent it seeks judgment of acquittal as to Counts One through Eleven generally.

### 2.   *Specific Challenges to Counts One through Five and Count Eight*

Coles next raises specific challenges to Counts One through Five and to Count Eight.  We address these arguments *seriatim*.

### a.   <u>Count One</u>

Count One charges Coles with conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a).  Coles asserts the government failed to produce evidence at trial that Coles "entered into an agreement with anyone to rob Jackson."  (<u>See</u> Doc. 1386 at 10).  As explained *supra*, the government is not required to produce direct evidence of a conspiratorial agreement to obtain a

---

[5] Coles also raises a general challenge to the murder-related counts based on Johnson's testimony that he shot Jackson first, after Jackson charged at him during the robbery.  Coles claims this one line of testimony undoes the entire theory of the prosecution, establishing that Jackson was killed because he attacked Johnson (not because he was a potential witness to the planned killing of Chaney) and that Cole and Chaney were killed only because they witnessed Jackson's murder.  (<u>See</u> Doc. 1386 at 9-10).  In Coles' view, Johnson unilaterally dissolved the conspiracy to murder Chaney the instant he shot Jackson; that Chaney nonetheless was killed moments later was, at least as to Coles, just a bit of good luck.  (<u>See</u> <u>id.</u>)  Coles cites nothing for his theory that he is off the hook for orchestrating what ultimately was a successful murder for hire simply because the federal-witness target was killed last.  Moreover, Johnson confirmed on redirect the plan always was to kill Chaney due to her status as a potential government informant, along with anyone else who may witness her murder.  As far as Johnson was concerned, "it didn't matter . . . if Phil Jackson hadn't charged [him] or Brandon Cole hadn't seen it or Wendy Chaney hadn't been the third one in"—Johnson was "there to kill" Chaney.  (<u>See</u> 4/13/22 Tr. 92:4-16).  Any rational juror could believe Johnson's testimony and find he was hired to kill Chaney because she was cooperating with law enforcement, he planned to leave no witnesses to Chaney's murder, and he accomplished these objectives.

conspiracy conviction.  See McKee, 506 F.3d at 238.  Johnson testified he was to be paid for Chaney's murder with $20,000 in cash as well as any drugs and guns he could steal from Jackson's farm, (see 4/13/22 Tr. 33:22-34:4), and a jailhouse informant testified that Coles said he "put his homies onto a lick" (i.e., robbery) at the farm when he "put the push through" for Chaney's murder, (see 4/25/22 Tr. 109:21-110:12).  From this evidence, the jury could reasonably infer Coles was part of, and in fact initiated, the Hobbs Act robbery conspiracy.

### b.    Count Two

Count Two charges Coles with Hobbs Act robbery in violation of 18 U.S.C. § 1951(a).  The jury selected both aiding-and-abetting and Pinkerton theories of criminal responsibility to support the guilty verdict on this count.  Coles contests only the aiding-and-abetting theory, positing the government did not produce evidence he "was involved in" or in any way assisted or furthered the robbery at Jackson's farm.  (See Doc. 1386 at 10-11)  We disagree for the reasons just stated: plenty of record evidence supports the conclusion that Coles offered the robbery ("lick") at Jackson's farm as compensation for Chaney's contract killing.  See supra pp. 16-17.  A rational juror could conclude from this evidence that Coles "acted to facilitate" or "to promote" the robbery as part and parcel of his murder-for-hire scheme.  See United States v. Centeno, 793 F.3d 378, 387 (3d Cir. 2015) (quoting United States v. Mercado, 610 F.3d 841, 846 (3d Cir. 2010)).

### c.    Counts Three and Four

Counts Three and Four charge Coles with causing the death of victims Phillip Jackson and Brandon Cole, respectively, through the use of a firearm during

and in relation to Hobbs Act robbery and murder of a witness, in violation of 18 U.S.C. 924(j).  The jury chose both aiding-and-abetting and <u>Pinkerton</u> theories of criminal responsibility for these counts as well.  Coles again challenges the aiding-and-abetting basis alone, contending the government did not adduce proof he aided and abetted anyone in killing Jackson or Cole.  (<u>See</u> Doc. 1386 at 10-11).

We agree with Coles that, as to aiding and abetting, the evidence fails to support the verdict.[6]  To convict a defendant of aiding and abetting a crime, the jury must find beyond a reasonable doubt that the defendant, *inter alia*, "knew of the commission of the substantive offense and acted to facilitate it."  <u>See</u> <u>Centeno</u>, 793 F.3d at 387 (quoting <u>Mercado</u>, 610 F.3d at 846).  Our court of appeals requires "proof that the defendant had the specific intent to facilitate the [principal's] crime" for aiding-and-abetting liability to attach.  <u>See</u> <u>id.</u> (citing <u>Mercado</u>, 610 F.3d at 846).  For Counts Three and Four, that standard requires the government to prove Coles knew of and acted with specific intent to facilitate the use of a firearm in the killings of Jackson and Cole, respectively.  And because the government proceeded on a second-degree murder theory as to all victims (rather than first-degree felony or premeditated murder), we instructed the jury that, to convict Coles of aiding and abetting the Section 924(j) murders of Jackson and Cole, it must find that Coles had

---

[6] The government presumably abandons the aiding-and-abetting theory for these convictions; its brief fails to respond directly to this argument.  (<u>See generally</u> Doc. 1432 at 19-22).  Its only contention on the subject goes to the <u>Pinkerton</u> verdict, not the aiding-and-abetting verdict.  (<u>See</u> <u>id.</u> at 18 ("Christopher Johnson's killing of Phillip Jackson and Brandon Cole was a natural and foreseeable consequence of the original mission.")).

advance knowledge of both the principal's intent to use a firearm *and* his intent to

cause the victim's death.  (See 4/28/22 Tr. 48:12-51:8).[7]

Abundant evidence at trial established Coles knew of and intended

*Chaney's* death, supporting the jury's guilty verdict on both aiding-and-abetting and

Pinkerton theories as to Chaney's murder.  But there was a dearth of evidence that

Coles knew of, intended, and acted in some way to bring about *Jackson's* or *Cole's*

---

[7] The government requested a jury instruction based on the Tenth Circuit's decision in United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000), that Coles did not need to know the principal was going to use the firearm to kill someone; he only needed to know about the crime of violence and the presence of the firearm. As we explained during the charge conference, Chanthadara is a Section 924(j) case involving first-degree felony murder, and felony-murder case law is clear that the principal does not need a specific intent to kill; therefore, an accomplice likewise does not need to have a specific intent to kill.  See Chanthadara, 230 F.3d at 1252; see also United States v. Morales-Machuca, 546 F.3d 13, 22 (1st Cir. 2008).  We read the case law to mean courts must look to the *mens rea* required for the type of murder charged in determining the requisite *mens rea* for an accomplice to that murder.  In the instant matter, the government proceeded on a second-degree murder theory only.  We held that, because second-degree murder requires proof of malice on the part of the principal, the government must also prove malice on the part of an alleged aider and abettor.  (See 4/25/22 Tr. 220:14-222:23).  We noted this understanding of Section 924(j) aiding-and-abetting liability accords with the United States Supreme Court's decision in Rosemond v. United States, 572 U.S. 65 (2014).  Rosemond spoke to Section 924(c), not Section 924(j), but its discussion of accomplice liability more broadly suggests Section 924(j) liability should only attach—at least for second-degree murder—if the accomplice was aware of the murder.  The Court emphasized, for example, that an accomplice's intent "must go to the *specific and entire crime* charged."  See Rosemond, 572 U.S. at 76 (emphasis added).  In other words, an aider and abettor must "join in the criminal venture . . . *with full awareness of its scope*."  See id. at 77 (emphasis added).  For Section 924(c), that means knowledge "that the plan calls not just for a drug sale, but for an armed one."  See id. at 77-78.  For Section 924(j) second-degree murder, it means Coles, as an alleged aider and abettor, must have had full knowledge of the underlying crime of violence, the use of a firearm, and the resulting death.  We further observed that the higher stakes accompanying a Section 924(j) conviction—a potential death sentence, contrasted with Section 924(c)'s life maximum—suggest the former should carry a higher standard of proof.  (See 4/25/22 Tr. 222:16-19).

murders.  Indeed, the only evidence on the subject was to the contrary—Coles told jailhouse informant Sirvonn Taylor the group from Baltimore was *not* supposed to kill Jackson, (see 4/25/22 Tr. 140:8-141:7), and Woodard testified Coles was "upset" by Jackson's death and told her "Phillip wasn't supposed to be there," (see 4/21/22 Tr. 124:2-8).  As to aiding and abetting, then, "the prosecution's failure is clear": there is no evidence to support the charge that Coles aided and abetted Jackson's or Cole's murder.  See Leon, 739 F.2d at 891 (quoting Burks, 437 U.S. at 17).

Coles' convictions on Counts Three and Four still stand, however, because the jury also found Coles guilty of Cole's and Jackson's murders on a Pinkerton theory of criminal responsibility.  Coles does not address the Pinkerton verdict for these counts in his posttrial briefing, presumably because the record contains ample support for it.  The jury easily could have found the murders of anyone else present at the farm on June 25, 2016, were reasonably foreseeable and committed in furtherance of the conspiracy to kill Chaney, and Coles was responsible for those murders as a member of that conspiracy.  Johnson confirmed for the jury "that's just what happens" in a murder-for-hire situation; he explained if "someone else is there, then everybody becomes a victim or a witness at that point," so "[m]ost likely" anyone else present is "going to die."  (See 4/13/22 Tr. 43:3-13, 92:14-16).  We will therefore grant Coles' motion only to the extent it seeks judgment of acquittal on the aiding-and-abetting theories supporting Counts Three and Four.

### d.   **Counts Five and Eight**

Count Five charges Coles with causing the death of Chaney through the use of a firearm during and in relation to Hobbs Act robbery and murder of a

witness, in violation of 18 U.S.C. § 924(j), and Count Eight charges Coles with murder of a witness in violation of 18 U.S.C. § 1512(a)(1)(C).  Coles posits that, because Chaney resigned as an informant two days before she died, his convictions on Count Eight as well as on Count Five, to the extent premised on murder of a witness as the predicate crime of violence, must be vacated.  (See Doc. 1386 at 11).

Section 1512(a)(1)(C) of Title 18 makes it a federal crime "to kill[] or attempt[] to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense."  See 18 U.S.C. § 1512(a)(1)(C).  Coles cites nothing for his suggestion that only an active informant can qualify as a "person" for purposes of this statute.  The government correctly observes no such limitation exists, either in the statutory language or its legislative history.  *Per contra*, when Congress enacted Section 1512 as part of the Victim and Witness Protection Act, it sought to *broaden* protections available to witnesses, informants, victims, and others.  See United States v. Hernandez, 730 F.2d 895, 898 (2d Cir. 1984) (explaining statute encompasses even "'potential' witnesses and those witnesses whose testimony might not be admissible at trial"); United States v. DiSalvo, 631 F. Supp. 1398, 1402 (E.D. Pa. 1986) (citing Hernandez, 730 F.2d at 897-99, and explaining revised statute is intended to "offer greater protection to those with knowledge of criminal activity and to thereby encourage them to testify in official proceedings").

Chaney plainly qualifies as a "person" within the scope of Section 1512(a)(1)(C).  The record is replete with evidence Chaney was working as an

informant (or "source of information") in the spring of 2016, providing information

to federal drug task force agents about the drug-trafficking activities of several

individuals, including Coles, Dickerson, and White.  (See, e.g., 4/13/22 Tr. 97:21-

103:11, 136:25-137:16, 138:6-139:14, 171:25-175:22; see generally id. at 179:3-210:5

(task force agent Sergeant Thomas Cox discussing Chaney's cooperation in May

and June 2016 in extensive detail)).  Although Chaney withdrew from her formal

informant status two days before her murder—specifically because she was afraid

Coles was going to kill her—she certainly remained a potential federal witness.  To

adopt Coles' construction of Section 1512(a)(1)(C) would work the absurd result of

absolving him of responsibility for Chaney's murder simply because he succeeded

in intimidating her.  We will deny Coles' motion for judgment of acquittal on Counts

Five and Eight.

### 3.    *Specific Challenge to Count Six*

Count Six charges Coles with conspiring to cause the death of Chaney

through the use of a firearm during and in relation to Hobbs Act robbery and

murder of a witness, in violation of Section 924(c), (j), and (o).[8]  Coles invokes the

United States Supreme Court's recent decision in United States v. Taylor, 596 U.S.

___, 142 S. Ct. 2015 (2022), in which the Court held attempted Hobbs Act robbery

does not have as an element the use, attempted use, or threatened use of physical

---

[8] Coles erroneously states Count Six charged a substantive violation of
Section 924(c).  (See Doc. 1446 at 6-7).  Count Six charges *conspiracy* to violate
Section 924(c) under Section 924(o); it does not charge a freestanding Section 924(c)
offense.  (See Doc. 499 at 18).  However, Coles does stand convicted of substantive
Section 924(c) offenses at Counts Three, Four, and Five.  We therefore address his
Taylor argument with respect to all potentially impacted counts.

force and thus does not qualify as a crime of violence for purposes of Section 924(c).
See Taylor, 142 S. Ct. at 2020-21.  Coles contends that, under the reasoning of
Taylor, conspiracy to commit Hobbs Act robbery likewise does not qualify as a
Section 924(c) crime of violence.  (See Doc. 1446 at 6-7).  He further contends,
cursorily and without explicitly grounding his claim in Taylor, that conspiracy to
murder a witness is not a crime of violence.  (See id. at 7).

Coles misunderstands the third superseding indictment and the jury's
verdict.  We will assume _arguendo_ Taylor applies equally to conspiracy offenses and
a conspiracy crime cannot serve as the underlying crime of violence for a Section
924(c) offense.  The problem for Coles is the indictment does not charge _conspiracy_
to commit Hobbs Act robbery or _conspiracy_ to murder a witness as the crimes of
violence underlying Count Six.  Rather, it charges the completed offenses, "that is,
(1) Hobbs Act robbery in violation of Title 18, United States Code, Section 1951(a),
and (2) killing of a witness, in violation of Title 18, United States Code, Section
1512(a)(1)."  (See Doc. 499 at 18).  So too for Counts Three, Four, and Five, which
charge substantive Section 924(c) and (j) offenses.  (See id. at 12-17).  The verdict
form likewise was limited to the completed crimes, instructing the jury to "identify
the crime of violence that you unanimously find the firearm was used, brandished,
or discharged during and in relation to (select all that apply)" and identifying
"Hobbs Act robbery" and "Killing a witness" as the only options.  (See Doc. 1337 at
2-5).  Consistent with the plain language of the indictment, the court's instructions
to the jury referred to _commission—i.e._, completion—of the underlying crimes of
violence.  (See, e.g., 4/28/22 Tr. 46:3-9 (instructing jury it could find Coles guilty as

aider and abettor on Counts Three, Four, and Five if principal "committed" charged crimes of violence and used and carried a firearm "during and in relation to the commission of those crimes").

We held earlier in this case that the completed crime of Hobbs Act robbery is categorically a crime of violence for purposes of Section 924(c).  See United States v. Coles, No. 1:16-CR-212, 2021 WL 308831, at *9-11 (M.D. Pa. Jan. 29, 2021) (Conner, J.) (citing United States v. Monroe, 837 F. App'x 898, 900-01 (3d Cir. 2021) (nonprecedential)).[9]  No party has yet asked us to consider whether the completed offense of murder of a witness likewise qualifies as a crime of violence; nonetheless, we note our agreement with courts to have concluded it does.  See, e.g., United States v. Smith, No. 99-445, 2022 WL 541608, at *2 (E.D. Pa. Feb. 23, 2022).[10]  For all of these reasons, we will deny Coles' motion for judgment of acquittal based on Taylor.

---

[9] Our court of appeals held in United States v. Walker, 990 F.3d 316 (3d Cir. 2021), that both completed Hobbs Act robbery and attempted Hobbs Act robbery are categorically crimes of violence for purposes of Section 924(c).  See Walker, 990 F.3d at 325-30.  The Supreme Court later vacated the court of appeals' decision in Walker in light of its conclusion in Taylor that attempted Hobbs Act robbery is not a crime of violence.  See Walker v. United States, 142 S. Ct. 2858 (2022) (mem.).  The parties in Walker then negotiated a resolution of the case, so the court of appeals did not issue a new decision.  See United States v. Walker, No. 15-4062, 2022 WL 3209540 (3d Cir. Aug. 9, 2022) (nonprecedential) (per curiam).  Accordingly, at present, there is no binding precedent in the Third Circuit on the status of completed Hobbs Act robbery as a crime of violence.

[10] Smith involved both attempt offenses and completed offenses.  The court of appeals vacated the district court's decision in Smith and remanded the case for further proceedings in light of Taylor's holding as to attempt offenses.  See United States v. Smith, No. 22-173, 2022 WL 16570531, at *1 (3d Cir. Aug. 12, 2022).  We adopt the Smith decision as persuasive only to the extent it pertains to the completed offense of murder of a witness.

**B.** **Motion for Judgment of Acquittal: Counts Fourteen, Fifteen, Seventeen, and Eighteen**

Coles raises sufficiency-of-the-evidence and legal challenges to the controlled-substance convictions, Counts Fourteen, Fifteen, Seventeen, and Eighteen. We take each argument in turn.

### 1. *Count Fourteen: Drug Weights*

Count Fourteen charges Coles with conspiracy to distribute, and to possess with intent to distribute, at least 100 grams of a mixture and substance containing a detectable amount of heroin and at least 28 grams of a mixture and substance containing a detectable amount of cocaine base and cocaine hydrochloride. The jury answered special interrogatories and found beyond a reasonable doubt that the amount of cocaine involved in Count Fourteen was 28 grams or more and the amount of heroin involved in Count Fourteen was 100 grams or more. Coles asserts the proof of drug weight at trial "was purely based on unreliable speculation of lay witnesses that were admittedly addicted to drugs in 2016," suggesting the testimony of addict witnesses cannot alone support a jury's drug-weight finding. (See Doc. 1386 at 12).

Coles devotes just one sentence to this argument in his supporting brief, and he cites no legal support for his suggestion the government cannot rely solely on drug-addicted witnesses to prove mandatory-minimum-triggering drug weights. (See id.) We reject this hollow argument. True, the bulk of the drug-weight evidence at trial came from witnesses who were current or former drug addicts. But that does not render their testimony "unreliable" *per se*. These witnesses, all of

whom were sequestered, offered strikingly consistent testimony, describing the ins and outs of Coles and Dickerson's drug operation, detailing quantities purchased (for personal use and, for some witnesses, to sell) and frequency of purchases, and recounting tragic addiction histories which allowed them to estimate drug quantities with precision.

For example, Lorisha Adams, with whom Dickerson lived and who was familiar with Coles and Dickerson's drug-trafficking enterprise, testified that Dickerson kept a package of heroin the size of a "golf ball" and at least an ounce of cocaine in her home at any given time in the spring of 2016, and that the drugs were replenished approximately every three to five days. (See 4/19/22 Tr. 101:10-102:24).[11] Kylie Owens, a customer of Coles and Dickerson who later became a driver for their operation, testified that Coles supplied her with roughly three grams of heroin per week for nearly a year, for an aggregate of more than 100 grams during the course of their dealings; she estimated she bought "double that" from Dickerson, since she dealt with him longer. (See 4/14/22 Tr. 224:13-226:3, 230:21-231:12). The testimony of these two witnesses alone would support the drug-weight special interrogatory responses, but the jury had quite a bit more to rely upon in reaching their verdict. (See, e.g., 4/19/22 Tr. 48:18-22, 53:16-54:22 (Courtney Smith testifying Coles supplied her between four and eight grams of heroin at a time and with more than an ounce

---

[11] The government erroneously claims Adams was not a drug addict. (See Doc. 1432 at 25). Adams testified that she "had a problem" with powder cocaine at the time Dickerson was living with her and storing his and Coles' drugs in her home, and that she "was dipping and dabbing in crack cocaine also." (See 4/19/22 Tr. 88:10-89:7). She described her powder cocaine addiction as "really bad" and a "daily battle" for "[f]our years . . . possibly five." (See id.)

of cocaine overall); 4/20/22 Tr. 21:5-22:1 (Trent Smith testifying he saw Coles delivering six or seven grams of crack and of heroin to Smith's apartment "[a] couple" times); 4/19/22 Tr. 195:12-17 (Krysta Rockwell testifying to having seen Coles in possession of "softball" size quantities of crack cocaine and heroin); 4/18/22 Tr. 158:3-159:5 (Jessica Ita testifying Coles and Dickerson directed her to conceal "softball" size bag of heroin in her person during traffic stop)).

Although the court is not required to provide an addict-witness instruction, see United States v. Miles, 53 F. App'x 622, 628 (3d Cir. 2002) (nonprecedential), we nonetheless instructed the jury it should weigh the testimony of these witnesses "with great care and caution," (see 4/28/22 Tr. 20:3-20); see also THIRD CIRCUIT MODEL CRIMINAL JURY INSTRUCTIONS 4.21.  The jury presumably credited at least some of their testimony in reaching its drug-weight calculation, and we must not second guess those credibility determinations or otherwise "substitut[e] [our] judgment for that of the jury."  See Caraballo-Rodriguez, 726 F.3d at 430 (citations omitted) (second alteration in original).

In any event, as the government notes, the jury was not relying on addict testimony alone in reaching its drug-weight calculations.  Llesenia Woodard did not use controlled substances, and she testified that Coles possessed heroin and cocaine in her home.  (See 4/21/22 Tr. 87:8-89:24, 90:4-91:14).  The jury also heard from law enforcement officers who testified about the quantity of drugs seized from Coles and Dickerson's vehicle when they were arrested in early July 2016.  (See 4/20/22 Tr. 180:15-181:10 (Hagerstown Police Department Sergeant Jesse Duffey testifying officers seized 17.73 grams of heroin from vehicle)).

The record provides ample support for the jury's special interrogatory responses as to drug weight.  Indeed, it supports weights far in excess of those minimum amounts found by the jury.  We will deny Coles' motion to the extent it challenges the drug-weight special interrogatory responses for Count Fourteen.

### 2.    *Counts Fourteen and Eighteen: Serious Bodily Injury*

Count Fourteen also charges that heroin Coles conspired to distribute caused "serious bodily injury" to two individuals, Krysta Rockwell and Harrell Hazelton, and Count Eighteen charges Coles with a substantive distribution offense for the transaction with Hazelton.  Coles avers the government did not prove either individual suffered a cognizable serious bodily injury, and, as to Hazelton, failed to prove it was Coles who distributed the heroin that caused the overdose or that the product ingested by Hazelton was heroin at all.  (See Doc. 1386 at 12-16).

### a.    <u>Serious Bodily Injury</u>[12]

An individual convicted of conspiring to distribute or distributing a controlled substance is subject to enhanced penalties if the jury finds beyond a reasonable doubt that "death or serious bodily injury result[ed]" from use of the substance.  See 21 U.S.C. § 841(b)(1)(B), (C); Burrage v. United States, 571 U.S. 204, 210 (2014).  A "serious bodily injury . . . involves . . . a substantial risk of death; . . . protracted and obvious disfigurement; or . . . protracted loss or impairment of the

---

[12] Coles argues in his opening brief that a serious-bodily-injury allegation must be charged in the indictment as a separate, standalone offense and cannot be charged as an enhancement to a conspiracy offense.  (See Doc. 1386 at 16).  Coles concedes in his reply brief that Third Circuit precedent forecloses this argument.  (See Doc. 1446 at 7-8 n.1 (citing United States v. Robinson, 167 F.3d 824, 832 (3d Cir. 1999))).

function of a bodily member, organ, or mental faculty." See 21 U.S.C. § 802(25). The Third Circuit Court of Appeals has not yet considered whether or under what circumstances an overdose might constitute a serious bodily injury. We confronted that question in United States v. Piaquadio, No. 4:15-CR-249, 2019 WL 3337063 (M.D. Pa. July 25, 2019) (Conner, C.J.), aff'd, No. 20-2841, 2021 WL 2946472 (3d Cir. July 14, 2021) (nonprecedential), and predicted our court of appeals would agree with the Eighth Circuit Court of Appeals to conclude "an overdose posing a serious risk of death without medical intervention constitutes serious bodily injury." See Piaquadio, 2019 WL 3337063, at *5 (citing United States v. Seals, 915 F.3d 1203 (8th Cir. 2019); United States v. Lewis, 895 F.3d 1004 (8th Cir. 2018)).

Coles asserts the phrase "without medical intervention" establishes a high standard of proof, tasking the government to prove with "medical evidence" that the victim received "professional" medical treatment. (See Doc. 1386 at 14-16; Doc. 1446 at 8-9). This reading distorts our holding. Piaquadio did involve "medical evidence" (specifically, medical expert testimony about the victim's symptoms) and "professional" medical treatment (specifically, paramedic transport and emergency-room medical care). See Piaquadio, 2019 WL 3337063, at *2-4. To claim both are *required* to prove serious bodily injury, however, improperly conflates context and conclusion. We concluded only that the government must prove the overdose victim was at "serious risk of death without medical intervention." See id. That the government met this standard in Piaquadio with expert testimony about the victim's professional medical treatment does not *ipso facto* mean it can *only* meet its

burden with such evidence.  We neither held nor implied as much in <u>Piaquadio</u>, and we are unaware of any decisional law adopting Coles' higher standard.[13]

We conclude, as we did at trial, that the evidence was sufficient to permit the jury to find both Rockwell and Hazelton suffered serious bodily injury.  As to Rockwell, the jury heard testimony from those present during her overdose; per their account, Rockwell went gray in the face and the lips, her eyes rolled back into her head, she was "lethargic" and "not responding," and her breathing was "very slow."  (<u>See</u> 4/19/22 Tr. 130:17-131:10, 165:3-13).  They heard from Rockwell herself

---

[13] Coles invokes another federal statute, 42 U.S.C. § 280g-1(e)(4), which he admits is "obviously much different" than Section 802(25)—it appears in the Public Health Service Act and defines "medical intervention" in the context of detecting, diagnosing, and treating hearing loss in children.  (<u>See</u> Doc. 1446 at 9).  Section 280g-1(e)(4) defines "medical intervention" as "the process by which a physician provides medical diagnosis and direction," <u>see</u> 42 U.S.C. § 280g-1(e)(4), and Coles argues this "illustrates that when Congress is referring to 'medical intervention,' it means intervention by a medical professional."  (<u>See</u> Doc. 1446 at 9).  Coles' argument is decidedly unpersuasive.  Initially, the criminal statute that defines "serious bodily injury" for purposes of certain mandatory minimum drug penalties, 21 U.S.C. § 802(25), does not use the term "medical intervention"; that standard evolved in the case law, not in Congress.  <u>See</u> <u>Lewis</u>, 895 F.3d at 1007; <u>Piaquadio</u>, 2019 WL 3337063, at *5-6 (citing, <em>inter alia</em>, <u>Lewis</u>, 895 F.3d at 1007).  Moreover, the contexts are poles apart; one could not reasonably believe the Eighth Circuit in <u>Lewis</u> or this court in <u>Piaquadio</u> was contemplating the Public Health Service Act's definition of "medical intervention" for hearing loss in children when using the term in a federal drug prosecution.  Speaking only for this court, we can say without reservation that we were not.  Coles comes closer with his invocation of the United States Sentencing Guidelines, which provide a general definition of "serious bodily injury" for all offenses as "injury . . . requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  <u>See</u> U.S.S.G. § 1B1.1 cmt. 1(M) (U.S. Sent. Comm'n 2018).  Even so, the Guidelines commentary is nonbinding, the phrase "such as" implies the list is nonexhaustive, and we are disinclined to hold, absent clear authority to the contrary, that administration of lifesaving medication in the field cannot qualify as "medical intervention."  We further note neither of Coles' cited authorities supports his second proposition—that the fact of the overdose can only be proven by expert testimony.

that the only thing she remembered was Dickerson saying "she's going to die." (See id. at 210:11-18). And they heard testimony that initial efforts to revive Rockwell by putting her in the shower failed, and that she recovered only after Dickerson administered Narcan—a medication intended to reverse opioid overdoses. (See id. at 131:11-132:24, 165:20-166:6). Viewing this evidence in the light most favorable to the government, especially in the broader context of a trial record embroidered with tragic testimony about heroin overdoses, the jury reasonably could find Rockwell was at serious risk of death by overdose had Dickerson not intervened with Narcan.

The evidence with respect to Hazelton was even more compelling. Jessica Ita testified that she got out of the shower to find Hazelton "passed out on the bed," that he "wasn't moving," "wasn't really breathing," "[h]is lips were blue," and "[h]is breathing was really, really shallow." (See 4/18/22 Tr. 129:16-130:17). She relayed that Hazelton's pulse slowed to the point she could no longer detect it. (See id. at 130:13-17). Ita attempted CPR and administered two doses of Narcan. (See id. at 130:17-131:25). Her efforts failed to revive Hazelton, so she called 911. (See id. at 131:16-19). Police arrived on scene and administered a third dose of Narcan, but Hazelton remained unconscious. (See id. at 200:22-201:23). When EMS arrived, they "bagged" Hazelton ("provid[ed] ventilation via [a] bagged valve mask") and inserted a nasal airway to supply supplemental oxygen, to no immediate effect. (See id. at 201:23-202:7, 217:1-218:6). It was not until he was being carried out of the hotel room by stretcher that Hazelton came to. (See id. at 218:14-220:9). Hazelton was then transported to the hospital. (See id. at 220:10-23).

Coles all but concedes this meets even his higher "professional" medical intervention standard; he takes issue only with the government's failure to adduce medical expert testimony as to Hazelton's oxygen saturation rate and precise risk of death or brain injury.  (See Doc. 1386 at 14-15).  We again reject the unsupported assertion that such evidence is required.  See supra p. 30 note 13.  The government produced more than sufficient evidence to support the jury's finding that Hazelton suffered serious bodily injury.[14]

### b.   Chain of Distribution

Coles also renews chain-of-distribution arguments he raised at trial.  As to Count Eighteen, Coles notes Ita could not recall if it was Coles or Dickerson who handed her and Hazelton the heroin; she knew it was one of them, but did not know which.  Coles asserts the government necessarily "relied on Pinkerton liability to

---

[14] Finally, Coles asserts the government did not establish heroin distributed by Dickerson and Coles caused Hazelton's overdose, because Ita did not actually watch Hazelton use the heroin and could not say with certainty whether the heroin that caused the overdose came from Coles and Dickerson.  (See Doc. 1386 at 13).  The circumstantial evidence at trial was adequate to support the inference reflected by the jury's verdict.  Ita and Hazelton sought out heroin, purchased that heroin together from Coles and Dickerson, tested the strength of the heroin by giving it to an "old guy" Hazelton knew, preemptively bought Narcan after the "old guy" appeared to overdose, and then went together to a hotel room to use the heroin.  (See 4/18/22 Tr. 123:2-132:7).  Ita told the jury that she knew Hazelton was a former heroin user but did not think he was using at the time, that they were talking while she was in the shower but Hazelton stopped responding, and that she discovered Hazelton unconscious.  (See id.)  Most importantly, Ita told the jury she did not think Hazelton had any other heroin on him that day.  (See id. at 192:6-8 (Q: "Was there any other heroin that you had that day other than what the defendant and Shy sold to Harrell Hazelton?"  A: "No, we didn't have any.  He didn't have any."); id. at 193:11-21 ("I can't say for sure, no, but I don't think he did have any.")).  The jury could reasonably find from this evidence that, when Hazelton overdosed in the hotel room, the overdose was caused by the heroin he and Ita had just purchased from Coles and Dickerson.

connect Coles with Hazelton's overdose" on this count, and asks the court to adopt

the Sixth Circuit Court of Appeal's conclusion in United States v. Hamm, 952 F.3d

728 (6th Cir. 2020), that the government cannot use the Pinkerton theory of criminal

responsibility to prove a serious-bodily-injury allegation.  (See Doc. 1386 at 13-14).

Coles applies similar reasoning to the serious-bodily-injury findings as to both

Hazelton and Rockwell for Count Fourteen.  (See id. at 15).

We rejected Coles' reliance on Hamm at trial and do so again *infra*.  But

Coles encounters a threshold problem for Count Eighteen: he misapprehends

the government's theory and the jury's verdict on that count.  The government

prosecuted Coles on Count Eighteen as a principal and an aider and abettor, *not* as

a Pinkerton coconspirator.  (See 4/27/22 Tr. 95:22-96:7).  The government made this

clear in proposed supplemental jury instructions filed before the second charge

conference, (see Doc. 1332 at 3; 4/28/22 Tr. 61:1-16), and the verdict form provided

only two options: "Principal" and "Aiding and Abetting," (see Doc. 1337 at 11).

Coles' argument concerning Pinkerton attribution therefore does not apply to

Count Eighteen.

At any rate, we again reject Hamm as inconsistent with the law of our circuit

and incompatible with the facts of this case.  In Hamm, the Sixth Circuit concluded

the government cannot use a Pinkerton theory to apply the death or serious-bodily-

injury enhancement to a drug charge; it must instead prove the defendant "[was]

part of the chain of distribution" to the victim.  See Hamm, 952 F.3d at 741.  Coles

contends that, because no witness could say with certainty whether it was Coles or

Dickerson who supplied the overdose-inducing heroin—in other words, whether

33

Coles was within the "chain of distribution"—he is entitled to judgment of acquittal as to all serious-bodily-injury allegations.  (<u>See</u> Doc. 1386 at 15-16).

Initially, <u>Hamm</u> is not binding on courts in this circuit.  Coles cursorily invokes the decision but offers no discussion of whether it is consonant with Third Circuit precedent.  Our research has not uncovered any decision of our court of appeals squarely on point.  However, the court has held <u>Pinkerton</u> attribution applies to drug-weight sentence enhancements, subject to "the ordinary limitations on co-conspirator liability."  <u>See</u> <u>United States v. Williams</u>, 974 F.3d 320, 364 (3d Cir. 2020).  The court has also approved a <u>Pinkerton</u> theory and corresponding jury instruction for a death-results sentence enhancement for an interstate domestic violence conviction under 18 U.S.C. § 2261(b)(1).  <u>See</u> <u>United States v. Gonzalez</u>, 905 F.3d 165, 190 (3d Cir. 2018).  These decisions arose in slightly different contexts, but both signal our court of appeals would not subscribe to the Sixth Circuit's wholesale rejection of coconspirator liability for the serious-bodily-injury enhancement.

We also note, as we did at trial, that <u>Hamm</u> is factually distinguishable in significant ways.  <u>Hamm</u> concerned multiple, separate chains of distribution comprising a broader conspiracy; the question was whether the government could use a <u>Pinkerton</u> theory to attribute a death and three nonfatal overdoses occurring within one chain to an uninvolved coconspirator in another chain.  <u>See</u> <u>Hamm</u>, 952 F.3d at 733, 744.  That is not what happened in the instant matter.  Trial testimony established Coles and Dickerson effectively operated a joint venture; they "went half" on their drugs, were "always together," were "working together," and were "a unit when it comes to anything drugs."  (<u>See, e.g.</u>, 4/18/22 Tr. 141:2-4, 171:1-5; 4/19/22

Tr. 94:20-25; 4/25/22 Tr. 100:21-101:7).  Under the specific and unique circumstances of this case, supply of heroin by Coles is virtually indistinguishable from supply of heroin by Dickerson.

Further distinguishing Hamm is the fact both Coles *and* Dickerson were involved in each of the incidents leading to the two charged overdoses.  Ita and Hazelton bought the heroin that caused Hazelton's overdose directly from Coles and Dickerson; Ita could not recall specifically which of them handed it over, but she was certain both were present for and involved in the transaction.  (See 4/18/22 Tr. 123:2-16, 173:11-177:8).  Likewise for the heroin that caused Rockwell's overdose: both Coles and Dickerson were with Rockwell on the day of her overdose, and Rockwell told the jury the only heroin she used that day came from Coles and Dickerson's supply.  (See 4/19/22 Tr. 215:25-216:10).  Thus, even if we were to adopt

<u>Hamm</u>'s chain-of-distribution requirement, the government's evidence would satisfy it.  We will deny Coles' motion for judgment of acquittal on these grounds.[15]

### 3. *Count Seventeen: Possession with Intent to Distribute Heroin*

Count Seventeen charges Coles with possession with intent to distribute heroin and crack cocaine on or about July 22, 2016.  The charge arises from law enforcement's search of Courtney Smith's apartment on July 22, 2016, and their seizure of cocaine base and heroin from that apartment.  Coles asserts he was in jail for two weeks at the time of the search and there was no evidence that the seized drugs belonged to him or that he had the ability to exercise dominion or control over them.  (<u>See</u> Doc. 1386 at 16).

Neither party provides much help in the way of case law or record evidence.  The lone decision upon which Coles relies—<u>United States v. Bates</u>, 462 F. App'x 244 (3d Cir. 2012) (nonprecedential)—is distinguishable.  The government in <u>Bates</u>

---

[15] Coles also argues he is entitled to judgment of acquittal on Count Eighteen because Ita disposed of the substance before emergency responders arrived, so it was never tested and the government cannot prove beyond a reasonable doubt it was in fact heroin.  (<u>See</u> Doc. 1386 at 13).  Such testing is not required: "It is well-established that 'lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction.'"  <u>See</u> <u>United States v. Stewart</u>, 179 F. App'x 814, 818 (3d Cir. 2006) (nonprecedential) (quoting <u>United States v. Dolan</u>, 544 F.2d 1219, 1221 (4th Cir. 1976)) (rejecting defendant's claim he was entitled to judgment of acquittal because cocaine he allegedly possessed was not "seized from him or tested by experts"); <u>see also</u> <u>Griffin v. Spratt</u>, 969 F.2d 16, 22 n.2 (3d Cir. 1992) (noting government "may establish the identity of a drug through cumulative circumstantial evidence" (citations omitted)).  Ita told the jury that she and Hazelton bought what they believed to be heroin from Coles and Dickerson, and that Coles and Dickerson held the substance out to be heroin.  The jury also heard that Hazelton used the substance and suffered an overdose.  From this circumstantial evidence, the jury could reasonably conclude the substance Coles possessed with intent to distribute was heroin.

sought to attribute heroin to the defendant based solely on evidence he previously lived in the residence where the heroin was found, still had his key, and was seen exiting the residence on one occasion before proceeding to conduct a cocaine sale on the same street.  See Bates, 462 F. App'x at 245-46.  The court held this evidence was insufficient to establish the defendant knew of and had control over the heroin found in the residence.  See id. at 250-53.

Coles' motion raises a different issue entirely.  Overwhelming record evidence establishes he and Dickerson stored their drugs at, and operated a drug-trafficking operation out of, Smith's apartment in the spring and early summer of 2016, through the day of Coles' arrest on July 6, 2016.  The question is whether the government proved Coles *continued* to store drugs in Smith's apartment *after* his arrest, through the date of the July 22, 2016 search.

The government offers little assistance in answering this question.  It cites only to "prison calls between Coles and Dickerson . . . in coded language about these activities," implying Coles and Dickerson discussed what to do with drugs remaining in the apartment after Coles' arrest.  (See Doc. 1432 at 39-40).  The cited calls, however, were about *guns*, not drugs.  Pennsylvania State Police Sergeant Antwjuan Cox explained to the jury that he listened to the recordings and that Coles instructed Dickerson to "separate" himself from the "n*gga AR" and "n*gga RU," which Sergeant Cox interpreted to reference an AR-15 and a Ruger firearm.  (See 4/21/22 Tr. 33:19-34:24).

The court has independently reviewed the record in search of evidence linking Coles to Smith's apartment, or to the drugs found in that apartment, after

his arrest.  The only evidence we have found is Woodard's testimony that, when she visited Coles in jail, he gave her the keys to Smith's apartment and told her "to give the keys to Shy [Dickerson] and give the address to Shy so that he can give them to someone else."  (See id. at 130:18-131:11).  Woodard did as she was told.  (See id. at 131:10-11).  Yet there was no testimony about what Dickerson did after that.  There was no proof he continued to operate the joint drug-trafficking enterprise from the apartment or that he or anyone else associated with the enterprise continued to use the apartment or to store drugs there.  Nor was there testimony connecting Coles to the heroin and crack cocaine law enforcement eventually found in the apartment; no one testified, for example, that the drugs were packaged or stamped or stored in the same way Coles packaged or stamped or stored his supply.[16]

The government's citation to United States v. Introcaso, 506 F.3d 260 (3d Cir. 2007), for a general proposition about constructive possession illustrates more of what this case lacks.  The defendant there was barred from entering the home he shared with his wife pursuant to a protection-from-abuse order.  See Introcaso, 506 F.3d at 263-64.  Roughly a week after entry of the order, during a search conducted with the consent of the defendant's wife, law enforcement found hand grenades in a

---

[16] Pennsylvania State Police Trooper Richard Kline did testify that the drugs were discovered in a "black pouch," and the jury was shown a photograph of the pouch.  (See 4/20/22 Tr. 203:20-204:4; see also Gov't Ex. 36.54).  Woodard testified that Coles carried his drugs and his firearm in a "fanny pack."  (See, e.g., 4/21/22 Tr. 101:9-23; see also 4/19/22 Tr. 98:15-99:16 (Adams testifying Coles "regularly" had fanny pack on him but she did not know what it contained)).  None of the witnesses who described the "fanny pack" were shown the photograph of the black pouch for comparison or identification, and the government does not suggest the "pouch" seized from Smith's apartment was the same bag in which Coles often stored his drugs and gun.

locked cabinet inside the home.  See id.  The court of appeals determined there was enough proof from which the jury could find the defendant constructively possessed the grenades, including, *inter alia*, that he resided in the home with his wife until a week before the search, he was seen in the vicinity of the home during the search, and his wife's keys did not work to unlock the cabinet.  See id. at 270-71.  That the grenades were stored in a secured location which only the defendant could access was central to the court's determination that the defendant possessed the grenades even after he no longer had access to the residence.  See id.

The record *sub judice* is in stark contrast.  Any number of people could have accessed Smith's apartment during the two weeks between Coles' arrest and law enforcement's search.  It was a known trap house frequented by countless drug users.  And the apartment was unsecured: one officer testified that the apartment door was hanging open when they arrived and he had "no idea" how long it had been open.  (See 4/20/22 Tr. 187:8-11, 208:8-25).  Given the number of drug users who frequented the apartment, the constant replenishment of the drug inventory, the transient nature of drugs, the length of time between Coles' arrest and the search, the fact the apartment door was open for an unknown amount of time, and the lack of any substantive evidence linking Coles to the particular drugs found, we conclude there is insufficient evidence to support the jury's finding that Coles possessed the drugs seized from Smith's apartment on July 22, 2016.  Accordingly, we will grant his motion for judgment of acquittal as to Count Seventeen.

### C.    Motion for Judgment of Acquittal: Count Nineteen

Finally, Coles seeks judgment of acquittal on Count Nineteen, which charges possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c).  The jury convicted Coles on this count as a principal, as an aider and abettor, and as a <u>Pinkerton</u> coconspirator.  Coles contends lay witness testimony from individuals who personally observed him with a firearm is insufficient to support this Section 924(c) conviction.  (<u>See</u> Doc. 1386 at 17).  He suggests the government is required to seize the firearm and enter it into evidence to establish "exactly what kind of firearm" he possessed and whether it "was properly functioning and met the legal definition of a firearm."  (<u>See</u> <u>id.</u>)

The law is to the contrary.  Our court of appeals has long accepted lay witness testimony as adequate to support a firearm conviction.  <u>See, e.g.</u>, <u>United States v. Beverly</u>, 99 F.3d 570, 571-73 (3d Cir. 1996) (testimony of robbery victim that defendant wielded "a chrome-plated revolver" sufficient to support Section 924(c) conviction even when gun was not recovered); <u>United States v. Trant</u>, 924 F.3d 83, 93 (3d Cir. 2019) (citing <u>Beverly</u>, 99 F.3d at 571-73) (lay witness testimony that he saw "imprint of a gun" in defendant's waistband, that defendant revealed "gun in his waist," and that witness "knew what he saw was a gun, describing it as a Glock that looked like one that he owned" sufficient for Section 922(g) conviction).  Such testimony is especially reliable if the witness observed the firearm more than once or was threatened with it, either of which decreases the likelihood the witness was mistaken about the weapon's authenticity.  <u>See</u> <u>Beverly</u>, 99 F.3d at 573.

Witness after witness in this case testified to observing Coles with a gun while dealing drugs.  They described the weapon (an automatic handgun), where he carried it ("in his waistband" or "fanny pack"), and how often he carried it ("[d]uring drug transactions mainly all the time" and "always").  (See, e.g., 4/18/22 Tr. 166:20-167:5; 4/19/22 Tr. 125:23-126:7, 155:14-156:18, 196:4-198:6, 208:1-8, 231:2-235:11; 4/20/22 Tr. 30:16-31:15; 4/21/22 Tr. 101:9-23).  Several witnesses testified that Coles used his gun to threaten and to intimidate them.  (See 4/19/22 Tr. 155:14-156:18, 199:22-203:24, 231:2-235:11).  Witnesses also testified that Dickerson, Coles' partner in crime, regularly carried a firearm.[17]  (See, e.g., 4/18/22 Tr. 166:20-167:5; 4/19/22 Tr. 95:1-96:16, 197:21-198:6).  Given the vast corroborative testimony, the court concludes the record evidence is more than adequate to support Coles' conviction at Count Nineteen on all three theories of criminal responsibility.

### D.    Motion for New Trial

Coles alternatively contends that the interests of justice demand we grant him a new trial.  Specifically, Coles claims the court's evidentiary rulings deprived him of his right to a fair trial.  (See Doc. 1386 at 17-19).  He targets three rulings: (1) our conclusion that testimony from Robin Gould about what he overheard Chaney say about an affair between Amber Jackson (victim Phillip Jackson's widow) and

---

[17] The jury found Coles to be equally responsible for Dickerson's firearm on aiding-and-abetting and Pinkerton theories.  (See Doc. 1337 at 11).

Torey White was *likely* inadmissible hearsay;[18] (2) our conclusion that testimony from Pennsylvania State Police Trooper Hershey that Chaney's mother told him that Chaney told her that Chaney and White fought shortly before the murders over his affair with Amber Jackson was not admissible under the residual exception to the rule against hearsay; and (3) our conclusion that lengthy extraction reports for Amber Jackson's cell phone and iPad should not go to the jury room when only the title page of each document was shown and explained to the jury at trial.  (See id.) Coles says these rulings in combination "neutralized important defense theories"—namely, Coles' desire to paint Amber Jackson as an alternate suspect.[19]  (See Doc. 1446 at 12).

We note as a threshold matter that Coles does not identify any error in the court's rulings.  He simply remonstrates that he does not like them.  That is hardly a basis for the "exceptional" remedy of a new trial.  See Silveus, 542 F.3d at 1005 (citation omitted).  Moreover, any suggestion our evidentiary rulings tilted unfairly against Coles ignores that they went both ways.  For example, the court prohibited

---

[18] We did not rule that Gould's testimony was inadmissible.  Rather, we reminded counsel of our earlier ruling that Coles, as the alleged wrongdoer, could not use the forfeiture-by-wrongdoing exception to get out-of-court statements by the deceased victims into the record.  (See 4/26/22 Tr. 184:15-23).  The court then cautioned counsel to be careful with Gould's testimony and emphasized they must fit the testimony into a hearsay exception for it to be admissible.  (See id. at 185:4-9).  After brief discussion off the record, Coles' counsel reported "Mr. Gould's testimony would be strongly related to hearsay" and elected not to call him as a witness.  (See id. at 185:13-16).

[19] We will not restate our rationale for each of the challenged rulings here; rather, we incorporate the reasoning articulated at length on the record as though fully set forth herein.  (See 4/26/22 Tr. 166:4-170:2 (Trooper Hershey), 182:21-185:16 (Robin Gould); 4/28/22 Tr. 92:3-99:21 (extraction reports)).

Lorisha Adams from offering the only evidence the government had about what Dickerson said of Coles' role in the murders. Adams' testimony was technically admissible on the drug charges, but it was not on the murder charges, and to avoid prejudice to Coles, we did not let the testimony come in at all. (See 4/19/22 Tr. 4:5-16:25). The record reflects a careful and measured application of the Federal Rules of Evidence from start to finish. A new trial is not warranted.[20]

## IV.   <u>Conclusion</u>

The court will grant in part and deny in part Coles' motion for judgment of acquittal. The court will deny Coles' motion for a new trial. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     December 2, 2022

---

[20] The only evidentiary ruling which reflects a true exercise of discretion is the court's conclusion regarding Amber Jackson's phone and iPad records. But even if Coles had established an abuse of discretion, any error was harmless. <u>See</u> <u>United States v. Casoni</u>, 950 F.2d 893, 902 (3d Cir. 1991). The court and the parties were still attempting to work through this dispute when the jury reported it had reached a verdict. (<u>See</u> 4/28/22 Tr. 95:8-9). Thus, even though Coles' counsel encouraged the jury during closing argument to peruse the extraction reports in search of proof of his alternate theory, the jury was sufficiently persuaded by the government's case-in-chief and did not need to further scrutinize the reports.